# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR, KAREN
WALKER, his wife, D.W., JR.., minor
child, and T.W., minor child,

        Plaintiffs,

        v.

THE CITY OF WILMINGTON, a political
subdivision of the State of Delaware,
DETECTIVE MICHAEL R. LAWSON, JR.,
individually and in his official capacity, and
UKNOWN ENTITIES.

        Defendants,

:        C.A. No. 06-288***

## APPENDIX TO DEFENDANT'S OPENING BRIEF IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

### VOL. II

Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants

## TABLE OF CONTENTS

**VOL I.**

Crime Reports ................................................................. A-1

Supplemental Crime Report ...................................................... A-25

Search Warrant ............................................................... A-36

DELJIS Criminal Record on Dwayne A. Walker ....................................... A-38

DELJIS Larceny Report for 118 Dutton Drive ........................................ A-45

Arial Map of 118 Dutton Drive .................................................... A-46

DELJIS Drivers License Inquiry on Karen Walker ..................................... A-47

DELJIS Drivers License Inquiry on Dewayne Walker, Sr. ................................ A-49

Detective Lawson's Warrant Affidavit .............................................. A-50

DELJIS Report on Dwayne Walker. ................................................ A-52

Wanted Poster for Dwayne Walker ................................................ A-59

Defendants Rule 26 Disclosures .................................................. A-60

Plaintiffs' Answers to Defendants' Interrogatories .................................... A-64

Wilmington Police Department Crisis Management Reports .............................. A-70

Wilmington Police Department Directive 6.11 ........................................ A-93

**VOL. II**

Deposition Transcript of Michael R. Lawson ......................................... A-110

Deposition Transcript of Jeffrey Silvers ............................................ A-175

Deposition Transcript of Confidential Informant ..................................... A-198

Deposition Transcript of Dewayne Walker, Jr. ....................................... A-226

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR., KAREN WALKER, )
his wife, D.W., JR., minor child, )
and T.W., minor child, )
                                   )
        Plaintiffs, )
                                   )
v. )     Civil Action No.
         )     06-288 KAJ
THE CITY OF WILMINGTON, a political)
subdivision of the State of )
Delaware, DETECTIVE MICAHEL R. )
LAWSON, JR., individually and in )
his official capacity, and )
UNKNOWN ENTITIES, )
                                   )
        Defendants. )

        Deposition of MICHAEL R. LAWSON, JR., taken
pursuant to notice at the offices of Biggs & Battaglia,
921 North Orange Street, Wilmington, Delaware, beginning
at 9:00 a.m. on Tuesday, December 5, 2006, before Anne
L. Adams, Registered Professional Reporter and Notary
Public.
APPEARANCES:
        PHILIP B. BARTOSHESKY, ESQ.
        BIGGS & BATTAGLIA
        921 North Orange Street
        Wilmington, Delaware  19899
        For the Plaintiff,
        ALEX J. MILI, JR., ESQ.
        SENIOR ASSISTANT CITY SOLICITOR
        City of Wilmington Law Department
        800 N. French Street, 9th Floor
        Wilmington, Delaware  19801
        For the Defendants.
------------------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

A-110



**WILCOX & FETZER LTD.**
Registered Professional Reporters



2

1          MICHAEL R. LAWSON, JR.,

2      the witness herein, having first been

3      duly sworn on oath, was examined and

4      testified as follows:

5                  EXAMINATION

6  BY MR. BARTOSHESKY:

7      Q.   Mr. Lawson, my name is Phil Bartoshesky.  I

8  represent DeWayne Walker and his family in this

9  litigation.  Have you ever given testimony in a

10  deposition before?

11      A.   Sure.

12      Q.   Just I'm going to go over a couple ground rules

13  anyway.  You understand the court reporter is taking

14  down everything we say.  So it's important we try not to

15  talk at the same time.  A lot of times you will try to

16  anticipate where a question is going.  But it's

17  important to wait until I finish the question and I will

18  try to do the same, wait until you finish your answer

19  before I start the next question.  If there is any

20  question that you don't understand or sounds like it

21  doesn't make sense to you, let me know and I will try to

22  clear that up.

23      A.   Sure.

24      Q.   If you need to take a break at any time, that's



3

1    fine.   Just let us know.

2    A.    Okay.

3    Q.    Can you state your full name, please?

4    A.    First name is Michael, middle initial R for Ray,

5    R-A-Y, last name Lawson, L-A-W-S-O-N.

6    Q.    You are a detective in the Wilmington Police

7    Department?

8    A.    Yes.

9    Q.    How long have you been a detective?

10   A.    Since November of 1998.

11   Q.    In 2005, what were your responsibilities or what

12   was your assignment?

13   A.    I handled robberies and homicides.

14   Q.    How long have you been in the robbery/homicide

15   division or department?

16   A.    Since November of '98.

17   Q.    And in 2005, in September 2005, you were

18   involved in the investigation of a stabbing death and

19   this litigation concerns a raid -- I'll call it a

20   raid -- at Mr. DeWayne Walker's house in New Castle.   Do

21   you remember that case?

22   A.    Search warrant, yes.

23   Q.    And the victim of that stabbing was, do you

24   remember?



Michael R. Lawson, Jr.

4

1    A.    DeWayne Freeman.

2    Q.    You executed the search warrant, you were part

3    of the team that executed the search warrant in New

4    Castle at 118 Dutton; is that right?

5    A.    I came in after the SWAT Team did the search

6    warrant, correct.

7    Q.    Were you there when the search team went into

8    the house?

9    A.    Yes.

10    Q.    And you had, at some point, had a concern with

11    Mr. DeWayne Walker; is that correct?

12    A.    Yes.

13    Q.    Did you give him your business card?

14    A.    Yes.

15    Q.    And why did you do that?

16    A.    Well, when I walked in, I asked someone from the

17    SWAT Team if they had found Dwayne Walker, the subject

18    we were looking for.  They said he was in the basement.

19    When I went to the basement, I saw Mr. Walker in the

20    basement.  He was handcuffed.  I immediately realized

21    that it was not the same Dwayne Walker that I had signed

22    warrants for.

23         I showed him a picture of the subject we

24    were looking for, Dwayne Walker.  I asked if he knew

Michael R. Lawson, Jr.

5

1  him, if he was a relative.  I asked him if he stayed

2  there.  He said no.  He stated something to the effect

3  of you have the wrong house.

4          At that time, I asked if he had any

5  identification.  He gave me a wallet.  He was

6  unhandcuffed.  I ran a check on him to make sure he was

7  not wanted.  And then after that, I gave him my card

8  told him we obviously had the wrong house.  I apologized

9  to him and explained to him that, unfortunately, the

10  person has the same name as you.  We had information

11  that he was staying at this location.  And that's why we

12  did the search warrant.

13     Q.   Is this the card that you gave him?

14     A.   Yes.  But it didn't have the 576-3620.  I did

15  not write that.  I wrote on the back my direct line,

16  576-3643.

17     Q.   Do you know what the number is on the front?

18     A.   That's the number to our main phone line up in

19  detectives, 3620.

20     Q.   That's not your handwriting on the front?

21     A.   No, it's not, just the secretary.  This is my

22  handwriting on the back.  That's my direct line.  That's

23  what I gave him.

24     Q.   Did you tell him that he could call you or call



Michael R. Lawson, Jr.

6

1  somebody to fix the damage that was done by the

2  officers?

3    A.   Yes.

4    Q.   And did you witness -- did you look around and

5  see any damage to the house?

6    A.   There was no damage.

7    Q.   Let me show you a photograph.

8         MR. BARTOSHESKY:   First let me -- I made a

9  photocopy of this card.  Can we mark that as Lawson

10 Number 1?

11        MR. MILI:   If you are going to get into

12 photographs, are these the same photographs that were

13 disclosed in response to my request for production?

14        MR. BARTOSHESKY:   Yes, they are.   The

15 request for production were photocopies.

16        (Lawson Exhibit No. 1, Copy of Business

17 Card, was marked for identification.)

18 BY MR. BARTOSHESKY:

19   Q.   Detective, we've just laid out 15 photographs

20 that Mr. Walker took of portions of his house after the

21 SWAT raid back in September of 2005.  Let me show you

22 one that shows a, it looks like the edge of a door.

23 These first two here, and I'm going to ask the court

24 reporter, we'll mark them Lawson 2 and 3.

Michael R. Lawson, Jr.

7

1    But you didn't see any damage like that at

2 the house?

3    A.    Not that I can recall, no.    This appears to be

4 the storm door that was unlocked when the SWAT Team

5 entered the house.

6    Q.    And did you look around to see if there was any

7 damage or did you just go in, talk to Mr. Walker, run

8 your check and then leave?

9    A.    When I went in, I didn't look for damage

10 initially.    When I left, I asked if there was any damage

11 because someone told me the door was not breached.

12 Because normally with the SWAT team, they have to force

13 entry.    They have to breach the door.    I was concerned

14 about damage to the door.    And that's why I explained to

15 Mr. Walker that if he had any questions to please give

16 me a phone call.    But I was told that there was no

17 damage on the door itself.

18    Q.    And who told you that?    Do you remember?

19    A.    Someone from the SWAT Team.

20    Q.    You don't remember specifically who it was?

21    A.    No.

22    (Lawson Exhibit Nos. 2 and 3, Photographs,

23 were marked for identification.)

24    THE WITNESS:    The damage you are referring



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-116

Michael R. Lawson, Jr.

8

1    to is, I guess, where these four screws are to the storm

2    door that go into the frame itself.

3    BY MR. BARTOSHESKY:

4        Q.    You didn't see anything like that?

5        A.    No.    Were these taken that day?

6        Q.    They were taken shortly after is all I know.

7              Detective, you are looking at another

8    picture.    You didn't see anything like that either at

9    the house?

10       A.    No.

11       Q.    It looks like the front of a door.    We'll mark

12   that one Number 4 and this one Number 5.    You didn't see

13   anything like that?    It looks like the hinge is sort of

14   popped off of the door.

15       A.    No.    Because when the SWAT Team approached the

16   dwelling, the storm door was closed.    The front door was

17   open.    And from what they told me, they actually saw

18   Mrs. Walker and that's when they entered the dwelling.

19       Q.    Did you see them go in?

20       A.    No.

21              (Lawson Exhibit Nos. 4 and 5, Photographs,

22   were marked for identification.)

23   BY MR. BARTOSHESKY:

24       Q.    So what you are talking about, the state of the

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A-117

Michael R. Lawson, Jr.

9

1    door, the storm door, being closed and the inside door

2    open, that's something that you believe because somebody

3    told you that?

4        A.    Certainly.

5        Q.    So you didn't see the door yourself; is that

6    right?

7        A.    I saw the door that day.

8        Q.    I mean, before --

9        A.    I didn't see any damage to it.

10        Q.    Before the SWAT Team went in, you didn't see the

11    door?

12        A.    No.

13        Q.    So --

14        A.    I'd never been to the house before then.

15        Q.    This raid happened at about what time in the

16    morning?

17        A.    Roughly 6:00 a.m.

18        Q.    And where were you when the SWAT Team went in?

19        A.    We were on the main road coming into the

20    development.  We had parked our car.  The SWAT Team was

21    in front of us.  They exited.  They made the entry and

22    we exited our vehicles once it was safe and went inside.

23        Q.    When you say we, who is we?

24        A.    Myself and whoever was with me.  I believe it



Michael R. Lawson, Jr.

10

1    was Detective Steve Massetic or possibly Detective Ralph

2    Hauck.

3        Q.    You didn't actually see the SWAT Team go into

4    the house; is that correct?

5        A.    Correct.

6        Q.    Because you were parked down a ways?

7        A.    Correct, just around the corner.  As I recall,

8    there is a main street and then you turn onto, I think,

9    I believe it's Dutton.  You turn left.  And we were on

10   that main street probably like maybe 40, 50 yards away.

11       Q.    Now, this house that was 118 Dutton, that's not

12   in the City of Wilmington; is that correct?

13       A.    Correct.  It's in New Castle.

14       Q.    And normally that location would be under the

15   jurisdiction of New Castle City Police?

16       A.    New Castle County Police.

17       Q.    Before you and the Wilmington SWAT Team went

18   into that house, was there any notification of the

19   county police that you were going to do that?

20       A.    There may have been.  I'm not a hundred percent

21   sure.  Normally our protocol is to notify RECOM to let

22   them know we were doing a search warrant within their

23   jurisdiction.  And we normally give them the address.

24   And, normally, that's done by a supervisor of the SWAT

Michael R. Lawson, Jr.

11

1    Team or a supervisor of my division.

2        Q.   But you don't know if it was done in this case

3    or not?

4        A.   I do not know.

5        Q.   Would there be some written record of that if it

6    was done?

7        A.   I doubt it.

8        Q.   Just be a telephone call probably?

9        A.   Correct.

10       Q.   Now, there have been two files, I will call

11   them, produced in this case.  I want to ask the court

12   reporter to mark both of them.

13                  (Lawson Exhibit No. 6 and 7, Files, were

14   marked for identification.)

15   BY MR. BARTOSHESKY:

16       Q.   Let me show you the one marked Exhibit Number 6.

17   And if you can go through and tell me what that file is.

18   This one, by the way, we will call it Bates stamped 1

19   through 35, I think.

20       A.   The first page is the Crime Report itself, the

21   initial Crime Report.  This is taken by the officer who

22   responds to the scene and who handles the initial

23   complaint, which on this day was Corporal Maureen

24   Binkley.

Michael R. Lawson, Jr.

12

1    Q.    Is this what has been marked, these 35 pages

2    that have been marked Exhibit Number 6, is that document

3    a separate file?  Is that how it's kept someplace, those

4    35 pages?  Or are these something that come from

5    different sources that were put together for the

6    purposes of this litigation?

7    A.    These are all the documents that are written by

8    the officers who are involved in the investigation.

9    Q.    Are those 35 pages as a group someplace in the

10   police files?  Is that how it's kept?

11   A.    Yes.

12   Q.    Can I ask you to look at the bottom marked Page

13   Number 6?  This is a supplemental report it says at the

14   top.

15   A.    Yes.

16   Q.    Your name is at the bottom.

17   A.    Yes.

18   Q.    Did you, essentially, put together what's on

19   this page?  How did the information on this page get

20   there?

21   A.    It's generated -- once I do the arrest, you have

22   to fill out a supplement as far as when the person is

23   arrested.  It's just, basically, just the day that he

24   was arrested.

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

A-121

Michael R. Lawson, Jr.

13

1    Q.    And the information under suspect/defendant

2    information, it has name, SBI number.

3    A.    Yes.

4    Q.    Where did all that information come from?

5    A.    DELJIS.

6    Q.    Is something that DELJIS prints on this form or

7    is it something that comes up on another piece of paper

8    and you put it on here?

9    A.    No.  It's all printed by DELJIS.

10   Q.    So this wasn't generated until after the arrest;

11   is that what you are saying, this document?

12   A.    Correct.

13   Q.    And the arrest was on --

14   A.    The 15th of September.

15   Q.    On Page 14 of this Exhibit Number 6, this is, I

16   guess, a report of a narrative generated by Sergeant

17   Drysdale; is that correct?

18   A.    Yes.

19   Q.    The last part, it says he sent the information

20   to you?

21   A.    Correct.

22   Q.    Were you, I guess, the lead investigator on this

23   case?

24   A.    The chief investigator, yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

A-122

Michael R. Lawson, Jr.

14

1    Q.    Now, it says here on the 13th, there was a

2    conversation between Sergeant Drysdale and someone who

3    wanted to remain anonymous talking about the perpetrator

4    who stabbed DeWayne Freeman, nickname Weasel, who was

5    described -- it goes on to tell a description.  But from

6    that information, were you able to find out who Weasel

7    was or did you know who Weasel was?

8    A.    Eventually we found out either on the 13th or

9    14th.  We have a positive identification as far as who

10   Weasel was, yes.

11   Q.    How did you get that positive?

12   A.    Through a witness identification through a photo

13   lineup.

14   Q.    If you look at the page, starting on Page 25 is

15   your summary of this whole case?

16   A.    Yes.

17   Q.    And on Page 27, which is part of your narrative,

18   you spoke to a woman, Shonda Wright?

19   A.    Yes.

20   Q.    Is that where you first learned that Weasey or

21   Weasel, both names are used here, was Dwayne Walker?

22   A.    Yes.

23   Q.    And it says here that she was shown a photo

24   lineup and identified Mr. Dwayne Walker; is that right?



Michael R. Lawson, Jr.

15

1    A.    Yes.

2    Q.    How is it that you had his photo already to show

3    her at this point?

4    A.    He had a previous arrest history and he was

5    arrested previously.

6    Q.    But why was he one of the people that -- I

7    understand you had his photo because he had a record.

8    But why was he one of the people that you showed in the

9    photo lineup to Miss Wright?  It seems to me you would

10   have to already suspect he was a possible suspect before

11   you talked to her if you were going to show her a

12   picture.

13   A.    It was either Shonda or another witness who told

14   us his name.

15   Q.    So this Shonda Wright, that's not the first time

16   that you suspected Dwayne Walker was the perpetrator of

17   this crime; is that right?

18   A.    It may have been the first time, yes.  The

19   information we had early on was that a subject named

20   Weasey or Weasel was the person who stabbed Mr. Freeman.

21   And speaking with Shonda and speaking with another

22   witness, we developed the name Dwayne Walker, who goes

23   by the nickname of Weasey.  That's when I put the photo

24   lineup together and she picked him out.

Michael R. Lawson, Jr.

16

1    Q.    From his prior arrest and his record, was he

2    already identified with that pseudonym, nickname,

3    whatever you want to call it, Weasey?

4    A.    He may have been.  I'm not a hundred percent

5    sure.

6    Q.    What I'm trying to figure out, at least

7    chronologically, this looks like the first time, in your

8    report, Dwayne Walker is identified as the suspect.  But

9    to have his photo ready to show somebody, you must have,

10   in my mind, must have had some inclination.

11   A.    This isn't just like within five minutes.  This

12   is probably a few hours.  And I'm not sure if it was

13   Shonda or someone else who gave us his name.

14   Q.    If you look on the next page, there is an

15   interview you did with Robin Lindsey where he was

16   identified in the photo lineup.

17   A.    Right, because Robin told us Dwayne Walker is

18   Weasey.  Most of these people were at our police

19   department that day when we did the interviews.  One or

20   maybe even more of these people knew him as Dwayne

21   Walker, Weasey.  I'm not a hundred percent sure if

22   Shonda knew his name as Dwayne Walker or just knew him

23   as Weasey.  Out of these witnesses, at least one subject

24   knew him as Dwayne Walker and that's how we got his

Michael R. Lawson, Jr.

17

1    photograph.

2        Q.    So at this point, when you find out that Dwayne

3    Walker is Weasey and these people are saying that he's

4    the one that did this stabbing, do you then -- what do

5    you do then?  Did you put his name in the DELJIS at that

6    point?

7        A.    Yes.

8        Q.    And when you did that, did you come up with the

9    address that shows up on this Suspect Supplemental

10   Report we looked at on Page 6 earlier?  Is that the same

11   information that would have come up on the 13th?

12       A.    Most likely, yes.

13       Q.    And that shows an address, 703 --

14       A.    West Fifth Street.

15       Q.    Did somebody go to that address to see what was

16   going on there?

17       A.    Someone did.  And he did not reside there.

18       Q.    Is there someplace in your report or any of

19   these reports that shows somebody going to that address?

20       A.    I don't believe it's in my report.  But I do

21   recall that that address was either a bad address or he

22   did not reside there.  I'm sure that it's probably not

23   in the report.

24               On Page 34 it says I went to 1103 West Fifth



Michael R. Lawson, Jr.

18

1   Street at his grandmother's house.  Because I had

2   information that he was staying with his grandmother.

3   And she had recently moved about a week prior.  I'm just

4   on the top paragraph.  And I'm not sure if 703 was just

5   a bad address in general or what the problem was with

6   703.

7        Q.   Did you talk to his grandmother?

8        A.   I believe I spoke with her on the phone.  And

9   she had moved over onto the east side either near

10  Bennett or Pine Street.

11       Q.   Back on Page 28, a couple paragraphs there talk

12  about your interview with Robin Lindsey.  It mentions,

13  it says Weasey's sister Tranika.

14       A.   Yes.

15       Q.   Did you try to find his sister?

16       A.   Yes.

17       Q.   Did you?

18       A.   No.

19       Q.   Do you remember what you did to try to find her?

20       A.   Went to her grandfather's house on 227 North

21  Jackson Street.  I went later during the investigation,

22  delivered a subpoena to her residence on Baylis Street,

23  33-A Baylis in New Castle.  Because she was she was

24  someone that I was interested with.  She was wanted on a

Michael R. Lawson, Jr.

19

1   capias and I had information that she was actually close

2   to the scene and made comment to someone else regarding

3   my brother just stabbed that boy.

4       Q.   That's what it says here on Page 28, right, it

5   says my brother just stabbed Freeman.  That's him lying

6   on the ground?

7       A.   I would have to read it.  But I'm just going by

8   my recollection.  That's accurate, right.

9       Q.   That's what Robin Lindsey told you?

10      A.   Uh-huh.

11      Q.   And did you ever talk to Tranika?

12      A.   No.  She never came in.  I had a subpoena issued

13  by the Attorney General's Office.  What I'm figuring,

14  her brother is involved.  She doesn't want to get

15  involved.  Plus, she's wanted.  So --

16      Q.   Now, several of these entries, at the end they

17  say the interview was preserved on videotape.  Are those

18  tapes still in existence?

19      A.   I'm sure they are.

20      Q.   Where would they be?

21      A.   At our police department.

22      Q.   They would all be in the Dwayne Walker file; is

23  that accurate?

24      A.   Pretty much.



Michael R. Lawson, Jr.

20

1    Q.    Now, you said you went to someplace in New

2    Castle looking for Tranika.  Do I recall that correctly?

3    A.    Uh-huh.

4    Q.    Is there anything in your report about that?

5    A.    I don't believe so, no.

6    Q.    You remember that?

7    A.    Yes.

8    Q.    Is there anyplace that you would have put that

9    in writing, that part of the investigation?

10   A.    Maybe some notes or a notebook or something.

11   Q.    Would that still be in existence?

12   A.    Sure.

13   Q.    So there are writings about your investigation

14   of this case that aren't included in this package or --

15   A.    Absolutely, uh-huh.

16   Q.    And they are all --

17   A.    Yeah.  I just don't remember everything in my

18   head obviously.  Just like you take notes, we take notes

19   during the investigation.  It will all be with notes or

20   something.

21   Q.    Now, Page 33 of your summary or report

22   narrative, that's the only thing I see in your report

23   that mentions the execution of the warrant on 118 Dutton

24   Drive.  Do you remember writing anything else about that

Michael R. Lawson, Jr.

21

1   for your report?

2      A.   No.  That's it.  There is no reason to write

3   anything else.  We were, obviously, at the wrong house.

4      Q.   On Page 23 of that document, it's the report of

5   Dwayne Walker turning himself in.  It says this

6   officer -- and then it's Sergeant, is it Akil?

7      A.   Fahime Akil.

8      Q.   It says was contacted by PC.  What does PC stand

9   for?

10     A.   Just person contacted.

11     Q.   And is that Reverend Derrick Johnson?

12     A.   Yes.

13     Q.   And saying that Dwayne wanted to turn himself

14   in.  It says this officer met PC, the subject, in the

15   400 Block of East 4th Street.  Why is that the location

16   where they met?

17     A.   I have no idea why that's the location where

18   they met.  But that's directly in front of our police

19   department.

20     Q.   And did you have any contact with the reverend,

21   Derrick Johnson, with respect to this situation?

22     A.   Before or after?

23     Q.   At any time.

24     A.   Just the day of the arrest.  He was there.  I

Michael R. Lawson, Jr.

22

1  shook his hand, thanked him for bringing him in.  That

2  was the end of the conversation.

3      Q.  It says farther down that PC advised that he was

4  contacted by the family who advised that their relative

5  was wanted.  Did you talk to Derrick Johnson about the

6  connection, that connection, the family connection?

7      A.  I believe I did.  And I believe he said that

8  either Dwayne himself or his mother had contacted him

9  and that he wanted to turn himself in.  And that was the

10  end of it.

11      Q.  Did you ever talk to Dwayne Walker's mother?

12      A.  No.

13      Q.  Did you ever try to?

14      A.  Yes.

15      Q.  And what happened when you tried to?

16      A.  Called her several times on her phone.  She

17  never returned the phone calls.  Went to her house after

18  I found out she lived on Baylis Street in New Castle.

19  Had no response.  Delivered a subpoena there and had no

20  response from the subpoena.

21      Q.  Was this all after the arrest?

22      A.  Yes.

23      Q.  And how did you find out that she lived on

24  Baylis Street in New Castle?



Michael R. Lawson, Jr.

23

1    A.    From her son, Dwayne.

2    Q.    After he was arrested?

3    A.    Correct.   There was nothing in our records that

4    showed her to live on Baylis Street, from what I recall,

5    until after he was arrested.

6    Q.    I'm going to ask you to look at what has been

7    marked as Number 7, which is another set of documents

8    that has been produced by the city's attorneys in this

9    case.   The first page, the first two pages, I guess, is

10   a letter from Mr. Mili, which isn't actually part of

11   your files or anything else.   It's just a transmittal

12   letter.   But the next few pages of this have to do with

13   the warrant that was issued that led to the

14   September 15th raid on Mr. DeWayne Walker's house.

15          The Affidavit of Probable Cause that you

16   executed -- it's about four or five pages in I guess --

17   at the bottom, Paragraph 8 talks about a proven reliable

18   informant contacting Detective Jeff Silvers.

19          At this point, I know there is a concern

20   about keeping this person's name confidential.   So I'm

21   not going to ask you to identify him on the record here.

22   But do you know this informant.   Did you have any

23   personal knowledge of this informant?

24   A.    No.



Michael R. Lawson, Jr.

24

1    Q.    Anything you heard about him came from Detective

2    Silvers?

3    A.    Yes.

4    Q.    And what did Detective Silvers tell you about

5    the reliability of this informant?

6    A.    He said he's used him in the past, he's past

7    proven reliable, that he knows Dwayne Walker very well

8    and provided us information as far as where he was

9    staying at.

10    Q.    Did Detective Silvers give you examples of

11    information that this informant had given him in the

12    past that proved reliable?

13    A.    No.

14    Q.    You just took his word that he was reliable?

15    A.    Absolutely.

16    Q.    Did you have any information where this

17    informant had given information that didn't prove

18    accurate?

19    A.    No.

20    Q.    So if we want to find out about the reliability

21    of this informant or why Detective Silvers believed he

22    was reliable, we would have to talk to Detective

23    Silvers?

24    A.    Correct.



Michael R. Lawson, Jr.

25

1    Q.   You didn't personally talk to the informant; is

2  that correct?

3    A.   Correct.

4    Q.   So the information that shows up in Paragraph 8

5  is all from Detective Silvers?

6    A.   Correct.

7    Q.   Did he give any more information than what is

8  here?

9    A.   Yes.

10    Q.   What other information did he give?

11    A.   He told us that he had been at his grandfather's

12  house on 227 North Jackson Street earlier and that he

13  had left in a vehicle, that he was planning on fleeing

14  Delaware because he knew he was wanted, and that he was

15  staying with his mom at a house that no one knows where

16  the, no one was familiar with the location because it

17  was a newer house where his mom had lived as far as her

18  residence, and that he was staying there behind the

19  Wilton area.

20    Q.   That's all information that Silvers told you

21  through the informant?

22    A.   Relayed to me, correct.

23    Q.   And that the mother's house was in New Castle?

24    A.   In the Wilton area, correct.



Michael R. Lawson, Jr.

26

1    Q.    And did you do anything to -- well, when you got

2    that information, what did you do next to find out a

3    better location than just in the Wilton area?

4    A.    We searched records in DELJIS looking for any

5    New Castle area that would be around Wilton or in

6    Wilton.  And Detective Silvers, actually, eventually

7    found 118 Dutton for "Dwayne" Walker, Jr.  There was an

8    incident there.  I believe it was a domestic situation

9    maybe a few years ago where "Dwyane" Walker, Jr., was a

10   witness to some type of domestic or incident at that

11   residence.

12   Q.    Well, let me show you, if you look three or four

13   pages past that, there is a DELJIS report.  It says at

14   the top, 9/14/05, Criminal Justice Information System,

15   Pending Complaint Incident Inquiry.  Is that what you

16   are talking about?

17   A.    Yes.

18   Q.    It shows the victim of a larceny being Karen

19   Alicia Walker, correct?

20   A.    Yes.

21   Q.    And then a witness, "Dwayne," no middle name

22   Walker, J.

23   A.    Correct.

24   Q.    Now, is that showing that his residence -- does



Michael R. Lawson, Jr.

27

1   that mean his residence, the witness, is 118 Dutton

2   Court?

3       A.   Yes.

4       Q.   And that was in 2003?

5       A.   Yes.

6       Q.   And that is the address where you did the raid?

7       A.   The search warrant?

8       Q.   The search warrant.

9       A.   Yes.

10      Q.   Are you sure of that?  If look at your

11   affidavit, it says 118 Dutton Drive.  Is that the same

12   address?

13      A.   Yes.

14      Q.   Dutton Court and Dutton Drive are the same

15   street?

16      A.   In New Castle, yes.

17      Q.   Now, the name here, "Dwayne" Walker, did you

18   ever talk to Mr. "Dwayne" Walker, Jr., at 118 Dutton

19   Court?

20      A.   I recall he was there.  I believe he was in his

21   bedroom.  I don't believe I spoke with him, no.

22      Q.   Now, when you got this report, did you believe

23   that this "Dwayne" Walker that's mentioned in this -- is

24   this a DELJIS report by the way?

Michael R. Lawson, Jr.

28

1     A.    Yes.

2     Q.    -- that's mentioned in this DELJIS report was

3 your suspect?

4     A.    Did I believe that at the time?  Yes.  May have

5 been my suspect, sure.

6     Q.    And that he was living at that address in 2003,

7 September, 2003?

8     A.    Yes.

9     Q.    Did you go back and -- the suspect here had a

10 record; isn't that correct?

11    A.    Uh-huh.

12    Q.    Going back 10 or so years?

13    A.    Right.  There was nothing else linking him to

14 Dutton Court.

15    Q.    Was there anything that showed where he was in

16 2003?

17    A.    I'm sure there was.

18    Q.    Actually, the record is in this package that

19 we've seen.  It's a couple pages past where you are

20 there.  And let me ask and then you can tell me if this

21 makes sense or not.  On the page here that says 2 of

22 7 --

23    A.    Yes.

24    Q.    -- it looks to me like there is a, if you go



Michael R. Lawson, Jr.

29

1  down the page, September 14, 2001, entry. I guess that

2  was guilty pleas or something. And then the next entry

3  is 3/25/05?

4      A.    Uh-huh.

5      Q.    Does that mean no one knew where he was or there

6  is no DELJIS report on his activities in that time

7  frame?

8      A.    No. He could have been incarcerated. He could

9  have been out of state. I have no idea.

10     Q.    And, in fact, this shows, the entries on

11 9/14/2001, show convictions entered or pleas and it says

12 you can click to view sentence detail. Did anybody look

13 at that to see if maybe he was incarcerated in 2003?

14     A.    At the time, no. I know I did not.

15     Q.    And I guess when he was arrested, he was still

16 on parole though; wasn't he?

17     A.    Probation.

18     Q.    In 2005?

19     A.    Correct.

20     Q.    Now, you mentioned that you did see "Dwayne"

21 Walker, Jr., at Dutton Court on the 15th?

22     A.    Yes.

23     Q.    Did you ask for his identification?

24     A.    No.



Michael R. Lawson, Jr.

30

1    Q.    Why not?

2    A.    I knew we were at the wrong house and we had the

3    wrong family.  The Dwayne Walker I was looking for was

4    much older.  He was in his twenties and Mr. Walker's son

5    is probably in his teens.

6    Q.    And you knew right away that you weren't looking

7    for --

8    A.    I wasn't looking for DeWayne Walker, no.

9    Q.    You saw his name was actually different than

10   your suspect's name, his first name, isn't that right?

11   A.    Right.  But on the report from DELJIS, it says

12   the son's name is the same, D-W-A-Y-N-E.

13   Q.    Did you ever find out whether this was accurate

14   or not?

15   A.    I don't know.  That's just the information that

16   we were going off of.

17   Q.    Now, two pages -- and this may not have been in

18   the exact sequence that they were produced -- there is a

19   DELJIS report on Karen Walker.  Is that what this is?

20   A.    Yes.

21   Q.    And why was that done?

22   A.    We were trying to find out who his mother was

23   because the informant was saying he was staying with his

24   mother.  And we pulled this up because we were

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

A-139

Michael R. Lawson, Jr.

31

1   interested because it was the same address, 118 Dutton.

2   And we thought that this may have been his mother, Karen

3   Walker.

4       Q.   Why did you think that, because of the name?

5       A.   Because of the address and also because of the

6   name.

7       Q.   So you looked for -- after you got the tip from

8   the informant about the suspect being in New Castle with

9   his mother, the first thing you did was find -- well,

10  what was the sequence after that?  Was it Karen Walker

11  first or was it this DELJIS report about a "Dwayne"

12  Walker, Jr., was a witness?

13      A.   I don't remember exactly.

14      Q.   And did you do either of these things, do the

15  DELJIS for Karen Walker or this other DELJIS report we

16  looked at or did somebody else do that?

17      A.   This may have been me for Karen Walker.  I'm not

18  a hundred percent sure.  I know that the one for the

19  incident that happened in 2003 for 118 Dutton Court was

20  provided to me by Detective Silvers.

21      Q.   You don't know if you did that before or after?

22      A.   This was definitely before because I had no idea

23  who Karen Walker was before I had gotten this

24  information as far as Dutton Court.



Michael R. Lawson, Jr.

32

1    Q.    And so the first information about Karen Walker

2  was on this DELJIS report that you got from Detective

3  Silvers?

4    A.    Yeah.   I could probably say 99 percent sure,

5  yeah.   Because it has her name as, I guess, the victim,

6  Karen A. Walker, Karen Alicia Walker.

7    Q.    And, at that point, you didn't know what the

8  suspect's mother's name was?

9    A.    I don't believe so, no.

10   Q.    Even though he had been in the system arrested

11 first back in 1996?

12   A.    Correct.

13   Q.    There was no information anywhere about his

14 mother's name?

15   A.    Not that I could remember, no.

16   Q.    In 1996, he would have been 13, 14 years old; is

17 that right?

18   A.    Which Dwayne Walker?

19   Q.    The suspect.

20   A.    Yes.

21   Q.    And he would have gone through family court;

22 isn't that right?

23   A.    Sure.

24   Q.    And he would have probably some parent around

Michael R. Lawson, Jr.

33

1    someplace, right?

2       A.    Correct.

3       Q.    And so no one looked at those records to see if

4    his mother was identified anywhere?

5       A.    Not that I could recall.  I think what we were

6    maybe thinking, this may have been a relative, an aunt.

7       Q.    This being?

8       A.    Karen Walker.  We weren't a hundred percent sure

9    whether or not this was his mother or another relative

10   at this location for Dutton Drive or Dutton Court.

11      Q.    Going back to the Affidavit of Probable Cause,

12   on Paragraph Number 9, you say -- well, what are you

13   saying in Paragraph 9 there?

14      A.    That the suspect, Dwayne Walker, date of birth,

15   12/10/82 with the previous report of incident at 118

16   Dutton Drive in New Castle.

17      Q.    And where did you get that information?

18      A.    From the Detective Silvers.

19      Q.    Well, the DELJIS report doesn't show a date of

20   birth; does it?

21      A.    No, it doesn't.

22      Q.    How did you put the date of birth?  Where did

23   you get the date of birth information?

24      A.    From just the information that he provided.  He



Michael R. Lawson, Jr.

34

1   gave me the piece of paper.  He said here's the previous

2   address, 118 Dutton.  This is Dwayne Walker.  This is

3   where he stayed at before.

4       Q.    And that turns out it was incorrect?

5       A.    Correct.

6       Q.    It's correct that it was incorrect; is that what

7   you are saying?

8       A.    Correct.

9       Q.    Who made the connection between the "Dwayne"

10  Walker that shows up at 118 Dutton Court on this DELJIS

11  report and the date of birth, 12/1082, the date of birth

12  of the suspect?  Did somebody just guess?

13      A.    No.  We knew that Dwayne Walker, 12/10/82, was

14  our suspect.  He's the one that stabbed our victim.  We

15  knew that.  We weren't sure where he was staying at.

16  The information that we received was through Silvers'

17  confidential informant.  Silvers located the DELJIS

18  report under Dwayne Walker as a witness.  And he gave me

19  that information and I put it together as far as

20  12/10/82 believing that it was the same Dwayne Walker we

21  were looking for residing at that address.

22      Q.    And in Paragraph 10 it says you looked at the

23  Conectiv record --

24      A.    Yes.



Michael R. Lawson, Jr.

35

1   Q.    -- and another DELJIS record; is that right?   It

2   says a check on DELJIS currently shows "Dwayne" Walker,

3   Sr., with the current address of 118 Dutton Drive in New

4   Castle.

5   A.    Correct.

6   Q.    Are either of those documents still available,

7   the power company or the other DELJIS report?

8   A.    I'm sure -- well, from back then, no.   This is

9   just a phone call from Conectiv -- or to Conectiv.   And

10  they confirm, yes, "Dwayne" Walker lives there or that's

11  the information who pays the bills there as far as

12  Conectiv.   And then DELJIS is just off of a, I guess it

13  would be Mr. Walker Sr.'s license or whatever.

14  Q.    And you are saying that you don't have the

15  DELJIS report for DeWayne Walker, Sr.?   It's not in

16  here.   Do you think it still exists someplace?

17  A.    I'm sure it does.

18          MR. BARTOSHESKY:   There seems to be a lot of

19  documents you didn't produce, notebooks, files, DELJIS.

20          MR. MILI:   Make a list.

21          MR. BARTOSHESKY:   We already asked for them

22  once.

23          MR. MILI:   Make a list.   We will ask for

24  them.



Michael R. Lawson, Jr.

36

1          MR. BARTOSHESKY:  You may have to take his

2    deposition.  He's got notebooks he says.

3          THE WITNESS:  It's not full of stuff.  It's

4    all investigative stuff regarding the homicide

5    investigation.  The only one day we went to 118 Dutton

6    and that was it.

7          MR. BARTOSHESKY:  I understand.  But there

8    are still documents that we've never seen.

9          MR. MILI:  Make a list.  You have to

10   understand, when you make general requests, we try to be

11   as specific as possible.  If you make a list of things

12   you want, we will give them to you.

13         MR. BARTOSHESKY:  We will address that

14   later.

15   BY MR. BARTOSHESKY:

16   Q.    You think that the DELJIS report said this:

17   D-W-A-N-Y-E Walker, Sr., not D-E-W-A-Y-N-E?

18   A.    Most likely it says D-E-W-A-Y-N-E.

19   Q.    Did you have any information that there was both

20   a "Dwayne" Walker, Sr., and "Dwayne" Walker, Jr., that

21   one of them was your suspect?

22   A.    My suspect was Dwayne Walker.

23   Q.    You didn't know if he was a junior or a senior?

24   A.    I believe he was a junior.



Michael R. Lawson, Jr.

37

1    Q.    Here's the suspect defendant information from

2    the -- it's in the document Page 6.  Would that normally

3    come up on that kind of report, whether he's a junior?

4    A.    It may and it may not.  This does not say he's a

5    junior.  His DELJIS record does not say he's a junior.

6    Q.    It says Dwayne A. Walker; doesn't it?

7    A.    Correct.

8    Q.    Whereas the DELJIS report that you saw for --

9    A.    It says Dwayne, middle name, Walker, Jr.,

10   correct.

11   Q.    Now the DELJIS report you were just looking at

12   for your suspect, Dwayne A. Walker, there is a

13   handwritten number there.  What is that, 183 and then

14   the star, 618 star?

15   A.    That's just his Nextel chirper number.

16   Q.    Where did you get that?  Did you somebody tell

17   you that during the investigation?

18   A.    Uh-huh.

19   Q.    Now, eventually, when he turned himself in, is

20   this an accurate description of his height and weight,

21   height, 6 foot, weight, 175?

22   A.    Pretty close, yeah.

23   Q.    And can we tell from this document when it was

24   generated?  Does that date up there, 9/13/2005, mean the



Michael R. Lawson, Jr.

38

1   date that this --

2       A.   Yes, that's when this was printed out.  Correct.

3       Q.   So was this one of the first things you did

4   after you got the name from the two witnesses?

5       A.   Yes.

6       Q.   And you saw his whole -- it's 7 pages; is that

7   right?

8       A.   Yes.

9       Q.   And then after that, there is another -- it says

10  1 of 3 pages.  Is that at the same time?  Or what is

11  this, the next three pages?

12      A.   Previous addresses for Dwayne Walker.

13      Q.   And on the third page of this previous address,

14  it says associated names.  Do you know who they are?

15  Annette Henry, Rochelle Maness?

16      A.   Rochelle Maness is a girlfriend who he has

17  children with.  She was also a witness in this

18  investigation.  Annette Henry, I believe, may be his

19  mother.

20      Q.   And that's the lady you did try to talk to a

21  couple times?

22      A.   Yes.

23      Q.   And so on the 13th, was this generated on the

24  13th also, this one address file?



Michael R. Lawson, Jr.

39

1    A.    Yes.

2    Q.    So you knew that his mother, at that point, you

3    knew his mother's name was Annette Henry?

4    A.    No.

5    Q.    Well, what did you do when these associated

6    names came up on this document?  Where did they come

7    from?

8    A.    These come from DELJIS, from his previous

9    history as far as associated names.

10   Q.    I understand they come from DELJIS.  How did

11   that information get into DELJIS?  Do you know?

12   A.    I have no idea.  Previous arrests.

13   Q.    When did you find out that that was his mother's

14   name, Annette Henry?

15   A.    I believe close to when he was arrested or after

16   he was arrested.  It had to have been after he was

17   arrested because I remember the informant had told

18   Silvers that he wasn't sure of the mom's name or the

19   mom's name may have been different from his.

20   Q.    So are you telling us that -- there wasn't a

21   point where you thought Karen Walker was his mother; was

22   there?  You thought it was some other relative?

23   A.    I personally thought it may have been his

24   mother, sure.



Michael R. Lawson, Jr.

40

1    Q.    The suspect's mother?

2    A.    Sure.

3    Q.    Why did you think that?

4    A.    Just based on the information we had from the

5    informant, and based on the 118 Dutton Drive with the

6    same address as the Dwayne Walker for that incident,

7    that larceny.

8    Q.    Also in this package of documents, probably

9    about 10 pages in, it says Wilmington Police Department,

10    Crisis Management Tactical Team After Action Report.

11    A.    Yes.

12    Q.    It's two pages.  It looks like it was written by

13    Lieutenant William Browne.

14    A.    Yes.

15    Q.    Tell us who Lieutenant Browne is.

16    A.    He would have been the lieutenant in charge of

17    the SWAT Team on that given day and filling out the

18    report as far as their actions.

19    Q.    It looks like there was some surveillance of

20    that property the day before.

21    A.    Correct.

22    Q.    Were you involved in that surveillance?

23    A.    No.

24    Q.    So the first time you ever saw this property was



Michael R. Lawson, Jr.

41

1   the day the warrant was executed?

2       A.    Physically, yes.

3       Q.    Did you see it some other way?

4       A.    Google Earth.

5       Q.    So the aerial photography?

6       A.    Correct.

7       Q.    Now, this surveillance, do you know how long it

8   went on, the surveillance the day before?

9       A.    Just roughly maybe two to three hours.

10      Q.    And why was it done?

11      A.    Because once Silvers had given me that address,

12  the vice squad, the undercover units went out there and

13  set up on the house to see if there was any activity, to

14  see if we could locate any vehicles that we may have

15  been interested in as far as him possibly being there.

16  The information we had was that he was in the city

17  earlier at 227 Jackson and that he had left in a

18  vehicle.  And the information that the informant was

19  giving us was that he was in a dark Lexus.

20      Q.    The informant told that to Detective Silvers?

21      A.    Stated that his mom had a dark Lexus.

22      Q.    So there is a significant amount of information

23  that came from the informant that doesn't show up in

24  your affidavit; is that right?



WILCOX & FETZER LTD.
Registered Professional Reporters

A-150

Michael R. Lawson, Jr.

42

1    A.    True.

2    Q.    Is it written down someplace else?

3    A.    No.

4    Q.    You just remember Silvers telling you all these

5    things?

6    A.    Yes.   Because he was having phone conversations

7    with the informant back and forth trying to find out

8    exactly where he was at, trying to find the exact

9    address in New Castle.

10   Q.    Did you ever, after the arrest, did you find out

11   if in fact the suspect was staying with his mother or

12   had stayed with his mother in New Castle at any point?

13   A.    I have no idea where he stayed.   I got no

14   cooperation from his mom, no cooperation from his

15   family.

16   Q.    Or from him I take it?

17   A.    Or from him.   He made no statement.

18   Q.    It says on the day before this warrant,

19   surveillance showed a female and a teenage male coming

20   from the residence.   Now, neither of them were your

21   suspect; is that correct?

22   A.    That's correct.

23   Q.    There was also a possibility there was a small

24   child in the residence.   Do you know how Lieutenant



Michael R. Lawson, Jr.

43

1    Browne came to that conclusion?

2      A.    Just from the surveillance that was done on the

3    previous day.

4      Q.    Right.  But do you know how he came to the

5    conclusion that a small --

6      A.    I believe it was a female.  The younger sibling

7    may have went inside the house.  I believe a Lexus

8    actually pulled up to the residence, either in a

9    driveway or in front of the house.  This is just

10   information that I'm getting back from Silvers and the

11   vice squad who was doing the video surveillance.  And I

12   believe they saw a small child somewhere during that

13   time.

14     Q.    So you are saying the vice squad did the

15   surveillance?

16     A.    Yes.

17     Q.    It wasn't Lieutenant Browne that did the

18   surveillance?

19     A.    He may have been out there.  I believe he was a

20   part of it.  I'm not sure exactly where he was set up

21   at.  But I believe that there was either two or three

22   vehicles that were out there that were conducting the

23   surveillance.  Because the car actually left with the

24   black female and the black male and they followed the

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A-152

Michael R. Lawson, Jr.

44

1    car up to the Chester area where they had lost it.

2      Q.    Is there anything in writing that shows more

3    detail of this surveillance?

4      A.    No.

5      Q.    Nothing?

6      A.    Not to my knowledge, no.

7      Q.    So you just remember all this about following

8    the car to Chester and losing it?

9      A.    Absolutely, yeah.

10      Q.    Who told you about that?

11      A.    It was the vice squad and that did this.  And I

12    believe I was listening to this on the radio, a secured

13    channel.

14      Q.    And I may have asked you this, maybe not.  I'm

15    sorry if I'm repeating.  But what was the purpose of

16    doing the surveillance?

17      A.    To see if we could spot Dwayne Walker, our

18    suspect.

19      Q.    And no one did, is that correct, spot him?

20      A.    No one did, no.

21      Q.    Was there anything that they saw from the

22    surveillance that indicated that the suspect was at that

23    house?

24      A.    Not to my knowledge, no.



Michael R. Lawson, Jr.

45

1    Q.   Now, you agree that the description of the

2  suspect that's on the DELJIS reports and, I guess, the

3  suspect information report of 6 foot, 175 pounds was

4  accurate?  When you arrested him, you saw that that was

5  pretty accurate?

6    A.   Yes.

7    Q.   And you agree that neither DeWayne Walker, Sr.,

8  nor DeWayne Walker, Jr., who were at the Dutton place

9  fit that description; is that correct?

10    A.   I'm not sure how tall Mr. Walker, Sr. is.  I

11  know junior is not 6 foot.

12    Q.   Well, you testified earlier that when you saw

13  DeWayne Walker, Sr., at his house, you knew right away

14  that you didn't have the right person.

15    A.   Correct.  He's not 20 years old.

16    Q.   Is that the only reason?  You knew what this

17  other guy looked like, right, in his height and weight?

18    A.   Yes.  Correct.

19    Q.   And Mr. Walker, Sr., doesn't have the same

20  height or weight; does he?

21    A.   If he can stand up, I will tell you.

22           MR. BARTOSHESKY:  Stand up.

23           THE WITNESS:  He's probably close to 6 foot,

24  probably closer to 160, 165 pounds.  Just guessing.  But



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-154

Michael R. Lawson, Jr.

46

1  it was obvious to me that this was not the same person

2  if that's the question you are asking.

3  BY MR. BARTOSHESKY:

4     Q.   And did you have any other information other

5  than from the informant that this suspect might have

6  been in New Castle, Delaware?

7     A.   I believe his girlfriend told us that he was

8  staying with his mom somewhere in New Castle.  She

9  wasn't sure of the address.  And that would have been

10 Rochelle Maness.

11    Q.   Does that show up in your report?

12    A.   No.

13    Q.   So other than this surveillance -- well, you

14 said you did run Mr. DeWayne Walker, Sr's, DELJIS

15 report, right?

16    A.   At some time, yes.

17    Q.   It was before you went into his house?

18    A.   I believe it was before, yes.

19    Q.   Would there have been any reason why you would

20 have done it afterwards?

21    A.   I don't believe so, no.

22    Q.   And it shows a height and weight on it, right?

23    A.   Yeah.  When I went to the house and saw

24 Mr. Walker, I knew this wasn't the person that I had



Michael R. Lawson, Jr.

47

1    signed warrants for.  I was looking for a younger Walker

2    thinking maybe he had a son named Dwayne Walker, Jr.

3    When I went there, I wasn't looking for him.  I was

4    looking for the person that I signed warrants on

5    believing that possibly he resided here maybe with his

6    mother or with an aunt at the Walker residence.

7         Q.   Do you know what your suspect's father's name

8    was or is?

9         A.   Not off the top of my head, no.

10                   MR. MILI:  When you get to a clean break --

11                   MR. BARTOSHESKY:  Let's do it now.

12                   (Thereupon, a brief recess was had.)

13   BY MR. BARTOSHESKY:

14        Q.   Detective, we may have covered some of this

15   already.  But can you tell me everything that was done

16   to confirm what the informant told Detective Silvers, to

17   confirm whether or not it was correct, the information

18   he gave Detective Silvers?

19        A.   Just the information we have from DELJIS as far

20   as that address, the car, which he told us about a dark

21   colored Lexus that the mother supposedly had.

22        Q.   Is there some written record checking the car or

23   is that just somebody saw it there?

24        A.   When the undercover officers were there, they



Michael R. Lawson, Jr.

48

1    saw it there.  And I believe they got the tag number and

2    I believe it came back to Karen Walker.

3        Q.    And what was the description of the vehicle?

4        A.    I believe it was a dark colored Lexus or a

5    Lexus.  I never saw the vehicle itself.

6        Q.    And this is the vehicle that was followed to

7    Chester?

8        A.    Chester, right.

9        Q.    And do you believe this is within the policy of

10   the department and the city to execute this kind of

11   warrant and go into a house based on this kind of

12   information?

13       A.    Certainly.

14       Q.    Are there policies, is there a written policy of

15   when an officer or what the department should do, what

16   kind of information they need to develop in order to do

17   a raid like this?

18       A.    I'm sure there is.  I can't tell you verbatim as

19   far as what it says.

20       Q.    Do you know where it would be written down?

21       A.    In our directives, in our departmental policy.

22       Q.    Now, how many of these type of raids were you

23   involved with in 2005 say?

24       A.    Maybe 20.



Michael R. Lawson, Jr.

49

1    Q.    And in 2006, this past year, about the same?

2    A.    Maybe a little less.

3    Q.    And can you tell me how many of those involved

4    suspects that were not African-Americans?

5    A.    I have no idea.

6    Q.    Can you tell me, in the last two years, how many

7    of those raids turned out to be the wrong address or the

8    wrong person?

9    A.    I can't tell you that, no.  I know it happens.

10   A lot of times we will go to a house.  We will get

11   information that the suspect is at this certain

12   residence.  We will go to the house and he may have

13   moved or the information may be bad from what we are

14   getting from the witness or the informant.  We have been

15   to wrong addresses before.  This isn't the first time,

16   obviously.  But I can't tell you or sit here and tell

17   you the exact number of times when this happened.

18   Q.    Can you give me a percentage?

19   A.    No, I can't.

20   Q.    Is it 50 percent?

21   A.    I'm not -- it's less than that.

22   Q.    Do you think it's less than 10 percent?

23   A.    Probably.  It doesn't happen frequently.  It

24   happens.  We rely on information from other sources

Michael R. Lawson, Jr.

50

1    besides just police.  If I go to a house and I have been

2    there before, I know that that suspect has lived there.

3    And I relay that information to another investigator.

4    That's good information.  That's a hundred percent.

5              Sometimes when you are dealing with these

6    people, informants or even past proven reliable

7    informants, that they give you information, you don't

8    know until you actually go there that it's a hundred

9    percent.

10    Q.    Now, I'm going to jump around a little bit.  But

11    going back to the morning of this, September 15th, you

12    said it was about 6:00 a.m. that it happened?

13    A.    Around 6, yes.

14    Q.    Was it dark out at that time?

15    A.    Yes.

16    Q.    Well, I think you didn't actually see the

17    officers go in.  Do you know if they knocked on the door

18    before they go in?

19    A.    I don't know if they did or not.

20    Q.    Is that something that they should do?

21    A.    Depends on the circumstances.  They are there

22    looking for someone who just killed someone, someone who

23    wants to flee Delaware and someone who has a violent

24    history.  Personally and professionally, I don't think



Michael R. Lawson, Jr.

51

1    it's of their best interest to knock on the door and

2    wait for that person to come to the door.  I think you

3    want to go in dynamically and try to get that person

4    restrained as quickly as possible.

5              I have been to search warrants where we

6    knock on the door.  And if there is no response, we

7    might not make the entry.  And I have been to search

8    warrants where you are looking for someone who is of a

9    violent nature and you have to rush in right away and

10   try to locate that person.

11   Q.    Now, you have testified about meeting with

12   Mr. Walker and you saw his son at the residence that

13   day.  Did you see Mrs. Walker also?

14   A.    Yes.

15   Q.    And an even younger child also?

16   A.    Yes.

17   Q.    Can you describe what their state of mind was

18   like at that point, how they seemed to you?  Did they

19   seem upset?

20   A.    They are obviously upset when a SWAT Team comes

21   to your house looking for a homicide suspect and you

22   know that he's not there because you don't know him and,

23   obviously, he doesn't stay there, of course you are

24   going to be upset.  I would say they were probably very

Michael R. Lawson, Jr.

52

1   upset, scared.

2      Q.   Now, the suspect eventually took a guilty plea

3   to somebody; isn't that right?

4      A.   Yes.

5      Q.   And he's been sentenced too, right?

6      A.   Yes.

7      Q.   And but he never really made any statement; is

8   that what your testimony was earlier?

9      A.   Never made any statement to me, correct.

10      Q.   So the only statements he might have made were

11   in court during a plea or something like that?

12      A.   He apologized to the family for what he did.

13      Q.   You were there in court?

14      A.   No, I wasn't.

15      Q.   How do you know that he apologized?  Somebody

16   else that was there told you about it?

17      A.   I believe it was the prosecutor told me.  And it

18   also may have been documented in the newspaper.

19      Q.   Were you part of the any of the pre-sentence

20   investigation for the suspect?

21      A.   No.

22         MR. BARTOSHESKY:  We'll mark this as the

23   next number, a copy of the city's answer to the

24   complaint and your answer to the complaint.



Michael R. Lawson, Jr.

53

1        (Lawson Exhibit No. 8, Answer of the City of

2   Wilmington and Detective Michael R. Lawson, Jr., was

3   marked for identification.)

4   BY MR. BARTOSHESKY:

5        Q.    That's been marked as Exhibit Number 8.   And

6   have you ever seen that before?

7        A.    I believe I have seen this, yes.

8        Q.    I'm really interested in Paragraph 49.   It says

9   in middle of that paragraph, "The Dwayne Walker sought

10  was previously transported by someone named Alicia

11  Walker, and Plaintiff Karen Walker's middle name is

12  Alicia."

13            Now, did you ever find out that the suspect

14  was transported by someone named Alicia Walker?

15       A.    I believe this was part of the information that

16  was related to me from Detective Silvers from the

17  confidential informant.

18       Q.    Did anybody ever find an Alicia Walker?

19       A.    Not to my knowledge, no.

20       Q.    And then the next sentence says, "Also by way of

21  further explanation, Dwayne Walker was the same race as

22  Plaintiff DeWayne Walker and Alicia Walker was the same

23  race as Plaintiff Karen Alicia Walker."   Is that

24  information accurate do you know?

Michael R. Lawson, Jr.

54

1    A.    I don't know.   Because I'm not sure who Alicia

2    Walker is.

3    Q.    And why does the race of these people, what does

4    that have to do with anything?

5    A.    It has nothing to do with it.   I don't exactly

6    understand where you got this from.   You are saying that

7    I told you this?

8    Q.    This is the city and your answer to the

9    complaint that was filed in this case.   I'm trying to

10    find out where the information in Paragraph 49 came

11    from.   I understand your lawyers, the city's attorneys,

12    drafted the answer to this.   So I'm not saying that you

13    wrote this down.   But I'm trying to find out where the

14    name Alicia Walker -- you think that was from the

15    informant that talked to Detective Silvers?

16    A.    I believe so.

17    MR. MILI:   For the record, this is the

18    answer of all answering defendants, not just Detective

19    Lawson personally.

20    MR. BARTOSHESKY:   I understand that.   It's

21    for the city.

22    THE WITNESS:   That's why I'm kind of

23    confused.

24    MR. MILI:   He can only answer on his own



55

1    behalf.

2                    MR. BARTOSHESKY:  I understand that.  I'm

3    trying to find out if he knows Alicia Walker.

4    Apparently, he does not.

5                    MR. MILI:  You will have the opportunity to

6    depose Silvers and everyone else involved in the raid.

7                    THE WITNESS:  But as far as race, race has

8    nothing to do with this.  I mean, the only consistency

9    is that my suspect, he was arrested for homicide, was

10   black, and Mr. Walker and his family are black.  And

11   that's the only thing.  But that has nothing to do with

12   oranges or apples.  It's just what it is.

13   BY MR. BARTOSHESKY:

14       Q.   Are you saying that when you did the DELJIS

15   report on Karen Walker, if that had shown up as a

16   Caucasian woman, would anything have been different in

17   this case?

18       A.   Probably.

19       Q.   And why would that be?

20       A.   Because that would throw up a flag to me that

21   maybe it's a different Walker from what I was being

22   told.

23       Q.   I think you said, as far as you know, there is

24   no writing of what the informant told Detective Silvers;



56

1  is that right?

2     A.   I don't have anything in writing.  And I don't

3  believe there is anything in writing.  It was all phone

4  conversations from the information that I was getting on

5  that day and just back and forth between the

6  surveillance, the informant, and Detective Silvers.

7     Q.   Well, the surveillance was later though; wasn't

8  it?  You didn't have the surveillance until after you

9  had --

10     A.   Not too much later.  But we wanted to try to

11  verify that there was an address out there and try to

12  get as much information as possible has far as who was

13  staying there, the layout of the dwelling itself and

14  just to try to confirm that it was definitely the

15  residence that we were, that we had thought he

16  supposedly had been located at.

17     Q.   On the 15th when the raid took place, how long

18  were the police at that location?

19     A.   Maybe 15, 20 minutes.  It wasn't very long.

20     Q.   And you didn't personally enter the residence

21  until after the SWAT came out and said everything is

22  secure?

23     A.   Correct.

24     Q.   How long was that?



Michael R. Lawson, Jr.

57

1      A.    Maybe three to four minutes.

2      Q.    And for secure, do they go through the whole

3   house to make sure that no one is there?

4      A.    Yeah.

5      Q.    And they went into the attic?

6      A.    Probably.

7      Q.    And you didn't go through the whole house also;

8   did you?

9      A.    I know I was in the basement with Mr. Walker and

10   I believe I may have went to the second floor.  Maybe

11   the son was still up there.  I remember there was a

12   laundry room.  I think I may have peaked inside the

13   laundry room.  But, no, it was a very short period of

14   time.

15      Q.    Does the SWAT team leave the scene after it's

16   secured or do they hang around?

17      A.    They stay for a few minutes and then we tell

18   them it's okay to clear and they leave.  But they left

19   before us, yeah.

20      Q.    And the SWAT Team was about 20 people total; is

21   that right?

22      A.    Sounds right.

23      Q.    And then you and another detective went in?

24      A.    Right.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael R. Lawson, Jr.

58

1    Q.    Was there anybody else other than the two of you

2    and the SWAT Team, any other officers?

3    A.    I know that Sergeant Wyatt was there.  He was

4    one of my supervisors along with Sergeant Bob Dunovan.

5    And I believe that was it.

6    Q.    So 25 or so people total?

7    A.    24, 25, sure.

8    Q.    What kind of equipment does the SWAT Team carry

9    when they go in?

10    A.    They have tactical vests which are all dark,

11    tactical helmets.  They have submachine guns, which are

12    normal, your AR-15's.  They have the same 40-caliber

13    weapon that I carry.  They normally have the breaching

14    device, which is some type of large barreled like ram,

15    normally a prying bar in case they have to pry open a

16    door, gas masks.  They wear black hoods most of them,

17    police radios.

18    Q.    Does what they are wearing identify them as

19    officers?

20    A.    It says police.

21    Q.    Where, on the back, on the front, on the helmet?

22    A.    Front and back.  Normally, it's in big white

23    letters.  It says police on the front.  And they have a

24    Velcro patch that they just throw right on the front and



Michael R. Lawson, Jr.

59

1    also on the back.

2       Q.    What does the Velcro patch -- it says police?

3       A.    It just says police.

4       Q.    I don't understand.  It's a Velcro patch that

5    says police?

6       A.    Yeah.

7       Q.    So it can be taken off?

8       A.    Right.  The vest itself, the exterior has the

9    Velcro on it.  And you have a patch that you put on the

10   front and then there is also a patch, I believe, that

11   you could put in the back.

12             And they also have the, I guess, our seal,

13   the city seal.  It's not the same color.  It's not the

14   blue, of course, but it's like a darker faded City of

15   Wilmington seal or police patch.

16      Q.    In this case, do you know if the officers, the

17   SWAT officers that went into the house were wearing

18   something that identified them as police when they went

19   in?

20      A.    I can't honestly sit here and tell you that I'm

21   a hundred percent sure that each individual had

22   something that said police.  But normally, sure.  I was

23   on the SWAT Team for 10 years.  And we put those patches

24   on because we don't want to be misidentified as an

Michael R. Lawson, Jr.

60

1    intruder or someone doing a home invasion.  When we go

2    into the house, the first thing we say is police,

3    police, search warrant, police search warrant.

4        Q.    Were there K-9 units also?  Did they have dogs?

5        A.    I believe there was.  I believe he may have been

6    in the rear of the house.

7        Q.    Is that normal to have a K-9 unit?

8        A.    Yes, in case someone flees.

9        Q.    Dogs can run faster?

10       A.    And they could bite.

11       Q.    Would it have just been one dog, do you think?

12       A.    I'm not sure about that raid itself.  I could

13   look at the names as far as the people on the SWAT Team

14   and tell you who has a K-9 and who doesn't have a K-9.

15       Q.    Does it say on there --

16                MR. MILI:  Actually, the Rule 26

17   disclosures --

18   BY MR. BARTOSHESKY:

19       Q.    This does.  It's in this document, Number 7, and

20   it's about 10 or 12 pages in.  It says vice K-9.  And

21   then on the next page, Joe O'Neal, Donnie Witte?

22       A.    Yes, they are all three K-9 officers.  And I

23   don't know how many K-9's actually exited the vehicle

24   with their handlers, but they were there.



WILCOX & FETZER LTD.
Registered Professional Reporters

Michael R. Lawson, Jr.

61

```
 1      Q.    Now, the last part of this same document that

 2   you are looking at is -- you talked about the aerial

 3   photos that's there.  Just after that is what I'm

 4   looking at.  There is a page with handwriting on it.

 5   Whose writing is that?  Do you know?

 6      A.    No.

 7      Q.    And it looks like it's sort of directions to 118

 8   Dutton; is that right?

 9      A.    Uh-huh.

10      Q.    And then it says '92 Lexus ES 300, four-door.  I

11   guess that's a tag number?

12      A.    Right.

13      Q.    It says tan or --

14      A.    Tan or Browne, right.

15      Q.    And do you know where this information came

16   from?  Is that from the surveillance people you think?

17      A.    I believe so, yes.

18      Q.    And then at the bottom it says third house on

19   left, storm door something?

20      A.    Out.  That means that it opens out.  This is

21   just probably someone who's getting information,

22   intelligence for the SWAT Team.

23      Q.    Can you read the last?  Green brick on house?

24      A.    Maybe green and black.  I'm not sure.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael R. Lawson, Jr.

62

1    Q.    And then the next pages of this look like a

2    report from, I guess, is it every one of the officers on

3    the SWAT Team?

4    A.    Yes.  These are called After Action Reports.

5    And these are just the reports that each individual SWAT

6    Team member fills out regarding what they did at that

7    search warrant.

8    Q.    Now, so when it says assignment on this page, it

9    says MTC, second floor, SUP.  Do you know what that

10    means?

11    A.    MTC would be move to contact, second floor

12    support.  So that, to me, means that it's an officer

13    going in.  He probably doesn't have his weapon drawn.

14    And his assignment is to take someone into custody, make

15    the arrest.  I shouldn't say make the arrest.  I should

16    say secure that person during the search warrant.

17    Q.    This document that's attached to the letter

18    here, is that a file that's intact someplace?  Is this a

19    file or is this something that's put together?

20    A.    These together here?

21    Q.    The whole package.  I understand the first part

22    of it is the warrant and the affidavit.  But is this all

23    together somewhere?

24    A.    No, it's not all together, no.  These activities



Michael R. Lawson, Jr.

63

1   reports stay with the SWAT Team in their own file.  They

2   keep files individually for each and every search

3   warrant or call-out that they are involved with.

4      Q.   Other than these documents that we looked at at

5   the end, these activities reports of each officer at the

6   scene, is any of the rest of this part of the SWAT

7   team's record?  Do you know?

8      A.   I believe just from the first page for the SWAT

9   Team with all the names on it to the end is what the

10   SWAT Team keeps.

11      Q.   Including the --

12      A.   They may have a copy of the search warrant.

13      Q.   Let me ask you, there is two -- there is the

14   wanted poster in here and there is two copies of it.

15   When was this put together?  Do you know?  When did the

16   wanted poster go out?

17      A.   Probably on the 14th, probably right after I

18   signed the warrants.  Because what I do, after I sign

19   the warrant, I put together the flyer and give it to our

20   patrol officers in case they come in contact with this

21   person.

22      Q.   And LKA, last known address, is that what that

23   means on here?

24      A.   Yeah, 507 West Fifth Street.

A-172

1   Q.   Where did that address come from?

2   A.   That may have been a mistake.

3   Q.   And on the second one of these, somebody wrote

4   in -- do you know who wrote that, 118 Dutton Court,

5   Route 40, Appleby?

6   A.   I can't tell you exactly who.  It looks like

7   Lieutenant Browne's handwriting.  That would probably be

8   from the SWAT Team as far as where they are going as far

9   as the address.

10          MR. BARTOSHESKY:  Let me take just a couple

11  minutes here.

12          (Thereupon, a brief recess was had.)

13          MR. BARTOSHESKY:  I don't have any other

14  questions.  Thanks.

15          MR. MILI:  He's going to read and sign.

16          - - - - -

17              INDEX TO TESTIMONY

MICHAEL R. LAWSON, JR.                        PAGE

18    Examination by Mr. Bartoshesky              2

          - - - - -

19              INDEX TO EXHIBITS

LAWSON DEPOSITION EXHIBIT NO.                 PAGE

20

   Lawson Exhibit No. 1, Copy of Business Card    6

21  Lawson Exhibit Nos. 2 and 3, Photographs       7

   Lawson Exhibit Nos. 4 and 5, Photographs       8

22  Lawson Exhibit No. 6 and 7, Files             11

   Lawson Exhibit No. 8, Answer of the City of   53

23  Wilmington and Detective Michael R. Lawson,

   Jr.,

24



WILCOX & FETZER LTD.
Registered Professional Reporters

ATTACH TO DEPOSITION OF: _Michael Lawson_

DATE TAKEN: _December 5, 2006_

IN THE MATTER OF: _Walker v City of Wilmington_

### ERRATA SHEET

**INSTRUCTIONS**: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 58 | 4 | Donovan — correct spelling |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _1-12-07_     _Michael Lawson_
(Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
        1330 King Street
        Wilmington, DE  19801

A-174

January 30 2007 Silver.txt

1

```
 1        IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
 2                        ----

 3
          DeWAYNE WALKER, SR., KAREN      :   C.A.
 4        WALKER, his wife, D.W., Jr.,    :
          minor child, and T.W., a        :   No. 06-288
 5        minor child,                     :
          Plaintiffs,                      :
 6                    vs                    :
          THE CITY OF WILMINGTON, a        :
 7        political subdivision of the     :
          State of Delaware,               :
 8        Detective MICHAEL R. LAWSON,     :
          JR., et al                       :
 9        Defendants                       :

10                       -----
                 Tuesday, January 30, 2007
11                       -----

12   Pretrial examination of JEFFREY SILVERS, held in the

13   offices BIGGS & BATTAGLIA, 912 North Orange Street,

14   Wilmington, Delaware 19899, commencing at 10:36 a.m.,

15   on the above date, before Mickey Dinter, Registered

16   Professional Reporter, Certified Shorthand Reporter and

17   Notary Public for the Commonwealth of Pennsylvania.

18                       -----
19              KARASCH & ASSOCIATES
           REGISTERED PROFESSIONAL REPORTERS
20             PENNSYLVANIA and DELAWARE
                   (800) 621-5689
21                       -----

22

23

24

25                                              A-175
```

J. Silvers, 1/30/07

2

```
 1
     A P P E A R A N C E S:
 2
```

January 30 2007 Silver.txt

3  BIGGS & BATTAGLIA
   BY: PHILIP B. BARTOSHESKY, ESQUIRE
4  912 North Orange Street
   Wilmington, DE 19899
5  Counsel for Plaintiff

6

   CITY OF WILMINGTON LAW DEPARTMENT
7  BY: ALEX J. MILI, JR., ESQUIRE
   Assistant City Solicitor
8  Louis L. Redding City/County Building
   800 French Street
9  Wilmington, DE 19801-3537
   Counsel for Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

A-176

3

1                    INDEX

2

3  WITNESS:    JEFFREY SILVERS

4  BY MR. BARTOSHESKY        PAGE  LINE
                              4     7
5

Page 2

January 30 2007 Silver.txt
EXHIBITS

| | DESCRIPTION | PAGE | LINE |
|---|---|---|---|
| 6 | | | |
| 7 | | | |
| | Silvers-1, a document entitled | 14 | 20 |
| 8 | DELJIS Web Applications | | |
| | Silver-2, a document entitled | 14 | 22 |
| 9 | Pending Complaint Incident | | |
| | Inquiry | | |
| 10 | Silvers-3, a Search Warrant | 18 | 16 |

11                    REQUESTS FOR DOCUMENTS/ITEMS
                                PAGE LINE
12                                NONE

13

                       QUESTIONS INSTRUCTED NOT TO ANSWER
14                                PAGE LINE
                                  NONE
15

16

17

18

19

20

21

22

23

24

25
                                                          A-177
                          KARASCH & ASSOCIATES

                             800-621-5689

                          J. Silvers, 1/30/07
                                                    4

1              (It was stipulated by and between/among

2    counsel that the sealing, filing and certification are

3    waived; and that all objections, except as to the form

4    of the question are reserved until the time of trial.)

5              JEFFREY SILVERS, being first duly

6    sworn/affirmed, was examined and testified as follows:

7    BY MR. BARTOSHESKY:

January 30 2007 Silver.txt

8      Q.      Mr. Silvers, you are currently employed by

9  the City of Wilmington in the police department, is

10  that correct?

11      A.      Yes.

12      Q.      And how long have you been employed as a

13  police officer?

14      A.      Nine years with the city; two years with

15  another department.

16      Q.      Nine years?

17      A.      Yes, sir.  And two years with another

18  police department.

19      Q.      What other police department was that?

20      A.      South Portland, Maine.

21      Q.      What is your current rank and unit or

22  division that you work in?

23      A.      Detective corporal in the Drug, Organized

24  Crime and Vice Division.

25      Q.      How long have you been in that division?

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

5

1      A.      A little over five years.

2      Q.      Now, I have taken the deposition in this

3  case of Detective Michael Lawson.  Do you know him?

4      A.      Yes.

5      Q.      How long have you known him?

6      A.      I would say eight years, I think.

7      Q.      Pretty much the whole time you have been

8  on the force?

9      A.      Close, yes.                                    A-178

10      Q.      And did you read the deposition, his

Page 4

January 30 2007 Silver.txt

11    deposition transcript?

12        A.    Parts of it.

13        Q.    Have you looked at any of the pleadings

14    that have been filed in this litigation?

15        A.    No.

16        Q.    Have you talked to Detective Lawson about

17    the fact that you are going to be giving a deposition?

18        A.    Yes.

19        Q.    What did you talk about?

20        A.    I just told him that I got a letter that I

21    was going to have to give a deposition in this

22    incident.

23        Q.    What did he say to you?

24        A.    "Let me know how it goes."

25        Q.    Okay.  Have you looked at the Affidavit of

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

6

1    Probable Cause that Detective Lawson filed in this

2    case?

3        A.    I've never seen it.

4        Q.    Now in September of 2005, you became

5    involved in some way with the investigation of the

6    killing of a DeWayne Walker, is that correct?

7        A.    Yes.

8        Q.    And as part of that investigation, you had

9    contact with a confidential informant to provide you

10    with some information, is that correct?

11        A.    Yes.

12        Q.    Have you received information from this or

A-179

Page 5

January 30 2007 Silver.txt

13    any other informer before that you used, you personally

14    used, to apply for any kind of search or arrest

15    warrant?

16        A.    Yes.

17        Q.    As part of that, you filed an Affidavit of

18    Probable Cause, is that right?

19        A.    Yes.

20        Q.    And would it be routine for you to write

21    down or take notes of the conversations you have with

22    an informant before you go and sign an Affidavit of

23    Probable Cause?

24        A.    Sometimes.

25        Q.    Sometimes you just do it from memory?

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

7

1        A.    Yes.

2        Q.    You take the information he or she gave

3    you from memory and use that to file an affidavit?

4        A.    Yes.

5        Q.    Would you normally, if you get information

6    from an informant, would you normally take some steps

7    to try to verify that information?

8        A.    Generally, yes.

9        Q.    And you normally do that before you go and

10    try to use the information to get an affidavit or to

11    get a search warrant, is that right?

12        A.    Yes.                                    A-180

13        Q.    Now, how was it that you became involved

14    with the investigation of the killing of Duane Freeman?

15        A.    My informant called me.

Page 6

January 30 2007 Silver.txt

16      Q.      He called you sort out of nowhere and said
17  I know something about this?
18      A.      Yes.
19      Q.      Has he done that before where he calls you
20  and says I have some information you guys might need?
21      A.      Yes.
22      Q.      How often does that happen?
23      A.      It depends on when he has information.
24  There is not a regular schedule to it.
25      Q.      Sure.  Are there instances where you call

                    KARASCH & ASSOCIATES
                      800-621-5689
                    J. Silvers, 1/30/07
                                                    8

1   him and say do you know anything about this situation?
2       A.      Yes.
3       Q.      Now, have you talked to this informant
4   about this Freeman situation since that time?
5       A.      No.
6       Q.      Have you talked to him about the fact that
7   we are trying to take a deposition of him for this
8   case?
9       A.      No.
10      Q.      How long have you known this informant?
11      A.      Close to five years.
12      Q.      And how did you get in touch with him?
13  How did you meet him?
14      A.      Through a search warrant at his residence.
15      Q.      Was he a suspect?
16      A.      Not at that time, no.
17      Q.      Has he been convicted of any crimes?

                                                    A-181

January 30 2007 Silver.txt

18    A.    I believe so.

19    Q.    Well, at some point, did you check his, I

20  don't know what you call it, wrap sheet?

21    A.    Yes.  I can't tell you without it sitting

22  in front of me, I can't tell you what's on it.

23    Q.    And you said he wasn't a suspect at that

24  time, but his residence was being searched?

25    A.    Yes.

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

9

1    Q.    What kind of offense were you

2  investigating at that time?

3    A.    Drug sales.

4    Q.    And is this informant involved with drugs?

5    A.    Right now, I don't believe so.

6    Q.    Back five years ago when you met him, was

7  he?

8    A.    If I recall correctly, I believe he just

9  had gotten out of jail at the time I met him.

10    Q.    Was it a drug offense that he was, that he

11  was in jail for?

12    A.    I don't know.

13    Q.    And when did he become an informant?

14    A.    Shortly after I met him at the residence.

15    Q.    How did it come about that he became an

16  informant?  Did he come to you and say I would like to

17  start providing the police with information or did you

18  go to him and say how about helping us out or...

19    A.    Generally, what I do is when I come in

20  contact with somebody relative to drug charges, since

A-182

Page 8

January 30 2007 Silver.txt

21  that's what I do, drug work, I let them know that if
22  they want to help themselves out and do some work for
23  us, that we talk to the Attorney General's Office and
24  see what we can do to help them.  I believe that's how
25  it started with him, also.

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

10

1           He was not the main target; a relative of
2  his was.  He contacted me asking if he could help that
3  relative out.
4      Q.     Since then, has he helped you in some
5  other situations?
6      A.     Numerous.
7      Q.     Can you tell me about how many?
8      A.     I don't have -- I would say at least, bear
9  minimum, twenty to twenty-five.
10     Q.     So four or five times a year, at least?
11     A.     At least.
12     Q.     And has he ever been paid for any
13  information he gives?
14     A.     Yes.
15     Q.     Does that money come from the police
16  department?
17     A.     Yes.
18     Q.     There is some kind of fund that is used to
19  reimburse or provide some reimbursements?
20     A.     To pay for information.
21     Q.     Is he paid per -- how does that work?
22  Does the information have to turn out to be helpful?

Page 9

A-183

January 30 2007 Silver.txt
23    Is he paid per phone call?

24        A.    It depends on what's done.

25        Q.    Can you give me an example of the kind of

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

11

1    information that he has given you that he has been paid

2    for?

3        A.    He's given me information on houses that

4    are selling drugs.  He's conducted controlled purchases

5    for me.  Those items get paid for.

6        Q.    And the information he provided you in

7    this case that we are talking about, the Duane Freeman

8    killing, did he get paid for that?

9        A.    I don't recall if he did or not.

10        Q.    And what's the -- Is there a certain

11    amount that he would get paid normally or does it vary

12    depending on what kind of information?

13        A.    It depends on what it is.  Generally, a

14    buy -- If they buy for me, I pay them twenty dollars.

15    It depends on what kind of information is given and

16    what pans out of it.  It depends on how much they get

17    paid.

18        Q.    Now, has he ever given you information

19    that has turned out to be wrong?

20        A.    No.

21        Q.    Can you remember what he told you in this

22    case?  You said he called you.

23        A.    Yes.                                    A-184

24        Q.    And did you talk to him more than once?

25        A.    I talked to him a couple of times.
                        Page 10

January 30 2007 Silver.txt

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

12

1    Q.    You called him back and said --

2    A.    There were phone calls going back and

3    forth.

4    Q.    What did he tell you?

5    A.    Initially, he informed me that he had

6    information on that murder. At that point, I was at

7    the police station. I told him I would call him back

8    in a minute. I went into the detectives area to see

9    who was handling that case.

10   Q.    What did you find out?

11   A.    Detective Lawson was handling the case.

12   Q.    And did you tell Detective Lawson anything

13   at that time?

14   A.    I just told him I had an informant who

15   just called and said he had information and I told him

16   I would call him back.

17   Q.    And you called him back?

18   A.    I called him back.

19   Q.    What did he tell you then?

20   A.    He said that the suspect in that murder

21   was staying with his grandfather. I believe it was his

22   grandfather on Jackson Street and he left that location

23   and went to his mother's house down in the Wilton area

24   near the Wal-Mart, behind the Wal-Mart, because he

25   believed that nobody knew where his mother lived.

KARASCH & ASSOCIATES

800-621-5689

A-185

January 30 2007 Silver.txt
J. Silvers, 1/30/07

13

1      Q.      Is that all he told you at that point?

2      A.      I can't tell you specifically which

3   conversation -- There was several conversations over a

4   fifteen-minute to a half-hour period.  He said -- I

5   believe he said the mother worked at Walmart.  They had

6   a Lexus, black or dark blue, and a van.

7      Q.      Anything else that he told you that you

8   can remember?

9      A.      That he was going to be leaving the area

10  soon.

11     Q.      The suspect was?

12     A.      Yes.

13     Q.      Did he tell you how he found out this

14  information?

15     A.      No.

16     Q.      You didn't ask him how he knew this

17  information?

18     A.      I don't recall if I asked him or not.

19     Q.      But he didn't tell you in any event?

20     A.      No.

21     Q.      And, so, what did you do next?  Did you

22  tell this to Detective Lawson?

23     A.      Detective Lawson was close by.  I went to

24  a computer and started to look up the name DeWayne

25  Walker and tried and see if there was any kind of a

KARASCH & ASSOCIATES

800-621-5689                                    A-186

J. Silvers, 1/30/07

14

1   DeWayne Walker that resided in that Wilton area near
Page 12

January 30 2007 Silver.txt

2   the Wal-Mart.

3       Q.    Did your informant tell you what the

4   suspect's mother's name was?

5       A.    I don't recall if he did or not.

6       Q.    So, you went to the computer.  And what

7   kind of records were you looking through?

8       A.    DELJIS.

9       Q.    Other than going to the computer and

10  trying to find DeWayne Walker in the Wilton area, did

11  you do anything else to try to verify what the

12  informant told you?

13      A.    Not at that point.

14      Q.    Did you at some other point?

15      A.    I believe Detective Lawson had people go

16  down there to check the area once.  I came up with the

17  address through the research on DELJIS.

18      Q.    And what did you find?  Let me ask you a

19  few -- There are two exhibits.

20              (Silvers-1, a document entitled DELJIS Web

21  Applications, marked for identification.)

22              (Silver-2, a document entitled Pending

23  Complaint Incident Inquiry, marked for identification.)

24  BY MR. BARTOSHESKY:

25      Q.    We have had two documents marked.  The

KARASCH & ASSOCIATES

800-621-5689                                    A-187

J. Silvers, 1/30/07

                                                    15

1   first one at the top says DELJIS Web Applications and

2   the other at the top says Criminal Justice Information

3   System Pending Complaint Incident Inquiry.

Page 13

January 30 2007 Silver.txt

4           Are either of these what you found or a

5    printout of what you had found on DELJIS?

6           A.       The letters on here, O-J-W-I-J-E-S, in the

7    upper right-hand corner, that's my sign-in for the

8    DELJIS system.  I'm the only one in the state with that

9    sign-in.  This is a form that I printed up.

10          Q.       You are pointing at the document that has

11   been marked as number 2?

12          A.       Yes.

13          Q.       So, you printed -- You printed this out,

14   what has been marked as number 2, and what did you do

15   then?

16          A.       Gave it to Detective Lawson.

17          Q.       Why did you print this one out?  What

18   about it made you think that it was relevant to this

19   case?

20          A.       The name DeWayne Walker was listed on this

21   as a witness to an incident at 118 Dutton Court.

22          Q.       And that address somehow meant something

23   to you?

24          A.       I looked on a map and saw it was in the

25   Wilton area behind the Wal-Mart.

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

16

1          Q.       Now the other, what we have marked as

2    number 1, did you have anything to do with having that

3    printed out?

4          A.       I don't recall.  This doesn't have any

5    markings with identifiers to who printed it out.  I

6    can't recall if I printed it out or not.

Page 14

A-188

January 30 2007 Silver.txt

7      Q.      Number 2, is that -- Can you tell us what
8   that is?  Is that a kind of document that's familiar to
9   you?
10     A.      Yes.  It's a -- we consider it a wrap
11   sheet document.  This is a driver's license inquiry.
12     Q.      Can you -- Can the system do a driver's
13   license inquiry on anyone or does it have to be someone
14   that's been found guilty of some kind of offense?
15     A.      Anyone with a driver's license or state ID
16   card, State of Delaware.
17     Q.      Did you know if anybody did one of these
18   inquiries on this DeWayne Walker that's mentioned on
19   number 2?
20     A.      I don't recall.
21     Q.      And do you know why -- You don't recognize
22   what is number 1 as being -- Did you see that back in
23   this timeframe?
24     A.      I don't know.
25     Q.      You don't remember.  And, so, after you

                    KARASCH & ASSOCIATES
                       800-621-5689
                    J. Silvers, 1/30/07
                                                    17

1   gave this report that has been marked as number 2 to
2   Detective Lawson, did you have any further involvement
3   with this case?
4      A.      I gave -- I gave him the information that
5   I was getting and then left it to him.  It was his
6   investigation.
7      Q.      Okay.  You told him what the informer told
8   you?

                        Page 15

January 30 2007 Silver.txt
9      A.    Yes.

10     Q.    And you found this DELJIS report?

11     A.    I went to DELJIS right after I spoke to

12  the informant. Some of the time I was speaking with

13  him, I was sitting at the computer trying to get a name

14  and address in that location. With the information

15  that he was giving me, I was also telling Detective

16  Lawson the information I was given, and this is an

17  example. I came up with information that I found. I

18  printed it out and gave it to Detective Lawson.

19     Q.    You had no further involvement with this

20  case?

21     A.    No.

22     Q.    Do you remember if you found any other

23  Walker's in the Wilton area?

24     A.    I don't recall.

25     Q.    Would you have printed them out if you

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

18

1  found another one?

2      A.    Yes. With the DeWayne Walker name. I

3  don't know if there had been a different Walker.

4      Q.    Did you think that this Walker, Karen

5  Alicia, that's mentioned on Exhibit Number 2, was some

6  kind of relative of the suspect?

7      A.    I would assume. I had assumed so because,

8  or a relative to the DeWayne Walker on this sheet

9  because they have the same address and same last name.

10     Q.    And I think I asked you this. You didn't

11  know what the suspect's mother's name was?

A-190

Page 16

January 30 2007 Silver.txt

12   A.   No.

13   Q.   You didn't know if it was Walker?

14   A.   No.

15   Q.   Let me show you the affidavit that.

16        (Silvers-3, a Search Warrant, marked for

17   identification?

18   BY MR. BARTOSHESKY:

19   Q.   Number 3 is five pages and it's the search

20   warrant that was issued for 118 Dutton Drive, together

21   with the application and Affidavit and the last, well,

22   pages 3 and 4 of this, are the Probable Cause Affidavit

23   that Detective Lawson executed.

24        I want to ask you to look at paragraph 8,

25   well, eight, nine and ten, really.  This talks about

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

19

1   the information that came from your informer.

2        Is that an accurate -- In paragraph 9, I'm

3   sorry, paragraph 8, it says, "Your affiant can truly

4   state that on 9/14/05 a past, proven, reliable

5   informant contacted Detective Jeff Silvers of the

6   Wilmington Police Drug Unit with information as to the

7   whereabouts of the suspect, DeWayne Walker.  The

8   informant states Walker is currently hiding in his

9   mother's house in New Castle and is making plans to

10   flee Delaware."

11        Is that accurate information as to what

12   you told Detective Lawson that the informant told you?

13   A.   Yes.

Page 17

A-191

January 30 2007 Silver.txt

14    Q.    And then number 9 says your "Affiant can

15  truly state that according to DELJIS records, a DeWayne

16  Walker DOB 12/10/82 with a previous reported incident

17  at 118 Dutton Drive in Newcastle."

18            Now, does the DELJIS report give a date of

19  birth for the DeWayne Walker?

20    A.    This one?

21    Q.    Yes.

22    A.    The one in front of me?  I don't see a

23  date of birth on there.

24    Q.    You didn't tell Detective Lawson that a

25  DeWayne Walker at 118 Dutton Drive had a date of birth

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

20

1  of 12/10/82, did you?

2    A.    I don't believe so.

3    Q.    Now, number 10 says, "Affiant can truly

4  state current records with Conectiv Power Company of

5  Delaware show 118 Dutton Drive registered to DeWayne

6  Walker."  Do you know anything about that Conectiv

7  record?

8    A.    No.

9    Q.    It says, "A check on DELJIS currently

10  shows DeWayne Walker, Sr., with a current address of

11  118 Dutton Drive in New Castle."  Did you know anything

12  about that DELJIS report?

13    A.    No.

14    Q.    Did you also tell Detective Lawson about

15  the Lexus?

16    A.    Yes.

Page 18

A-192

January 30 2007 Silver.txt

17      Q.      Do you know if there was any surveillance

18  done on 118 Dutton Drive before the warrant was

19  executed, before they went into the house?

20      A.      I believe there was.

21      Q.      Why do you believe there was?

22      A.      I recall that they followed a Lexus from

23  that location.

24      Q.      Do you know what color the Lexus was that

25  they followed?

                    KARASCH & ASSOCIATES

                       800-621-5689

                    J. Silvers, 1/30/07

                                                        21

1       A.      I think it was black.  I don't know

2   one-hundred percent.

3       Q.      How did you know that they followed a

4   Lexus?

5       A.      I was in the area.  I wasn't part of the

6   surveillance on it, but I was in the area when the,

7   near Detective Lawson when the surveillance was being

8   done.

9       Q.      And that was back at the police station?

10      A.      Yes.

11      Q.      You just overheard that something was

12  going on with the surveillance?

13      A.      Yes.

14      Q.      Have you ever done surveillance?

15      A.      Yes.

16      Q.      Probably a lot of times?

17      A.      Yes.                                    A-193

18      Q.      What is normally the purpose of doing

                       Page 19

January 30 2007 Silver.txt

19  surveillance?

20      A.      To try and determine locations, where

21  people are going, what people are doing.

22      Q.      Have you ever seen that Affidavit of

23  Probable Cause before?

24      A.      No.

25      Q.      Do you know if the informant that gave you

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

22

1   the information in this case has ever given information

2   directly to any other police officers?

3       A.      I don't know.  Let me correct that.  My

4   partner.

5       Q.      Okay.  So, but other than you and your

6   partner, you don't know?

7       A.      I don't believe so.  I don't know.

8       Q.      Did you ever come to learn that the police

9   department's execution of the warrant, search warrant

10  on the Dutton Street address was, turned out to be a

11  mistake?

12      A.      After it occurred, yes.

13      Q.      How did you find out?  Did Detective

14  Lawson talk to you about it?

15      A.      I don't recall who told me.

16      Q.      Did you ever find out if any of the

17  information your informant gave you was accurate in

18  this case?

19      A.      I don't understand what...

20      Q.      The informant said that he believed that

21  the suspect was hiding out with his mother in New

Page 20

A-194

January 30 2007 Silver.txt

22  Castle, right?

23      A.    Correct.

24      Q.    Did you ever find out if that was true or

25  not?

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07

23

1       A.    I heard that he was staying, I believe,

2   within a half-mile of this address.

3       Q.    Where did you hear that?

4       A.    I believe it was Detective Lawson.

5       Q.    Do you know how Detective Lawson found

6   that out?

7       A.    No.

8       Q.    I would guess that you participated in

9   executing search warrants a number of times?

10      A.    Yes.

11      Q.    Have you ever been involved in a situation

12  where the warrant that you obtained and acted on was on

13  the wrong place?

14      A.    I have not.  Not personally, no.

15      Q.    Do you know of some instances where that

16  has happened other than this case where we are talking

17  about?

18      A.    Yes.

19      Q.    Do you know how many times?

20      A.    I can't give you a number.  I don't know.

21      Q.    What normally -- Does the department do

22  anything to look into that kind of situation where it

23  turns out that it's the wrong place on a search

A-195

Page 21

January 30 2007 Silver.txt
24   warrant?

25        A.    I don't know.

KARASCH & ASSOCIATES

800-621-5689

J. Silvers, 1/30/07
                                              24

1        Q.    Now, I think I asked you this, but I'm not

2   sure. You don't believe you took any notes of your

3   conversation with your informant, is that right?

4        A.    No, I didn't.  I checked yesterday.  I did

5   not.

6        Q.    Do you have any writings or notes having

7   to do with this case or investigation at all?

8        A.    No.  When I was on the phone, I was at the

9   computer.  The information was coming in my ear and

10   going out my fingers.

11        Q.    The only sort of document that you

12   developed in this case was that DELJIS report that we

13   have marked as number 2?

14        A.    That one.  I don't know if there were any

15   others that I would have printed out.  I don't know.

16   The only one I have been shown is that one, yes.

17        Q.    Have you ever done a surveillance where at

18   some point you realized, hey, this is the wrong place,

19   the person that we are looking for isn't there, or

20   anything along those lines?

21        A.    That's hard to say because the

22   surveillance we do is trying to gain information to

23   determine -- have I done surveillance and found out it

24   was the wrong person?  Yes.  It's been brothers and

25   relatives that look similar.

KARASCH & ASSOCIATES
Page 22

A-196

January 30 2007 Silver.txt
800-621-5689
J. Silvers, 1/30/07

25

1     Q.    In those other situations, were you
2   waiting for a search warrant?
3     A.    Not that I can recall.
4     Q.    Would you normally do the surveillance in
5   order to get enough information to get a search
6   warrant?
7     A.    Part of the investigation techniques, yes.
8     Q.    Let me take a second and make sure I
9   didn't miss anything.  I think we are just about
10  finished.
11          I believe you said other than you and your
12  partner, you don't think this informant has ever had
13  direct, given information to any other officers, is
14  that right?
15    A.    Yes.
16    Q.    Do you know if he has ever given any
17  information to your partner that turned out to be
18  incorrect?
19    A.    Not that I'm aware of.
20          MR. BARTOSHESKY:  I don't have any other
21  questions.  Thanks.
22          MR. MILI:  Read and sign, please.
23          (Deposition concluded, 11:09 a.m.)
24
25

A-197

KARASCH & ASSOCIATES
800-621-5689
J. Silvers, 1/30/07
26
Page 23

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR., KAREN WALKER,    ) CONFIDENTIAL
his wife, D.W., JR., minor child,     )
and T.W., minor child,                )
                                      )
           Plaintiffs,                )
                                      )
v.                                    ) Civil Action No.
                                      ) 06-288(MPT)
THE CITY OF WILMINGTON, a political   )
subdivision of the State of Delaware) )
DETECTIVE MICHAEL R. LAWSON, JR.,     )
individually and in his official      )
capacity and Unknown Entities,        )
                                      )
           Defendants.                )

           Deposition of CONFIDENTIAL INFORMANT taken
pursuant to notice in the Detective's Conference Room,
Wilmington Department of Police, 300 North Walnut
Street, Wilmington, Delaware, beginning at 10:00 a.m.
on Thursday, May 24, 2007, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

www.wilfet.com                                A-198



**WILCOX & FETZER LTD.**
Registered Professional Reporters



APPEARANCES:


        PHILIP B. BARTOSHESKY, Esquire

        BIGGS and BATTAGLIA

          921 North Orange Street

          Wilmington, Delaware  19899

          on behalf of the Plaintiffs,


        ALEX J. MILI, JR., Esquire

        LAW DEPARTMENT - CITY OF WILMINGTON

          Louis L. Redding City/County Building

          800 French Street

          Wilmington, Delaware  19801-3537

          on behalf of the Defendants.


ALSO PRESENT:


        DeWAYNE WALKER, SR.

                      A-199

        MICHAEL R. LAWSON, JR.



```
1                   CONFIDENTIAL INFORMANT,

2            the witness herein, having first been

3            duly sworn on oath, was examined and

4            testified as follows:

5                        EXAMINATION

6    BY MR. BARTOSHESKY:

7      Q.    Sir, my name is Philip Bartoshesky, and I

8    represent DeWayne Walker and his family in a lawsuit

9    we've brought against the City of Wilmington and some

10   of the police officers of the City of Wilmington.

11            It's my understanding that you provided

12   some information to the police about an incident in

13   September 2005, and that's what we are here to talk to

14   you about.

15     A.    Okay.

16     Q.    I take it that you have at some time lived in

17   the city of Wilmington?

18     A.    Yes.

19     Q.    Were you born here?

20     A.    No.

21     Q.    Where were you born?

22     A.    New York City.

23     Q.    How long have you been in Wilmington?

24     A.    Since '72.
```

```
 1    Q.    Now, you know Detective Jeff Silvers, right?

 2    A.    Yes.

 3    Q.    And how did you come to meet him?

 4    A.    Through a -- through a bust that he had at a --

 5  my house years ago with my wife.

 6    Q.    How many years ago?

 7    A.    Ten.

 8    Q.    Is it ten years?

 9    A.    Pretty long.  Probably eight I would say,

10  eight, nine, ten, something like that.

11    Q.    Have you ever been convicted of a felony?

12    A.    No.

13    Q.    Have you ever been in prison?

14    A.    Yes.

15    Q.    What were you in prison for?

16    A.    Traffic ticket.  Fines.

17    Q.    You went to jail for a traffic ticket?

18    A.    Fines I didn't pay.  Mm-hmm.

19    Q.    Did you end up paying them?

20    A.    Yes.

21    Q.    So you got out of jail after you paid them?

22    A.    Yes.

23    Q.    Now, you've worked with Detective Silvers

24  several times over the last eight or so years, is that
```

A-201

1   correct?

2       A.      Yes.

3       Q.      You provided him some information?

4       A.      Yes.

5       Q.      Do you know if you've ever given him

6   information that led to someone being convicted?

7       A.      Yes.

8       Q.      Do you know how many times?

9       A.      Several.

10       Q.      What kind of offenses do you believe the

11   information you provided led to a conviction, what

12   kind of offense?

13       A.      Murder.  Drugs.  Mostly drugs.

14       Q.      And did Detective Silvers or the City or the

15   police department ever pay you for your information?

16       A.      Mm-hmm.

17       Q.      Did they pay you all the time for your

18   information?

19       A.      Uh-huh.

20       Q.      One of things you have to do -- the court

21   reporter is taking stuff down?

22       A.      No.  No.                                    A-202

23       Q.      Okay.  I'm sorry.  They don't pay you every

24   time, is that correct?

```
 1    A.    Some I did favors.

 2    Q.    You get favors?  What kind of favors?

 3    A.    If I knew someone that's wasn't doing -- you

 4  know, messing around the drugs, something like that,

 5  and I knew some information, I would give it to them.

 6    Q.    Without getting paid -- maybe my question is

 7  confusing.  You indicated that you've been paid for

 8  providing information?

 9    A.    Yes.

10    Q.    Did you get paid every time you provide

11  information?

12    A.    Yes.  Mm-hmm.

13    Q.    Now, have you read any of the depositions or

14  any of the documents from this litigation, from this

15  case?

16    A.    From this case?

17    Q.    Yes.

18    A.    No.

19    Q.    Has anybody told you about this case?

20    A.    A little bit.

21    Q.    What did they tell you?

22    A.    That I had to come in here and talk to you guys

23  as far as I know anything else about it.

24    Q.    Who told you that?
```

1    A.    Jeff.

2    Q.    You haven't talked to Mr. Mili about this case?

3    A.    Just today.

4    Q.    What did you talk about with him?

5    A.    Just the disclosure of this document that they

6  put before me.

7    Q.    What document is that?

8              MR. MILI:  The protective order.  It's

9  right in front of him if you want to look at it.

10             MR. BARTOSHESKY:  No.  I didn't know what

11  it was.  That's fine.

12  BY MR. BARTOSHESKY:

13    Q.    So you didn't talk to him about the facts the

14  of the case, what --

15    A.    No.

16    Q.    -- what information you gave, nothing like

17  that?

18    A.    No.

19    Q.    Now, I want to focus on this incident that gave

20  rise to this lawsuit, and it was back in September

21  2005 -- or 2006?

22             MR. MILI:  Five.

23    Q.    A man gamed DeWayne Freeman was killed?

24    A.    Yes.

1    Q.    And did you know DeWayne Freeman?

2    A.    Yes.

3    Q.    Did you know him personally or just sort of

4    know who he was?

5    A.    Personally.

6    Q.    How did you know him?

7    A.    From around our neighborhood and all the time

8    seeing him every day.

9    Q.    And how did you find out that he had been

10   killed?

11   A.    I was out on the street that day.

12   Q.    You didn't see him get killed, did you?

13   A.    Not actually, no.

14   Q.    How did you know something happened, just word

15   of mouth, you heard of something?

16   A.    No.  I was on the corner from where they were.

17   I -- the Dwayne Walker that's in this document here, I

18   know him also personally through my sister-in-law and

19   we were all outside.  These two got to playing around.

20   I turned my back.  I looked up.  Next thing I know,

21   Freeman was bleeding.  Dwayne walked off.  And later

22   on, the Freeman guy died and then they were looking

23   for Dwayne.

A-205

24   Q.    Do you know how the police found out Dwayne was



WILCOX & FETZER LTD.
Registered Professional Reporters

1    involved in this killing?

2    A.    Through other witnesses that were on the street

3    that day.

4    Q.    So was it pretty quick that they knew they were

5    after Dwayne Walker?

6    A.    I would -- I wouldn't say pretty quick, but

7    eventually, yes.

8    Q.    And at some point you contacted Detective

9    Silvers because you had some other information about

10   this, is that correct?

11   A.    I contacted Silvers to let him know, because I

12   had looked at the news and they said they didn't --

13   they didn't know who the suspect was.  I called Jeff

14   to tell him that I knew Dwayne and where he was

15   staying -- staying with my sister-in-law and then

16   where his mother lived.

17   Q.    Now, you called Silvers; he didn't call you, is

18   that right?

19   A.    Right.

20   Q.    And at that point, did they know that Dwayne

21   Walker was -- he was wanted by that point?

22   A.    Yes.

23   Q.    And you knew where he was?

24   A.    Yes.

1    Q.    How did you know where he was, you said your

2    sister-in-law?

3    A.    Well, Mr. Walker -- I'm married and my wife's

4    sister, who has a daughter -- this Dwayne Walker is

5    the father of her two kids.

6    Q.    And what's her name?

7    A.    What's her name?

8    Q.    Right?

9              THE WITNESS:  Do I have to tell her --

10             MR. MILI:  Do you really need to know?

11             MR. BARTOSHESKY:  Is it somebody that's --

12   go off the record a second.

13             MR. MILI:  Let's go off the record.

14             (Discussion off the record.)

15             MR. MILI:  If you have to refer to people,

16   at least for this person, give the initials.

17             THE WITNESS:  RM.

18   BY MR. BARTOSHESKY:

19   Q.    Did you tell Detective Silvers that Dwayne

20   Walker had two children?  Did he know that?

21   A.    Did he know that?  I doubt it.

22   Q.    Did you tell him that?                A-207

23   A.    Yes.  I told him what my relationship and me

24   and Mr. Walker was all about, same thing I just told

11

1    you.

2      Q.    And at that time, to your knowledge, was Dwayne

3    Walker at that house, at the sister-in-law's house?

4      A.    At the time I called Jeff, yes, he was.  But

5    then he turned around and left before, I guess, they

6    went to check.

7      Q.    So you told him first -- did you give him an

8    address?

9      A.    I pointed the house out to him.

10     Q.    You were with him?

11     A.    I called him up and asked to meet with him

12   because I had information on Dwayne Walker who was

13   accused of murdering Freeman.  He met with me.  And

14   I -- we did drive past the house and I showed him the

15   house where he was at at the time, which was my

16   sister-in-law's house.

17     Q.    Did the police do anything about that?  Do you

18   know if they went to that house?

19     A.    I have no idea because I left after that.  I

20   was dropped off after that, but I'm assuming, when

21   you're looking for a murder suspect, you're going to

22   go check out all houses.

23     Q.    Now, did you get paid for that information that

24   you gave Detective Silvers --

A-208

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    Yes, I did.

2    Q.    -- when you got this?

3    A.    Yes, I did.

4    Q.    You drove around and you pointed out the house?

5    A.    I didn't drive around.  I took him right to the

6    house.

7    Q.    Now, did you contact Detective Silvers again

8    about some other knowledge of Mr. Walker that you had?

9    A.    Later on that -- I believe it was later on that

10   evening or might have been the next day -- I'm not too

11   sure because it's been a little bit -- yes.  I was

12   talking with my wife and my sister-in-law, and we knew

13   that Mr. Walker's mother lived in the Wilton area.

14   Q.    Do you know how long she had lived in Wilton?

15   A.    To my knowledge, maybe about two years.

16   Q.    Do you know her name -- two years at the time

17   in September of 2005?  She had lived there for two

18   years?

19   A.    Yes.

20   Q.    And did you know her name?

21   A.    Yeah.

22   Q.    Did you tell Detective Silvers his mother's

23   name?

24   A.    No.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-209

1    Q.    Did he ask you the name for the lady?

2    A.    I don't believe he did.  I'm not sure.  I don't

3    know.  I don't believe he did.

4    Q.    So what did you tell him?

5    A.    I told him that his mother lived in Wilton, and

6    if he wasn't at my sister-in-law's house, that's

7    probably most likely place he could be found.

8    Q.    Did Detective Silvers ask you whether Dwayne

9    Walker was alone?

10    A.    Did he ask me was Dwayne Walker alone?

11    Q.    Yeah.

12    A.    No.

13    Q.    Did he ask you if you knew how Dwayne Walker

14    got from Wilmington out to the Wilton area to his

15    mother's house?

16    A.    No.

17    Q.    Didn't ask you that?

18    A.    No.

19    Q.    Did he ask you if you knew the address of his

20    mother's house?

21    A.    I believe he did, but I wasn't sure on the

22    address.

A-210

23    Q.    The best that you knew at that point is in the

24    Wilton area?  Is that as close to an address or close

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   to the location of the house as you could give

2   Detective Silvers?

3      A.    That I couldn't -- because I had never been to

4   the house up there, so...

5      Q.    Did Detective Silvers ask you how you knew all

6   this information?

7      A.    What do you mean did he ask me?

8      Q.    Did he say, "Well, how do you know that this is

9   true?"

10     A.    Well, I explained to Jeff when I called him on

11  the phone to let him know about Mr. Walker what my

12  relationship was to Mr. Walker, how did I -- you know,

13  how much I knew about him and then who he was to my

14  sister-in-law and the father of her children.

15     Q.    Now, Dwayne Walker, he had a nickname, didn't

16  he?  What was his nickname, do you remember?

17     A.    He had a few nicknames, you know.  I'm not

18  sure.

19     Q.    I'm showing you -- I guess it's a wanted

20  poster.  It says, "Wanted" at the top, "Murder First

21  PDWDCF" and under it Dwayne Walker a/k/a Wheezy."  Was

22  that one of his nicknames?

23     A.    That's one of his.                    A-211

24     Q.    Does that look like him that picture?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

15

1    A.    That's exactly him.  That's after -- as a

2    matter of fact, he gained a little weight and grew a

3    beard after he was incarcerated because he was

4    skinnier than that before.

5    Q.    Is this about what he looked --

6    A.    That's exactly what he looks like.

7    Q.    -- like in September of 2005?

8    A.    Yes.

9    Q.    And is that about right, six-foot, 200 pounds?

10   A.    After he came up here, I would say, yeah.

11   Q.    Let me change the subject for a second.  Do you

12   know if you've ever given Detective Silvers

13   information that was inaccurate?

14   A.    No.

15   Q.    You never have?

16   A.    No.

17   Q.    You've always been accurate?

18   A.    Yes.  To my knowledge.

19   Q.    Now, how did you communicate with Detective

20   Silvers this second time when you were talking to him

21   about Dwayne Walker being out of his mother's house?

22   Was it by telephone or did you meet in person?        A-212

23   A.    I called him on the phone first.  We met --

24   that was the first time when I showed him the first

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    house.   The second time I called him on the phone and

2    relayed the message to him how I knew that Dwayne was

3    within that area.

4        Q.    Did you have more than one conversation by

5    telephone that day about the mother and the Wilton

6    area?

7        A.    No.

8        Q.    Did Detective Silvers ask you if you had ever

9    been to the house in Wilton?

10       A.    Yes.

11       Q.    What did you tell him?

12       A.    No.

13       Q.    Did he ask you if the mother had any kind of

14   automobile?

15       A.    Yes.

16       Q.    And did she?

17       A.    Yes.

18       Q.    What kind?

19       A.    At that time she had a Maxima.

20       Q.    A Maxima?

21       A.    Yes.   Nissan Maxima, maroon.

22       Q.    Did Detective Silvers ask you if you knew

23   whether or not anyone else lived in the house with

24   Dwayne's mother?

17

1   A.   I think her boyfriend and her -- and Dwayne's

2   stepsister.

3   Q.   Did Detective Silvers ask you that?

4   A.   I told him that.

5   Q.   You told him that?

6   A.   Yes.

7   Q.   Did Detective Silvers ask you if Dwayne's

8   mother was employed?

9   A.   I don't think so.

10  Q.   Was she employed?

11  A.   Yes.

12  Q.   Do you know where she worked?

13  A.   No.

14  Q.   Do you know whether or not the place where

15  Dwayne's mother lived was -- was it a house?

16  A.   I have -- I have never been there, so that I

17  couldn't tell you.  I didn't know too much about that

18  Wilton area.  I'm assuming it was a house.

19  Q.   You don't know; it could have been an

20  apartment?

21  A.   It wasn't an apartment.

22  Q.   It was not?

23  A.   No.

24  Q.   How do you know that?                    A-214

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    Because in the Wilton area, there are houses,

2    not too many apartments.

3              That, and conversations, if I remember

4    correctly, that Dwayne had that his mother would drive

5    into the driveway, which I think she pulled the car --

6    I know a couple times he said he washed the car out in

7    the driveway.

8    Q.    Dwayne said he washed his own car in his --

9    A.    No.   Washed his mother's.

10   Q.    He went out and washed his mother's car?

11   A.    Yeah.

12   Q.    Let me see if I can get this time frame, if you

13   can help me with that.   You met with Detective Silvers

14   and you drove past this house and you pointed out a

15   house, sister-in-law's house where Dwayne had been, is

16   that right, or you thought he was there at the time

17   probably?

18   A.    Yes.

19   Q.    How did you know that he left there and went to

20   his mother's house?

21   A.    The first house I showed him was my

22   sister-in-law's house.   I didn't ride with him out to

23   his mother's house.                         A-215

24   Q.    Why did you believe that that's where he had

1    gone, to his mother's house?

2    A.    Through my sister-in-law and my wife.

3    Q.    And did he have some kind of plan that you knew

4    about?

5    A.    No.  I just -- I took that assumption that he

6    would go to his mother's because his mother worked and

7    she had -- she had a couple hours.  So if I knew that

8    he wanted to run or would try to run that would be the

9    first place he'd run, to his mom, and try to get some

10   money.

11   Q.    Do you know how Dwayne intended to get to his

12   mother's house?

13   A.    No, I don't.

14   Q.    Did Dwayne have a car?

15   A.    No.  He had a lot of friends that had cars.

16   Q.    Do you know if, in fact, he went to his

17   mother's house?  Do you know if he ever did?

18   A.    That I don't know.  I know he went into hiding

19   for a couple days and then winded up turning himself

20   in through my pastor at our church.

21   Q.    And that part of that story was in the

22   newspaper that his pastor was with him when he came to

23   the police department?

24   A.    He is my pastor, so I'm quite sure.

A-216

1   Q.   Did you see that in the newspaper?

2   A.   No, I didn't.

3   Q.   Have you ever been to the Wilton area?

4   A.   Mm-hmm.

5   Q.   Did you go to visit somebody there or

6 something?  Why have you been up there?

7   A.   My son's mother lives in the Wilton area.

8   Q.   And do you know a street called Dutton Street

9 or Dutton Place?

10   A.   No, I don't.

11   Q.   Did Detective Silvers ever indicate that he

12 might want to talk to your sister-in-law about this

13 situation?

14   A.   No.

15   Q.   Did you have contact with any other police

16 officers about this situation?

17   A.   No.

18   Q.   Do you provide information to other police

19 officers other than Detective Silvers as maybe his

20 partner?

21   A.   To a couple other officers, yes.

22   Q.   In Wilmington?

A-217

23   A.   Yes.

24   Q.   How frequently?  Do you deal with Detective

1    Silvers more frequently than anybody else?

2    A.    Yes.

3    Q.    Have you told him that you're talking to other

4    officers sometimes, giving other officers information?

5    A.    He knew.

6    Q.    He does?

7    A.    Yes.

8    Q.    Now, I understand that you've been out of the

9    Wilmington for a while now, came back just a couple

10   weeks ago, is that right?

11   A.    Yes.

12   Q.    Are you intending to leave Wilmington again any

13   time soon?

14   A.    No.

15   Q.    Why were you -- I don't want to ask where you

16   were, but you were a couple hundred miles away maybe?

17   A.    An hour away, yes.

18   Q.    Why were you there?  Because you were there for

19   an extended period of time, weren't you?

20   A.    Eight months.

21   Q.    Why were you there, some kind of job?

22   A.    No.  Personal.                              A-218

23            MR. MILI:  Do you really need to get into

24   this?

1          MR. BARTOSHESKY:  No.  No.  I just...

2  BY MR. BARTOSHESKY:

3    Q.    While you were wherever you were, did you

4  provide information to any police officer in that

5  jurisdiction?

6    A.    No.

7    Q.    Do you know how much you were paid for the

8  information you provided about this Dwayne Freeman

9  situation?

10   A.    Yes.  Do I know how much?

11   Q.    Yes.

12   A.    Yes.

13   Q.    How much?

14   A.    20.

15   Q.    $20?

16   A.    Yes.

17   Q.    That was for both things, you rode in the car

18  one time with Detective Silvers and then you called

19  him later and gave him further information?

20   A.    No.  Just that -- just that one time earlier.

21  The information that I called and gave him, I called

22  and just gave him.

23   Q.    You didn't get paid for that?

24   A.    No.                                    A-219

23

1    Q.    And that's the information about the mother's

2   house?

3    A.    Yes.

4    Q.    Mr. DeWayne Walker is sitting next to me, my

5   client.   Have you ever met him before, seen him

6   before?

7    A.    Face is familiar, but no, I don't think I met

8   him personally.

9    Q.    Did Detective Silvers ask you if you could try

10  to find an address for Dwayne Walker's mother out in

11  Wilton?

12   A.    Did he ask me could I find an address?

13   Q.    Mm-hmm.

14   A.    Yes.

15   Q.    Did he ask you to try to find an address?

16   A.    Yes.

17   Q.    Did you try?

18   A.    I tried, but I couldn't.   I was unable to.

19   Q.    Did you call him back and tell him you could

20  not find an address?

21   A.    Yes.                                    A-220

22   Q.    Other than an address, did he ask you if you

23  can find out any other information about what was

24  going on at Dwayne's mother's house, whether there

1    were other people there, a location better than just

2    the Wilton area, anything like that?

3    A.    He asked me about Dwayne's mother.  Did she

4    have a boyfriend?  Could there be other -- anybody

5    else in the house?  I told him if he -- if he did find

6    the house, it would be probably the mother, the

7    boyfriend, and maybe the sister.

8    Q.    But you couldn't give him any better

9    information than the Wilton area, is that right?

10    A.    No.

11    Q.    You said no, but it's correct that you couldn't

12    give him any further information other than the Wilton

13    area?

14    A.    Right.

15    Q.    Did he ask you Dwayne's mother's name?

16    A.    I believe he did but I couldn't remember it.

17    Q.    What's her last name, Walker?

18    A.    Yes.

19    Q.    Did you tell anyone or -- you were only talking

20    to Detective Silvers about this.  So did you tell

21    Detective Silvers that Dwayne walker's mother drove a

22    Lexus?

23    A.    Did I tell him she drove a Lexus?          A-221

24    Q.    Yeah.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    No.

2    Q.    And she didn't, did she?

3    A.    No.   She drove a Maxima at that time.

4    Q.    Was there a Lexus?  Did you provide him with

5    information that you thought there might be a Lexus at

6    that house?

7    A.    No.   Not that I know of.

8    Q.    Did Detective Silvers ask you whether you knew

9    what kind of cars may have been in the driveway or

10   parked on the treat next to this house?

11   A.    I believe he did, but I couldn't provide that

12   because -- Dwayne's family, like I said, they had a

13   couple dollars, so they could have been driving just

14   about anything.  And then he had friends -- I mean,

15   when you really look at this, Dwayne, I knew him

16   personally.  He growed up around and in my house.  I

17   knew he sold a lot of drugs.  I knew his family had a

18   little bit of money.  So it's possible that they could

19   have not only been driving a Lexus; they could have

20   been driving a Jaguar.

21   Q.    But you earlier testified that his mother drove

22   a Maxima.                                    A-222

23   A.    I seen her driving a Nissan Maxima, yes, I did.

24   Q.    Did you tell Detective Silvers that?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    Yes, I did, but then he asked me were there any

2    other vehicles.    I told them it could have been

3    anything because, like I said, they had a little bit

4    of money at the time.

5    Q.    Now, do you know what Dwayne Walker's

6    whereabouts -- where he was from the time of the

7    killing until the time he turned himself in?    Was he

8    at -- you told us that he was at a sister-in-law's

9    house.    You thought he was at his mother's house.

10    A.    I know when he -- when the incident happened,

11    we were all on the street.    Things got chaotic.

12    People were running.    People were crying because we

13    knew both parties.    Dwayne walked up the street as

14    if -- as if nothing happened.    He just turned around

15    and just walked up -- started walking up the street.

16    We all turned around, looked.    The guy was bleeding.

17    Everybody contacted, you know, kept looking at

18    Freeman.    Dwayne walked off.    I say -- I ran around to

19    my house, told my wife what had happened.    She in turn

20    called her sister, which is her -- like I told you,

21    her sister's daughter is Dwayne's kids' father.    A-223

22    Dwayne went there.    After Dwayne left there, I didn't

23    know where he went.    Then my understanding was I was

24    more or less trying to find out where he was because I

1    knew him -- one, I didn't want him to get hurt.  Two,

2    I think he needed to be caught before anything else

3    could happen.  I mean he just killed a man.

4    Q.    And so you tried to find out somewhere he might

5    be and that's --

6    A.    I tried my best to.

7    Q.    And that's when you found out or --

8    A.    That his mother lived in Wilton.

9    Q.    And that's where he might be?

10    A.    Yes.

11    Q.    Now, did you tell Detective Silvers that you

12    thought that he was there, or did you say that, this

13    is his mother, he might be there?

14    A.    I told him that I thought that that would be

15    the first place he went because of the situation

16    between him and his mom and all them.  Like I said,

17    they had a couple dollars and if you just -- if you

18    think about, you just kill someone, you're going to

19    want to try to get away.  And if he didn't have any --

20    I know Dwayne didn't have that much money in his

21    pocket.  He had drugs.  So the first thing he would do

22    was run to his mom, which he always done whenever he

23    got in trouble.                              A-224

24    Q.    Did you tell Detective Silvers all that?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    Yes, I did.

2    Q.    So if I'm correct, you don't know if Dwayne

3  Walker went directly from the sister-in-law's house to

4  mother's house?

5    A.    No.

6    Q.    In fact, you don't know if he actually showed

7  up at his mother's house or not, is that right?

8    A.    That I don't know.

9          MR. BARTOSHESKY:  That's it.

10         MR. MILI:  Okay.  I have nothing further

11  to supplement the record.

12         You have the option of reading and signing

13  this transcript at some point, or if you trust the

14  court reporter to have taken everything down

15  accurately, you can waive reading and signing.  It's

16  up to you.

17         THE WITNESS:  I will waive reading and

18  signing.

19         MR. MILI:  Okay.  We are done.

20         MR. BARTOSHESKY:  Thank you, sir.

21         (Deposition ended at approximately

22  10:45 am.)

23

24                                        A-225

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


DeWAYNE WALKER, SR., et al.,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　　　　)　　Civil Action
v.　　　　　　　　　　　　　　　　　)　　No. 06-288 KAJ
　　　　　　　　　　　　　　　　　　)
THE CITY OF WILMINGTON, et al.,　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　)


　　　　　　Deposition of DeWAYNE WALKER, JR. taken
pursuant to notice at the offices of the City of
Wilmington, Law Department, 800 N. French Street, 9th
Floor, Wilmington, Delaware, beginning at 4:00 p.m. on
April 27, 2007, before Vincent J. Bailey, Registered
Professional Reporter and Notary Public.

APPEARANCES:

　　　　PHILIP B. BARTOSHESKY, ESQ.
　　　　BIGGS AND BATTAGLIA
　　　　　1206 Farmers Bank Building
　　　　　Wilmington, Delaware  19899
　　　　　For the Plaintiffs

　　　　ALEX J. MILI, JR., ESQ.
　　　　SENIOR ASSISTANT CITY SOLICITOR
　　　　　800 N. French Street, 9th Floor
　　　　　Wilmington, Delaware  19801
　　　　　For the Defendants

ALSO PRESENT:
　　　　DeWayne Walker, Sr.


　　　　　　　　　　　　　　　　　　　　　A-226

WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



2

                    DeWAYNE WALKER, JR.,

1

2          the deponent herein, having first been

3          duly sworn on oath, was examined and

4          testified as follows:

5                    EXAMINATION

6    BY MR. MILI:

7        Q.    DeWayne, first and foremost, thank you for coming

8    here today to answer some questions for me.  My name is

9    Alex Mili.  I represent the City of Wilmington in this

10   lawsuit that your family has filed against the police

11   department for an incident that happened at your house in

12   September of 2005.  And this is called a deposition.  The

13   format today is going to be that I'm going to ask you

14   questions about that incident.  We will get started by

15   asking you about some background about yourself.

16                What grade are you in in school?

17       A.    Right now I'm in the 10th grade.

18       Q.    At what school?

                                                    A-227

19       A.    William Penn High School.

20       Q.    What kind of grades do you get in school?

21       A.    My grade point average is a 3.14, and I keep that

22   at all times.  I try not to go below a 3.0.

23       Q.    Are you involved in any after school activities?

24       A.    Yes.  I am in Mock Trial and I'm in FAME, which

Case 1:06-cv-00288-SLR    Document 47-1    Filed 06/22/2007    Page 121 of 130
Dewayne Walker, Jr.

3

1    is advancement in engineering.  I'm also on the robotics

2    team.  And that's about it.

3        Q.    The robotics team, did that take you to Atlanta,

4    Georgia recently?

5        A.    Yes, it did.

6        Q.    Were you in some kind of competition?

7        A.    Yes.

8        Q.    How did that turn out?

9        A.    Well, we won the Chairman's Award, which is given

10   to the team that shows the most community service and

11   shows that it excels in robotics and -- but our robot

12   didn't do so good.

13       Q.    Did you do anything to prepare for this

14   deposition today?

15       A.    I just went over the material.

16       Q.    What material?

17       A.    That was given to me, like the statement that was

18   written after the incident.

19       Q.    Did you discuss this deposition with your parents

20   prior to coming here today?

21       A.    Yes.

22       Q.    What did you talk about?

23       A.    We talked about telling the truth.

24       Q.    Okay.  Let's get right to the incident itself.

A-228

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

DeWayne Walker, Jr.

4

1    Obviously, police came into your house.  Where were you

2    in the house when the police came?

3        A.   At the time I was sleep in my room.  I heard a

4    bang at the door.  Immediately I woke up.

5        Q.   Did you stay in the room or did you go out of the

6    room to see what was going on?

7        A.   I was still in the room and then I saw about five

8    men rushing into my door with guns with lasers on them

9    and immediately I was shocked.  They just told me to put

10   my hands behind my head and stay still on the bed.

11       Q.   Do you know where your father was at this time?

12       A.   No, I don't.

13       Q.   Do you know where your mother was at this time?

14       A.   No, I didn't, but I did hear her screaming.

15       Q.   When they entered the room did you know that they

16   were police officers?

17       A.   I did because of the SWAT vests they had on.

18       Q.   So not only did you know they were police

19   officers, but you also knew they were on the SWAT team?

20       A.   Yes.

21       Q.   So where were you, where specifically in your

22   bedroom were you when they came in?

A-229

23       A.   Well, at that time I had two twin beds, so I was

24   in my bed furthest to the right.  And I was sitting there

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Dewayne Walker, Jr.

5

```
 1   the whole time.
 2        Q.    What did they say to you after that?
 3        A.    Well, they asked me what my name was, and how old
 4   I was.  And that was all.
 5        Q.    Did you respond?
 6        A.    Yes, I did.  I told them my name and also my age
 7   at the time.
 8        Q.    Did they eventually take you out of the room?
 9        A.    Well, at the time I was half naked, so they gave
10   me some clothes out of my drawer and told me to put them
11   on and they would explain to me what was going on.
12        Q.    How long did that take?
13        A.    About 10 minutes.
14        Q.    Then eventually did they take you out of the
15   bedroom?
16        A.    Yes, and they walked me downstairs.
17        Q.    They brought you downstairs.  Where specifically
18   downstairs did they take you?
19        A.    They took me into the living room where I saw my
20   frustrated dad and my crying mom.
21        Q.    Where was the baby?
22        A.    The baby was with my mother.
23        Q.    Were all of you in the living room at this time?
24        A.    Yes.
```



DeWayne Walker, Jr.

6

1    Q.   Does your house have a family room?

2    A.   Yes.

3    Q.   At any point were you in the family room?

4    A.   No.

5    Q.   Once the officers had gathered you in the living

6    room you said -- first of all, how many officers were

7    there in the living room with you?

8    A.   I don't know exactly, but it was quite a few.

9    Maybe like five.

10   Q.   Did they explain why they were there?

11   A.   Well, all they said was they were looking for a

12   man by the name of DeWayne Walker and that's about it.

13   Q.   Did they say that anybody in your household was

14   the man they were looking for?

15   A.   No.

16   Q.   Did they eventually leave?

17   A.   Yes.

18   Q.   About what time did they leave?

19   A.   I know it was before 6:00, because my alarm

20   hadn't gone off yet.

21   Q.   They left before 6:00?

22   A.   Yes.

23   Q.   Did you go to school that day?

24   A.   Yes.

Dewayne Walker

7

1    Q.    Were you late for school?

2    A.    No.

3    Q.    Do you know if your father went to work that day?

4    A.    Yes.

5    Q.    Yes, you know, or, yes, he did go to work?

6    A.    Yes, he did.

7    Q.    Do you know if your mother went to work that day?

8    A.    Yes, she did.

9    Q.    When you came home from school that day what did

10   you do?

11   A.    I came home from school, I did my homework, took

12   a nap as usual.  But I still was kind of still in shock,

13   because, I don't know, the atmosphere just wasn't right.

14   Q.    What wasn't right about it?

15   A.    Because it was very quiet.  No one really was

16   speaking.  We were all just in shock.

17   Q.    You don't like it quiet?

18   A.    I wouldn't say I don't like it quiet, but I can

19   tell that something was wrong.

20   Q.    Did you have to clean anything up in the house

21   when you came home from school?

22   A.    I'm not sure.

23   Q.    Did you eventually have to start seeing a doctor

24   over this incident?

A-232

DeWayne Walker, Jr.

8

1    A.    Yes, I did.

2    Q.    Do you know which doctor?

3    A.    I don't recall what his name was, but I'm pretty

4    sure I saw a doctor.

5    Q.    Pretty sure?

6    A.    I know I did.

7    Q.    How many times?

8    A.    Two times.

9    Q.    What did you see the doctor for?

10    A.    Basically he was just telling me that everything

11    was going to be all right, and giving me techniques I

12    should use just to stay calm.

13    Q.    This doctor that you saw two times, I understand

14    you can't remember his name, but aside from him did you

15    see any other doctors?

16    A.    No.

17    Q.    You said a moment ago the doctor gave you some

18    techniques.  Can you tell me what those techniques were?

19    A.    Well, basically just to think positive and get

20    into extracurricular activities to get the incident off

21    of my mind.

22    Q.    Did you have any trouble with your grades in

23    school after this incident happened?

24    A.    Not really -- no, I didn't, because I always

A-233

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

```
 1    maintain good grades.  I wouldn't let that get to me.

 2    But I did have skin trouble after that.  I just started

 3    breaking out, stress.

 4        Q.    How old are you?

 5        A.    Sixteen.

 6        Q.    You never had skin trouble before that?

 7        A.    Not really.

 8        Q.    Did you ever notice any of your classmates having

 9    skin trouble, kids your age?  Acne?

10        A.    Some, yes.

11        Q.    Do you know if your parents had to go to see any

12    doctors?

13        A.    Yes.  I believe my parents were prescribed

14    antidepressants.

15        Q.    Do you know by whom?

16        A.    No.

17        Q.    Do you know if your parents had to go to any

18    therapy with any doctors?

19        A.    Yes, they did, but I don't know the doctor's

20    names.

21        Q.    But do you know if they went to see doctors

22    for --

23        A.    Yes.

24        Q.    Do you know what kind of therapy?
```



DeWayne Walker, Jr.

10

1    A.    No.

2    Q.    Do you know how long your parents had to see

3    these doctors?

4    A.    No.

5    Q.    Do you know if your parents are still seeing

6    these doctors?

7    A.    I don't think they are.

8    Q.    Do you know if your parents are still taking

9    these -- what medication did you say a minute ago?

10   Antidepressant.  Do you know if your parents are still

11   taking those?

12   A.    I don't know.

13   Q.    Can you tell me a little bit about the condition

14   of the house after the police left that morning?

15   A.    As I stated before, it was very quiet, like there

16   wasn't much communication.  We were just still in shock

17   about what happened, because we moved from Chester, which

18   is like a bad neighborhood area, into a nicer place like

19   Delaware to get away from those kinds of things and it

20   just -- we were in shock.

21   Q.    This is my fault.  I actually -- that's not what

22   I was trying to get at.  When I said the condition of the

23   house, what I meant, was anything taken out of place or

24   dirtied up or anything like that?

Dewayne Walker, Jr.

11

1    A.    Well, yes.    The door was mangled.    And also the

2    attic door was broken.    And so as a result my room now

3    doesn't get, quite get enough heat in the wintertime and

4    air in the summer, because of the circulation.

5    Q.    Anything else out of place in the house after the

6    police left?

7    A.    Not that I know of.

8    Q.    Give me just one second.

9         MR. MILI:    I think we are done, unless your

10   attorney wants to supplement the record.

11        MR. BARTOSHESKY:    I do not.

12        (The deposition concluded at 4:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

A-236

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR, KAREN     :
WALKER, his wife, D.W., JR.., minor   :
child, and T.W., minor child,      :
                                 :

     Plaintiffs,            :     C.A. No. 06-288 KAJ
                                 :

     v.                 :
                                 :

THE CITY OF WILMINGTON, a political  :
subdivision of the State of Delaware,   :
DETECTIVE MICHAEL R. LAWSON, JR.,:
individually and in his official capacity, and :
UKNOWN ENTITIES.          :

### CERTIFICATE OF SERVICE

     I, Alex J. Mili, Jr., Esquire, hereby certify that on this 22nd day of June, 2006, that I filed

the Appendix to Defendant's Opening Brief in Support of Their Motion for Summary Judgment

Vol. II with the Clerk of Court using CM/ECF which will send notification of such filing(s) that

this document is available for viewing and downloading from CM/ECF to the following:


                    Victor F. Battaglia, Sr.
                    Biggs & Battaglia
                    921 Orange Street
                    Wilmington, DE 19801


                        /s/ Alex J. Mili, Jr.
                        Alex J. Mili, Jr., Esquire (DE Bar I.D. #4125)
                        Assistant City Solicitor
                        City of Wilmington Law Department
                        Louis L. Redding City/County Building
                        800 N. French Street, 9th Floor
                        Wilmington, DE 19801
                        (302) 576-2175
                        amili@ci.wilmington.de.us