IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR., KAREN           :
WALKER, his wife, D.W. Jr., minor child    :
and T. W., minor child,                       :
                                              :
        Plaintiffs,                           :
                                              :
    v.                                        :        C.A. NO.  06-288 ***
                                              :
THE CITY OF WILMINGTON, a political :
subdivision of the State of Delaware,         :        **Jury Trial Demanded**
DETECTIVE MICHAEL R. LAWSON, JR.,:
individually and in his official capacity,  and :
UNKNOWN ENTITIES,                             :
                                              :
        Defendants.                           :

## APPENDIX TO PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**BIGGS AND BATTAGLIA**

/s/ Philip B. Bartoshesky (#2056)
/s/ Victor F. Battaglia (#156)
Philip B. Bartoshesky, Esquire
Victor F. Battaglia, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
VictorSr@batlaw.com
Attorneys for Plaintiffs

Date:  July 9, 2007

## TABLE OF EXHIBITS

Plaintiff's First Amended Complaint                                              B-1

Answer of the City of Wilmington and Detective Michael Lawson                    B-13

Defendant City of Wilmington's Response to Plaintiffs' First Interrogatories     B-23

Affidavit of DeWayne Walker, Sr.                                                 B-31

Sentence Order of Dwayne Walker                                                  B-37

Transcript of Deposition of Karen Walker                                         B-42

Transcript of Deposition of DeWayne Walker, Sr.                                  B-54

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR., KAREN          :
WALKER, his wife, <u>D.W. Jr.</u>, minor child   :
and <u>T. W.</u>, minor child,                  :
                                    :
        Plaintiffs,              :
                                    :
     v.                          :    C.A. NO.  06-288
                                    :
THE CITY OF WILMINGTON, a political :
subdivision of the State of Delaware,   :    <u>Jury Trial Demanded</u>
DETECTIVE MICHAEL R. LAWSON, JR.,:
individually and in his official capacity,  and :
UNKNOWN ENTITIES,                   :
                                    :
        Defendants.              :

<u>1st Amended COMPLAINT</u>

**JURISDICTION**

      This court has original jurisdiction over this matter that is brought to redress the deprivation of  rights, privileges and immunities secured by the Constitution and laws of the United States pursuant to 28 <u>U.S.C.</u> §1331 and §1343.  The federal issues involved arise under 42 <u>U.S.C.</u> § 1983.  This court has supplemental jurisdiction over all other claims asserted herein in that they are related to those issues over which original jurisdiction is conferred and are part of the same controversy, pursuant to 28 <u>U.S.C.</u> §1367(a).

**PARTIES**

      1.    Plaintiff DeWayne Walker, Sr. is a 39 year old African-American and is a citizen of the State of Delaware.  His address is 118 Dutton Place, City of New Castle, New Castle, DE 19720 (hereafter "Plaintiff Walker, Sr.").

B-1

2.      Plaintiff Karen Walker, is the wife of Plaintiff Walker, Sr. and is a citizen of the State of Delaware (hereafter "Plaintiff K. Walker"). Her address is 118 Dutton Place, City of New Castle, New Castle, Delaware 19720. She is an African-American.

3.      Plaintiff D.W. Jr., a child of Plaintiff Walker, Sr. and Plaintiff K. Walker, and is a citizen of the State of Delaware. His address is 118 Dutton Place, City of New Castle, New Castle, DE 19720 (hereafter "Plaintiff D.W., Jr."). He is African-American.

4.      Plaintiff T.W. is the minor child of Plaintiff Walker, Sr. and Plaintiff K. Walker and is a citizen of the State of Delaware (hereafter "Plaintiff T. W."). Her address is 118 Dutton Place, City of New Castle, New Castle, Delaware 19720. She is an African-American.

5.      Defendant City of Wilmington, is a political subdivision of the State of Delaware (hereinafter "City"). The City maintains a police department whose jurisdiction is limited by statute to the City of Wilmington except in circumstances not relevant here.

6.      Defendant Michael R. Lawson, Jr. (hereinafter "Defendant Lawson" is a detective with the Wilmington Police Department.

7.      Defendant Unknown Entity(ies) is/are political subdivision(s) of the State of Delaware and/or individuals involved in relevant circumstances to the events alleged in this Complaint.

## GENERAL ALLEGATIONS

8.      On September 15, 2005 at approximately 6:00 a.m., Plaintiff Walker, Sr. was in his residence preparing for work, his wife, Plaintiff K. Walker was within the house with their one year old daughter, Plaintiff T. Walker. The Plaintiffs' 15 year old son, Plaintiff D.W., Jr. was asleep in his upstairs bedroom.

B-2

9.    At approximately 6:05 a.m. members of the City of Wilmington Police, including heavily armed members of the SWAT unit broke through the front door of the home and stormed the inside of the residence holding and detaining Plaintiff Walker, Sr. at gun point and handcuffs, on his knees, in his basement and further detained Plaintiff K. Walker at gun point with Plaintiff T. W. by forcing them to sit on their laundry room floor.

10.    Plaintiff K. Walker informed officers they did not have to point guns at them, but was ignored. Plaintiff Walker, Sr. repeatedly said, "You guys have the wrong house."

11.    Defendant Lawson appeared on the scene and began searching through Plaintiff Walker, Sr.'s pockets. Defendant Lawson took out Plaintiff Walker, Sr.'s wallet and went through the wallet. He said he could not find Walker, Sr.'s driver's license. He then told Walker, Sr. to carefully go through the wallet and "give me your driver's license, I can't find it". Defendant Lawson then took off Walker, Sr.'s handcuffs. After reviewing Walker, Sr.'s driver's license, Lawson presented Walker Sr. with a photo of the suspect and asked him if he knew the man. The answer was negative. The detective then requested information if anyone else was in the house besides himself, his wife and 1 year old child. Walker, Sr. said his fifteen year old son was upstairs. Lawson asked what he was doing up there, Walker, Sr. said, "he is sleeping in his bed".

12.    The police units then proceeded to the upstairs and entered the bedroom of Plaintiff D.W., Jr. who woke to officers moving into his bedroom, guns and laser sights pointed at him. He was laying in the bed and they were asking his name. He responded. They told him to get up slowly and emphasized move slowly. He was naked. The officers then searched his dresser drawers for clothing. They handed him a pair of pants. They told him to put on the clothing.

B-3

There are twin beds in the room. The officers asked him who else sleeps in the room. <u>D.W., Jr.</u> responded that it is a guest bed and that no one sleeps there. They continued to interrogate him with the same questions, then moved him forcefully downstairs and set him next to his mother and one year old sibling who had been escorted by the police from the laundry room up to the family room.

13.    Walker, Sr. was then moved from the basement to the family room to be seated with Wife, 1 year old and his 15 year old son. At this point, the detective explained it was a mistake. After Wife questioned him about how such a significant mistake could be made, Detective Lawson responded, "Wife's middle name is the same as the suspect's mother's first name. She lives in Wilton." Still baffled by his response and asking for further information, the Detective responded that "these things happen". Walker, Sr. asked what about the front door and the damage to his home, Detective Lawson then pulled out a business card, crossed out the phone number on the front of the card and wrote on the back of the card a different number and informed Walker, Sr. to "call this number to get his door fixed".

14.    Walker's neighbor and coworker, Allen Peoples, drove by the house during the incident and stopped and asked a SWAT member what was happening, stating he worked with Plaintiff Walker, Sr. The officer said "You won't be seeing him [Walker] going to work for a while."

15.    To the best of Walker, Sr.'s recollection, every room and every closet in the home was searched, including the attic.

16.    None of the Plaintiffs had violated any law or regulation. None were accused of any violation. No explanation or apology for Defendants' conduct was offered.

B-4

4

## COUNT I (§1983 – Claim Against All Defendants)

17.     Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 16.

18.     On or about September 15, 2005, as aforementioned, while acting under color of state law, without prior notice forcibly entered Plaintiffs' residence, detained the Plaintiffs at gun point and handcuffed Plaintiff Walker, Sr.. all without probable cause and without a reasonable belief that anyone within the residence had committed a crime or had taken some other action for which arrest or detainment is legal or appropriate.

19.     The aforesaid actions of the Defendants were intentional, reckless, and/or showed deliberate indifference to the rights and welfare of Plaintiff.

20.     Plaintiffs took no action which constituted any offense or provided any justification or reason for Defendants to forcibly break into the home unannounced, draw their weapons against the Plaintiffs and the minor children, a one year old daughter and 15 year old son, and handcuff Plaintiff Walker, Sr. and otherwise detain anyone within the household.

21.     The acts of Defendants were done with the purpose and intent of depriving Plaintiffs the right to be secure in their person against unreasonable search and seizure as guaranteed to them by the 4th Amendment to the United States Constitution and their rights not to be deprived of life, liberty or property without due process of law as guaranteed by the 14th Amendment of the Constitution of the United States.

22.     The acts of Defendants were taken against Plaintiffs because of Plaintiffs' race and were done with the purpose and intent of depriving Plaintiffs the right to be secure in their person against unreasonable search and seizure secured to them under the 4th Amendment of the

B-5

United States Constitution and their right not be deprived of life, liberty or property without due

process of law and to be accorded the equal protection of the law that is guaranteed to them

under the 14ᵗʰ Amendment of the United States Constitution.

23.    As a result and proximate cause of the acts of Defendants, who were acting under

color of law, Plaintiffs:

        a.    Suffered great and significant and continuing physical and emotional

distress, harm, anguish, shame and humiliation; and

        b.    Incurred medical expenses.

### COUNT II  (§1983 Claim – Against City of Wilmington)

24.    Plaintiffs hereby reallege and incorporate by reference the allegations contained

in paragraphs 1 through 23.

25.    At all times relevant to the action, Defendant Lawson was an employee or agent

of Defendant City and was acting for and on behalf of Defendant City.  Defendant City knew or

should have known of actions of its employee, Defendant Lawson, whose actions were within

Defendant City's supervision and control.

26.    Defendant City knew, or should have known, the actions of Defendant Lawson

included wholesale deprivations of Plaintiffs' constitutionally guaranteed civil rights and battery

and false arrest of Plaintiffs.

27.    Defendant City showed a deliberate indifference to the well being and

constitutional rights and welfare of Plaintiffs.

28.    By the acts and/or omission of Defendant City, an atmosphere was created

conducive to the aforesaid illegal and constitutional actions of Defendant Lawson and which

B-6

6

demonstrated the complete disregard by Defendant City of a risk known or which should have been known and a deliberate indifference to the constitutional rights and welfare of Plaintiffs and others.

29.    The acts of Defendant Lawson were pursuant to a custom or policy of Defendant City which, as a result of the aforesaid acts and/or omissions of Defendant City, Plaintiffs:

a.    Suffered great and significant and continuing physical and emotional distress, harm, anguish, shame and humiliation; and

b.    Incurred medical expenses.

### COUNT III (§1983 Claim – Against City of Wilmington)

30.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 29.

31.    Defendant City is the employer of Defendant Lawson and at all times Defendant Lawson was acting as the agent and/or employee and under its supervision and control.

32.    Defendant City is responsible for the operation and conduct of the City of Wilmington Police Department and the supervising and training of all of its officers, including Defendant Lawson.

33.    Defendant City's negligent, intentional, willful and/or wanton failure to adequately train and/or supervise its officers, specifically Defendant Lawson, was a cause of the illegal and unconstitutional actions taken against Plaintiffs by Defendant Lawson and constitutes illegal, unconstitutional actions and deliberate indifference to the welfare and constitutional rights of Plaintiffs and others.

34.    As a direct and proximate result of the aforesaid actions, inactions and omissions

B-7

by Defendant City, Plaintiffs:

        a.     Suffered great and significant and continuing physical and emotional distress, harm, anguish, shame and humiliation; and

        b.     Incurred medical expenses.

### COUNT IV – (§1983 Claim Against Defendant Lawson)

35.    Plaintiffs hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 34.

36.    Defendant Lawson at all times was acting as an agent and employee of the City and acting under color of state law.

37.    Defendant Lawson's negligent, intentional, willful and/or wanton actions were done with the purpose and intent of depriving Plaintiffs the right to be secure in their person and against unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution and the right not to be deprived of life, liberty or property without due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

38.    The acts of Defendant Lawson was taken against Plaintiffs because of their race and were done with the purpose and intent of depriving Plaintiffs the right to be secure in their person and against unreasonable searches and seizures secured to them under the Fourth and Fourteenth Amendments to the United States Constitution and the right not to be deprived of life, liberty or property without due process of law and to be accorded the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

B-8

39.    As a result of the proximate cause of the acts of Defendant Lawson who was acting under color of law, Plaintiffs:

a.    Suffered great and significant and continuing physical and emotional distress, harm, anguish, shame and humiliation; and

b.    Incurred medical expenses.

### COUNT V  (§1983 Claim Against Unknown Entities)

40.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 39.

41.    At all times relevant to the action, Defendants Unknown Entities are either political subdivisions, agencies or individual employees  or agents of a political subdivision at the State of Delaware acting under color of state law.

42.    These unknown entities include police officers employed by the City and/or by the State of Delaware and/or a county of the State.  Defendants Unknown Entities actions included wholesale deprivations of Plaintiffs' constitutionally guaranteed rights, battery and false arrest of Plaintiffs.

43.    Defendants Unknown Entities showed a deliberate indifference to the well being and constitutional rights and welfare of Plaintiffs.

44.    The acts and/or omission of the Defendants Unknown Entities which are subdivisions of the State, created an atmosphere conducive to the aforesaid illegal and constitutional actions of individual Defendants Unknown Entities and which demonstrated the complete disregard of a risk known or which should have been known and a deliberate indifference to the constitutional rights and welfare of Plaintiffs and others.

B-9

45.   The acts of Defendants Unknown Entities were pursuant to a customs or policies of Defendants Unknown Entities which are political subdivisions of the State.

46.   Defendants Unknown Entities actions under color of state law deprived Plaintiffs of their rights not to be deprived of life, liberty and property without due process of law, their right to be free of unreasonable search and seizure and their right to equal protection under the law as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

47.   As a result of the proximate cause of the acts of Defendant Lawson who was acting under color of law, Plaintiffs:

      a.   Suffered great and significant and continuing physical and emotional distress, harm, anguish, shame and humiliation; and

      b.   Incurred medical expenses.

              **COUNT VI** (§ 1983 Claim Against All Defendants)

48.   Plaintiffs hereby reallege and incorporate by reference the allegations contained paragraphs 1 through 47.

49.   Plaintiffs Walker, Sr., Plaintiff K. Walker, Plaintiff Walker, Jr. and Plaintiff T. Walker have no common identification with the individual being sought by the Defendants other than being African-American with the household surname of Walker.

50.   The actions of Defendants traveling out of their jurisdiction were taken because of Plaintiffs' race.

51.   Defendants actions constitute a violation of Plaintiffs' right to due process of law and equal protection of the law guaranteed under the United States Constitution.

52.   As a direct and proximate result of the actions of Defendants the Plaintiffs:

B-10

      a.     Suffered great and significant and continuing physical and emotional distress, harm, anguish, shame and humiliation; and

      b.     Incurred medical expenses.

### COUNT VII (State Claim of False Imprisonment)

53.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 52.

54.    Defendants acted intentionally by acts and threats causing Plaintiffs to be totally controlled for an unreasonable amount of time within physical boundaries established by Defendants.

55.    Defendants confinement of Plaintiffs was without consent or legal jurisdiction or justification.

56.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered injuries, including, but not limited to:

      a.     Suffered great and significant physical and emotional distress, harm, anguish, shame and humiliation;

      b.     Incurred medical expenses.

### COUNT VIII – (State Law Battery Claim)

57.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 56.

58.    Defendants intentional physical assault of Plaintiffs constitutes a battery.

59.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered injuries, including, but not limited to:

B-11

11

      a.    Suffered great and significant physical and emotional distress, harm, anguish, shame and humiliation;

      b.    Incurred medical expenses.


      **WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and punitive damages, including costs and attorneys' fees pursuant to 42 U.S.C. §1988 and other such relief as is just and appropriate.

<div align="right">

BIGGS AND BATTAGLIA


_____/s/ Victor F. Battaglia
Victor F. Battaglia, Sr. (ID# 156)
921 Orange Street
Wilmington, DE 19801
(302) 655-9677
VictorSr@batlaw.com
Attorney for Plaintiffs

</div>

Date:  May 2, 2006

<div align="right">

B-12

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR, KAREN           :
WALKER, his wife, D.W., JR.., minor  :
child, and T.W., minor child,        :
                                     :
        Plaintiffs,                  :        C.A. No. 06-288 KAJ
                                     :
    v.                               :
                                     :
THE CITY OF WILMINGTON, a political  :
subdivision of the State of Delaware, :
DETECTIVE MICHAEL R. LAWSON, JR.,:
individually and in his official capacity, and :
UKNOWN ENTITIES.                     :

## ANSWER OF THE CITY OF WILMINGTON
## AND DETECTIVE MICHAEL R. LAWSON, JR.

1.    Admitted upon information and belief.

2.    Admitted upon information and belief.

3.    Admitted upon information and belief.

4.    Admitted upon information and belief.

5.    The City of Wilmington and Detective Michael R. Lawson, Jr. (hereafter "Answering Defendants") admit that the City of Wilmington is a political subdivision of the State of Delaware, and further admit that the City maintains a police department. Answering Defendants deny that the jurisdiction of the City's police department is limited to the City of Wilmington. Answering Defendants are not aware of the statute in this averment to which Plaintiffs refer but fail to cite.

6.    Admitted.

7.    Answering Defendants do not have sufficient information to admit or deny the averments about the Unknown Entity described in this averment.

B-13

## GENERAL ALLEGATIONS

8.    Answering Defendants do not have any information to admit or deny what Plaintiffs were doing in their residence at the said date and time.

9.    Denied as stated. By way of further explanation, at the said date and time, City of Wilmington police officers did execute a warrant by entering 118 Dutton Place through the unlocked screen door in search of Dwayne Walker, who was wanted for the crime of First Degree Murder.

10.    Answering Defendants do not have sufficient information to admit or deny this averment.

11.    Admitted.

12.    Answering Defendants admit that guns were drawn, but deny that guns were equipped with laser sights, and further deny that the non-existent laser sights were pointed at anyone. Answering Defendants admit that D.W., Jr. was in bed, that he identified himself, that he was told to get up slowly, that he was naked, that he was handed a pair of jeans, and that he was instructed to wear the jeans. Answering Defendants further admit D.W., Jr. was asked who slept in the guest bed, but deny that D.W. Jr. was continually interrogated with the same questions. Answering Defendants deny that they forcefully moved D.W. Jr. downstairs. By way of further explaination, Answering Defendants escorted D.W. Jr. downstairs to sit with the rest of his family.

13.    Denied as stated. Answering Defendants admit that the Walker family was gathered in the family room, at which time Detective Lawson showed Plaintiff DeWayne Walker the "wanted flyer" for Dwayne Walker, and also explained to Plaintiff Karen Walker that her middle name (Alicia) matches the first name of Alicia Walker, who transported Dwayne Walker

to Chester, Pennsylvania, within hours after he committed first degree murder.    Detective

Lawson admits that he gave his business card to Plaintiff DeWayne Walker and invited him to

call to have his door fixed.  By way of further explanation, Detecitve Walker did not observe any

damage to the door, and the SWAT entered the house by opening the unlocked door.

14.    Answering Defendants deny making any such statements to Allen Peoples.

15.    Admitted.

16.    Admitted in part; denied in part.  Answering Defendants admit that none of

Plaintiffs violated any laws or regulations.   Detective Lawson did explain how the mistake

occurred and he apologized to the Plaintiffs.

## COUNT I (42 U.S.C. § 1983 - CLAIM AGAINST ALL DEFENDANTS)

17.    Answering Defendants hereby incorporate the responses set forth in Paragraphs 1

through 16 as if set forth herein at length.

18.     Denied as stated.  Answering Defendants admit that they entered Plaintiffs'

residence at the said date and time to execute a warrant for Dwayne Walker, who was wanted for

first degree murder.    Answering Defendants admit that they entered the residence without prior

notice, but deny that they entered the residence forcefully.  Answering Defendants deny that they

lacked probable cause and/or reasonable belief that anyone within the residence had committed a

crime or had taken some other action for which arrest or detainment was appropriate.

19.    This averment states a legal conclusion to which no response is required.  To the

extent that a response is required, Answering Defendants deny the allegations and deny any

liability

20.    Denied as stated.  Answering Defendants admit that Plaintiffs took no action

which constituted any offense.  Answering Defendants deny that they lacked probable cause to

B-15

believe that a murder suspect could be found in Plaintiffs' residence.  Answering Defendants

deny that apprehension of a first degree murder suspect is insufficient justification or reason to

enter unannounced with weapons drawn into the dwelling where the first degree murder suspect

is believed to be hiding.

21.    Denied in full.

22.    Denied in full.

23.    Denied in full, and as to each sub-part.

a.    Denied in full.

b.    Denied in full.

## COUNT II (42 U.S.C. § 1983 - CLAIM AGAINST THE CITY OF WILMINGTON)

24.    Answering Defendants hereby incorporate the responses set forth in Paragraphs 1

through 23 as if set forth herein at length.

25.    Admitted in part; denied in part.  Answering Defendants admit that Detective

Lawson was an employee and/or agent of the City of Wilmington at all relevant times therein.

Answering Defendants deny that the City knew or should have known of the actions of Detective

Lawson.  Answering Defendants admit that Detective Lawson's actions were within the City's

supervision and control.   Answering Defendants deny that Detective Lawson is liable to

Plaintiffs and further deny that any liability is imputed to the City.

26.    Denied in full.

27.    Denied in full.

28.    Denied in full.

29.    Denied in full, and as to each sub-part.

a.    Denied in full.

B-16

b. Denied in full.

**COUNT III (42 U.S.C. § 1983 - CLAIM AGAINST CITY OF WILMINGTON)**

30. Answering Defendants hereby incorporate the responses set forth in Paragraphs 1 through 29 as if set forth herein at length.

31. Admitted.

32. Admitted.

33. Denied in full.

34. Denied in full, and as to each sub-part.

a. Denied in full.

b. Denied in full.

**COUNT IV (42 U.S.C. § 1983 - CLAIM AGAINST LAWSON)**

35. Answering Defendants hereby incorporate the responses set forth in Paragraphs 1 through 34 as if set forth herein at length.

36. Admitted.

37. Denied in full.

38. Denied in full.

39. Denied in full, and as to each sub-part.

a. Denied in full.

b. Denied in full.

**COUNT V (42 U.S.C. § 1983 - CLAIM AGAINST UNKNOWN ENTITIES)**

40. Because Answering Defendants do not know the unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

41. Because Answering Defendants do not know which unknown entities to which

Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

42.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

43.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

44.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

45.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington and Detective Lawson.

46.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

47.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

a.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

b.    Because Answering Defendants do not know which unknown entities to which Plaintiffs are referring, no response is required by the City of Wilmington or Detective Lawson.

## COUNT VI (42 U.S.C. § 1983 - CLAIM AGAINST ALL DEFENDANTS)

48.    Answering Defendants hereby incorporate the responses set forth in Paragraphs 1 through 47 as if set forth herein at length.

B-18

49.     Denied. By way of further explanation, the suspect sought was named Dwayne Walker, which is almost identical to the name of Plaintiff DeWayne Walker. Also by way of further explanation, the Dwayne Walker sought was previously transported by someone named Alicia Walker, and Plaintiff Karen Walker's middle name is Alicia. Also by way of further explanation, Dwayne Walker was the same race as Plaintiff DeWayne Walker, and Alicia Walker was the same race as Plaintiff Karen Alicia Walker.

50.     Denied.

51.     Denied.

52.     Denied in full, and as to each sub-part.

   a.     Denied in full.

   b.     Denied in full.

53.     Answering Defendants do not have sufficient information to admit or deny this averment.

## COUNT VI (STATE LAW CLAIM OF FALSE IMPRISONMENT)

54.     Answering Defendants hereby incorporate the responses set forth in Paragraphs 1 through 53 as if set forth herein at length.

55.     Answering Defendants deny that Plaintiffs were "confined", and further deny that legal jurisdiction or justification was lacking. Answering Defendants are not able to admit or deny whether Plaintiffs' consented.

56.     Denied in full, and as to each sub-part.

   a.     Denied in full.

   b.     Denied in full.

B-19

## COUNT VII (STATE LAW CLAIM OF BATTERY)

57.    Answering Defendants hereby incorporate the responses set forth in Paragraphs 1 through 56 as if set forth herein at length.

58.    Denied.

59.    Denied in full, and as to each sub-part.

    a.    Denied in full.

    b.    Denied in full.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

60.    Answering Defendants' actions were supported by probable cause.

### SECOND AFFIRMATIVE DEFENSE

61.    Answering Defendants' actions were authorized by the Warrant Clause of the Fourth Amendment.

### THIRD AFFIRMATIVE DEFENSE

62.    Answering Defendants' actions were authorized by the Police Mutual Assistance Act, 11 Del.C. § 1941 et seq.

### FOURTH AFFIRMATIVE DEFENSE

63.    Answering Defendants' actions were authorized by 11 Del.C. § 1911(a)(3)&(d), which gives City police officers statewide authority to makes arrests outside of the jurisdictional limits of the City of Wilmington.

### FIFTH AFFIRMATIVE DEFENSE

64.    Plaintiffs fail to state a claim against Answering Defendants upon which relief

B-20

can be granted.

## SIXTH AFFIRMATIVE DEFENSE

65.    Law Enforcement Officers Privilege.

## SEVENTH AFFIRMATIVE DEFENSE

66.    The actions and conduct of Answering Defendants, to the extent they occurred as alleged, did not rise to the level of a Constitutional violation and, therefore, Plaintiffs did not suffer any infringement of their constitutional rights.

## EIGHTH AFFIRMATIVE DEFENSE

67.    The actions and conduct of Answering Defendants, to the extent they occurred as alleged, were objectively reasonable under the circumstances which Answering Defendants were aware, therefore, they enjoy qualified immunity from all liability.

## NINTH AFFIRMATIVE DEFENSE

68.    The actions and conduct of Answering Defendants did not violate any clearly established Constitutional or Federal statutory rights of which Answering Defendants reasonably should have been aware, entitling Answering Defendants to qualified immunity.

## TENTH AFFIRMATIVE DEFENSE

69.    The actions and conduct of the Answering Defendants, to the extent they occurred as alleged, were undertaken in good faith performance of their official duties, without wantonness or malice, and were, therefore protected by the sovereign immunity provisions of 10 Del. C. §4010 et seq.

## ELEVENTH AFFIRMATIVE DEFENSE

70.    Plaintiffs' damages, if any, are limited by 10 Del. C. §4013.

B-21

## TWELFTH AFFIRMATIVE DEFENSE

70.    To the extent that Plaintiffs may have been injured, Answering Defendants were not the proximate cause of any such injuries.

## THIRTEENTH AFFIRMATIVE DEFENSE

71.    Punitive damages are not recoverable against Answering Defendants for the claims alleged by Plaintiffs.

## FOURTEENTH AFFIRMATIVE DEFENSE

72.    Plaintiffs cannot show an official policy, practice, procedure or custom sufficient to support a finding of municipal liability.

**WHEREFORE**, Defendants, City of Wilmington and Detective Michael R. Lawson, Jr., pray that this Honorable Court dismiss Plaintiffs' Complaint, assess costs and reasonable attorney's fees against Plaintiffs, and order such other relief as this Court deems appropriate.

/s/ Alex J. Mili, Jr.
Alex J. Mili, Jr., Esquire (DE Bar I.D. #4125)
Assistant City Solicitor
City of Wilmington Law Department
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
amili@ci.wilmington.de.us
Attorney for Defendants City of Wilmington and
Detective Michael R. Lawson, Jr.

Dated: June 19, 2006

B-22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR, KAREN          :
WALKER, his wife, D.W., JR.., minor :
child, and T.W., minor child,       :
                                    :
        Plaintiffs,                 :        C.A. No. 06-288 KAJ
                                    :
    v.                              :
                                    :
THE CITY OF WILMINGTON, a political :
subdivision of the State of Delaware, :
DETECTIVE MICHAEL R. LAWSON, JR.,:
individually and in his official capacity, and :
UKNOWN ENTITIES,                    :
                                    :
        Defendants.                 :

**DEFENDANT CITY OF WILMINGTON'S RESPONSE TO PLAINTIFFS' FIRST
INTERROGATORIES DIRECTED TO DEFENDANT CITY OF WILMINGTON**

**INTERROGATORIES**

1. Identify the officers of the City of Wilmington Police Department who were investigating the case against Dwayne Walker, ID 0509010302, and include:

      a. The dates and times each were on duty each day;

      b. The rank of each individual.

<u>ANSWER</u>    The following officers were on duty on September 15, 2005 at 6:00 a.m.:

Detective Michael Lawson
Detective Raymond Wyatt, Jr.
Senior Corporal Bruce Coffiey
Senior Corporal John Ciritella
Detective Matt Hall
Corporal Stephen Brock
Senior Corporal Bill Gearhart
Senior Corporal Ralph Hauck
Senior Corporal Shawn Gordon

B-23

Senior Corporal Gene Solge
Senior Corporal Dave Simmons
Senior Corporal Damian Vice
Master Sergeant Scott Sowden
Sergeant Dennis O'Connor
Master Sergeant Kyle Rogers
Master Sergeant Tom Spell
Corporal Matt Severance
Corporal Joe O'Neil
Senior Corporal Tom Curley
Senior Corporal Donnie Witte
Corporal George Pigford
Corporal Jeffrey Silvers
Corporal Stephen Misetic

2. State whether in the past 10 years there has ever been any complaints, accusations or claims against any member of the Wilmington Police Department, or the Wilmington Police Department in general, which make accusations of violation of Constitutional rights or of discrimination based upon race, national origin, or sex, and include for each such complaint or accusation:

      a. The date(s) of each;

      b. The nature or the claims or accusations;

      c. The status of any investigation of those claims or accusations;

      d. How each such claim or accusation was resolved.

**ANSWER**    Objection. Defendants object to this Interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objection, Defendants disclose:

Albert Brown v. Randolph Pfaff, et al. – 8/03 - Civil Rights Violations - dismissed
Kurt C. Bryson v. City of Wilmington – 8/05 - Civil Rights Violations - unsubstantiated
Paul Sekscinski v. Cpl. Anthony Harris – 5/05 - Civil Rights Violations - dismissed
Faheem Akil v. City of Wilmington – 5/05 – Civil Rights Violations - unsubstantiated
Joseph Gibbs v. Carolyn Hartsky, et al. – 12/98 - Civil Rights Violations - dismissed
Clarence Jamison v. Wilmington Police Dept., - 4/04 - Civil Rights Violations- dismissed
Marsha Ash v. City of Wilmington Police –10/04 - Civil Rights Violations - unsubstantiated
Gerald Samuels v. Det. Cummings, et al. – 5/03 – Excessive Force - dismissed

B-24

Haleem Clark, et al. v. Wilmington Police Dept., - 9/02 - Civil Rights Violations - dismissed
Christopher Gibson v. Mayor, et al. – 8/00 – Civil Rights Violations – Jury Verdict for Defense
Raymond Green v. City of Wilmington, et al. – 7/02 - Excessive Force - dismissed
David Jones v. City of Wilmington, et al. – 12/00 – Race Discrimination - dismissed
Crystal Dupree v. City of Wilmington, et al. – 6/00 - Civil Rights Violations- dismissed
Alfred Hatchet v. City of Wilmington, et al. – 10/01 - Race Discrimination - unsubstantiated
Timothy Smith v. Wilmington Police Dept., - 3/99 - Excessive Force - dismissed
Salomie Cooper, et al. v. Officer Villaburdi, et al – 8/00 - Excessive Force- dismissed
Harvey Hudson v. City of Wilmington, et al. – 2/00 - Excessive Force- dismissed
Joseph Washington v. Robert Curry, et al. – 9/01 - Excessive Force - dismissed
Steven Miller v. City of Wilmington, et al. – 3/01 - Excessive Force- dismissed
Crystal Spanos v. City of Wilmington, et al. – 8/00 – Excessive Force - dismissed
Stanford Burris v. James G. Peiffer, et al. – 4/98 – Excessive Force- dismissed
Alton Cannon v.  City of Wilmington – 8/99 - Excessive Force - dismissed
Michael Szczerba v. City of Wilmington – 5/99 - Race Discrimination - unsubstantiated
Dana Williams v. Nancy Dietz, et al. - 1997 - Excessive Force - dismissed

Currently 17 pending cases and 8 settled cases.

     3. State for each claim or accusation set forth in the preceding interrogatory:

        a. Whether any federal, state, or other public entity performed any investigation;

        b. The results of any such investigation;

        c. The location of any document in any way referring to any such incident or the

        investigation of any such claim or accusation.

**ANSWER**    Objection.  Defendants object to this Interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving the objection, Defendants disclose the following claims which were investigated by the EEOC:

Kurt C. Bryson v. City of Wilmington – 8/05 - Civil Rights Violations
Faheem Akil v. City of Wilmington – 5/05 – Civil Rights Violations
Marsha Ash v. City of Wilmington Police Dept. –10/04 - Civil Rights Violations-
Alfred Hatchet v. City of Wilmington, et al. – 10/01 - Race Discrimination
Michael Szczerba v. City of Wilmington – 5/99 - Race Discrimination

As for any internal investigations conducted within the Wilmington Police Department, the contents and results are prohibited from disclosure by Delaware's Law Enforcement Officers Bill of Rights.

B-25

4. Describe the training each individual member of the Wilmington Police Department receives prior to and after becoming an employee of the Wilmington Police Department.

**ANSWER**

Each individual member of the Wilmington Police Department must graduate from the police academy.

5. Describe any and all training each and every member of the Wilmington Police Department receives either before or after becoming a member of the police department with respect to non-discrimination against individuals on the basis of race, color, national origin or sex.

**ANSWER**

The Wilmington Police Department provides diversity training as part of the department's academy training. Diversity training is also given throughout the department on occasions.

6. Describe each and every record, including any computer file or other electronic database which sets forth the training which employees of the Wilmington Police Department received concerning discrimination as set forth in the pervious Interrogatory.

**ANSWER**

Objection. Overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objection, the White Book contains the comprehensive body of police procedures for the Wilmington Police Department.

7. Identify, describe and state the current location of any video, audio, written or other record of the activities or actions of the Wilmington Police Department or any member thereof, related in any way to Plaintiff DeWayne Walker, Sr., his son, DeWayne Walker, Jr. and/or the suspect, Dwayne Walker, including, but not limited to any 911 or other emergency call recordings, logs or other written records.

B-26

ANSWER

 The investigative files have been disclosed as part of the Defendants' initial Rule 26
 disclosures, as well as Defendants' response to the Interrogatories propounded by
 Plaintiffs.

8. Identify every record, whether in writing, or consisting of a computer file or other electronic database or any other type of recording which sets forth any depiction or description or contains any reference to the incident which is the subject matter of this lawsuit including any such materials which describe any investigation by any entity of the Government of Wilmington relating to the incident.

ANSWER

 See response to Number 7, above.

9. If there at one time existed any document, record or other item which would have been included in response to Interrogatories 7 or 8 above, but which has been destroyed or lost, please state:

 a. The date the item was destroyed or lost;

 b. The reason it was destroyed;

 c. What the item contained.

ANSWER

 Defendants have no knowledge of any documents other than those described in
 Responses 7 and 8 above.

10. Describe, in detail, any prior incidents involving the Wilmington Police (or any investigations by the Wilmington Police) relating to any incident occurring at the Plaintiff DeWayne Walker's residence, and include the date of the incident, the nature of the incident,

B-27

and the location of any documents describing or any way relating to the incident.

## ANSWER

There are no known incidents prior to September 15, 2005.

11. Identify any other agencies involved in the execution of the subpoena for Plaintiff DeWayne Walker and include:

     a. The names of all police officers in the Walker household;

     b. The names of any other agencies whose representatives, agents or employees entered the Walker household;

     c. Identify any documentation describing how that permission was granted to travel outside the City of Wilmington boundaries to execute the subpoena;

     d. For each individual or agency listed in the foregoing answers, describe what knowledge they have regarding the execution of the subpoena and the identity of DeWayne Walker;

     e. Identify any documents specifically in the affidavits or warrants used to gain entry to the Walker residence;

     f. Identify any audio or video recordings of anything related to the Walker subpoena execution including the identity of any informants or sources of information including, but not limited to, surveillance.

## ANSWER

    (a)    See Response to #1, above.
    (b)    None.
    (c)    See signed warrant from Rule 26 Disclosures.
    (d)    See warrant affidavit in Rule 26 Disclosure.
    (e)    See affidavit and warrant in Rule 26 Disclosure.
    (f)    There are no known audio or video recordings.

B-28

12. On what authority and what authorization was required, for the Defendant to go outside the City limits of Wilmington to the Walker residence.

## ANSWER

The Delaware General Assembly, which passed a statute authorizing all sworn law enforcement officers in Delaware to have statewide law enforcement authority.

13. What notice or communication occurred between the Defendant and any other State, County or Municipality regarding Plaintiff.

## ANSWER

No notice or communication was given or required.

14. Describe and identify each officer present at the Plaintiff's residence on the date of execution of the search warrant and provide a narrative of each officer's activity there.

## ANSWER

| | |
|---|---|
| Detective Michael Lawson | Supervisor |
| Detective Raymond Wyatt, Jr. | Supervisor |
| Senior Corporal Bruce Coffiey | Breecher |
| Senior Corporal John Ciritella | Breecher |
| Detective Matt Hall | UMP/1st Floor |
| Corporal Stephen Brock | Contact/1st Floor |
| Senior Corporal Bill Gearhart | Contact/2nd Floor |
| Senior Corporal Ralph Hauck | UMP/ 1st Floor |
| Senior Corporal Shawn Gordon | Contact/ 1st Floor |
| Senior Corporal Gene Solge | UMP/2nd Floor |
| Senior Corporal Dave Simmons | Contact/ 2nd Floor |
| Senior Corporal Damian Vice | K9/Assist Perimeter |
| Master Sergeant Scott Sowden | UMP/support 2nd Floor |
| Sergeant Dennis O'Connor | Support 2nd Floor |
| Master Sergeant Kyle Rogers | Support 2nd Floor |
| Master Sergeant Tom Spell | Support 1st Floor |
| Corporal Matt Severance | Support 1st Floor |

B-29

Corporal Joe O'Neil
Senior Corporal Tom Curley
Senior Corporal Donnie Witte
Corporal George Pigford
Corporal Jeffrey Silvers
Corporal Stephen Misetic

K9/Rear Perimeter
Support Rear Perimeter
k9/front perimeter
Support Front Perimeter
Involved in dealing with the confidential informant.


CITY OF WILMINGTON LAW DEPARTMENT



Alex J. Mili, Jr. , Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
 Attorney for Defendants

DATE:   November 3, 2006

B-30

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR., KAREN :
WALKER, his wife, <u>D.W. Jr.</u>, minor child :
and <u>T. W.</u>, minor child, :
 :
   Plaintiffs, :
 :
  v. :  C.A. NO.  06-288 ***
 :
THE CITY OF WILMINGTON, a political :
subdivision of the State of Delaware, :  <u>**Jury Trial Demanded**</u>
DETECTIVE MICHAEL R. LAWSON, JR.,:
individually and in his official capacity,  and :
UNKNOWN ENTITIES, :
 :
   Defendants.

## <u>AFFIDAVIT OF DEWAYNE WALKER, SR.</u>

DeWayne Walker, Sr., being duly sworn according to all, deposes and says:

1. I am a Plaintiff in the captioned action.

2. Since 1996, I have lived with my family at 118 Dutton Drive, Eagle Glen,

Wedgewood, New Castle, Delaware.

3. When I purchased my home, electrical power was supplied by Conectiv Power

Company.

4. According to my recollection and research, Conectiv Power changed its name to

Delmarva Power in 2005, and began sending bills in the name of Delmarva Power in or about

August 2005, as set forth in the attached press release. (Ex. A)

5. At all times the bills for electrical service which were sent to me from either Conectiv

and/or Delmarva Power were addressed to DeWayne Walker, 118 Dutton Drive.  B-31

6. Attached hereto (as Exhibit B) is a true and correct copy of the billing statement from Delmarva Power from January of 2007 sent to me, DeWayne Walker, at 118 Dutton Drive.

7. I am aware of the incident which resulted in a complaint being filed by my wife in September of 2003 which is reflected in the "Criminal Justice Information System pending Complaint Incident Inquiry" set forth at page A-45 of the Appendix to the Defendant's Opening Brief in Support of their Motion for Summary Judgment.

8. This report concerned the theft of my son's (DeWayne Walker, Jr.), bicycle in September of 2003. The bicycle was taken from Wilton Park off Appleby Road in New Castle, and not from our residence at 118 Dutton Drive, which is not in Wilton Park.

9. The report at page A-45 incorrectly shows my son's name as "Dwayne" Walker, but correctly notes he has no middle name (NMN) and is a "Junior" (J).

10. The report also incorrectly states that both my wife and my son's address is 118 Dutton Court, while, in fact, our residence is not on Dutton Court, but rather on Dutton Drive.

11. The report also does not set forth a date of birth for my son, DeWayne Walker, Jr.

12. At no time have I or my wife owned or driven a Nissan Maxima, nor was such a vehicle at my house from on or about September 13 through 15, 2005.

13. Neither I nor my son have ever used the name "Dwayne" Walker or have ever been known by that name.

DeWayne Walker, Sr.

Sworn and Subscribed before
Me this 2nd day of July, 2007

Notarial Officer

B-32

2

# EXHIBIT A



A PHI Company

We're connected to you by more than power lines.

**Welcome to Delmarva Power** ⌄          **Your Home** →          **Your Business** →

About Delmarva Power     Community & Environment     <u>News & Information</u>     FERC Standards of Conduct     Visit PHI

## Monthly Bills Now Carry Delmarva Power Name

### Monday, July 25, 2005

**FOR IMMEDIATE RELEASE**
Contact: Bill Yingling: 302-283-5811
Bill.Yingling@pepcoholdings.com

*Part of Ongoing Brand Change Emphasizing Local Commitment*

**WILMINGTON, Del.** - As part of the ongoing change in its brand name, Delmarva Power has begun mailing monthly gas and electric bills that carry the new Delmarva Power name instead of the old Conectiv Power Delivery name.

While Delmarva Power first announced the name change March 31, the company has been changing the name gradually to minimize costs.

For customers, there"s no need for concern. Although we are changing our brand name, we remain the same company and will provide the same safe and reliable service as always. Customers will use the same phone numbers and addresses to contact us. And if they participate in budget billing or direct debit payment plans, they won"t have to make any changes to stay enrolled.

Customers can now write the new company name on their check when they receive their bill and make payment. Any customers who mistakenly write the old Conectiv Power Delivery name on their check need not worry. Those checks will still be accepted as payment. But we do ask customers to get in the habit of using the new name.

Some customers received bills in July that carry the old Conectiv Power Delivery name. Customers should not discard that bill since it is their regular monthly bill. As a rule of thumb, the company name on the bill should be the same name to which they make payment on their checks.

"As we go through the process of changing our name, our goal is to minimize the impact on our customers," said Gary Stockbridge, President of Delmarva Power. "With that in mind, we hope to complete this transition by the end of the year."

### # #

Delmarva Power, a subsidiary of Pepco Holdings, Inc. (NYSE: POM), provides safe, reliable and affordable regulated electric and natural gas delivery services to more than 500,000 customers in Delaware, Maryland and Virginia.

Copyright © 2006 Delmarva Power. All rights reserved.

B-34

# EXHIBIT B



**delmarva power**

6AH0
100018609

PAGE 2
Account Number:
2717 7609 9993

KAREN WALKER
DEWAYNE WALKER
118 DUTTON DR
NEW CASTLE DE 19720-5454

Service Location:
118 DUTTON DR
NEW CASTLE DE 19720

## Electric Meter Information

### Meter Number 189010963

| | | |
|---|---|---|
| Current Meter Reading, Dec 27 (actual) | | 003555 |
| Last Meter Reading, Nov 22 (actual) | | 001465 |
| Total KWHs Used | | 2090 |

Your Next Scheduled Meter Reading is Jan 23, 2007

## Electric Delivery Charges

Current charges for 35 days - Winter Rates in Effect - Residential Service

For Account 2717 7609 9993, the class average annual price to compare is 11.11 cents per kWh

Delivery Charges:

| | | |
|---|---|---|
| Customer Charge | $ | 7.36 |
| Distribution Charge: First 500 kWh X $0.022976 Each kWh | $ | 11.49 |
| Last 1590 kWh X $0.022976 Each kWh | $ | 36.53 |
| **Total Electric Delivery Charges** | $ | **55.38** |

Supply Charges:

| | | |
|---|---|---|
| Transmission Charge: 2090 kWh X $0.003464 Each kWh | $ | 7.24 |
| Standard Offer Service Charge First 500 kWh X $0.116809 | $ | 58.39 |
| Last 1590 kWh X $0.099577 | $ | 158.31 |
| **Total Electric Supply Charges** | $ | **223.94** |

| | | |
|---|---|---|
| **Total Electric Charges** | $ | **279.32** |

## Your Electric Energy Comparison

Daily Averages:

| | Dec 05 | Dec 06 |
|---|---|---|
| Temp: | 35° | 44° |
| KWH: | 44.4 | 59.7 |

Letters above graph denote reading type
A - Actual
E - Estimated
C - Corrected
U - Customer

Monthly Usage in KWHs

A E E A A A E E E E A A A

2600
2080
1560
1040
520
0

D J F M A M J J A S O N D
0506

B-36

**delmarva power**

Ple LOCATION:3023241884 Details

RX TIME 01/23 '07 13:02

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY 0102003251-19
0109010116 - 5

STATE OF DELAWARE
          V.
DWAYNE A WALKER

DOB: 12/10/1982
SBI: 00354596

CASE NO. 0106020017- 8
CR.A. NO. IN01070758

CHARGE: POSSW/I1000'SCH
         HEROIN
CHARGE DISP: PLED GUILTY

DOC
BP
PP
PSI

CF

SENTENCE ORDER

NOW, THIS 10TH DAY OF OCTOBER, 2001, IT IS THE ORDER OF THE COURT
THAT:

THE DEFENDANT IS ADJUDGED GUILTY OF THE OFFENSE CHARGED.

THE DEFENDANT IS TO PAY THE COST OF PROSECUTION.

THE DEFENDANT IS TO PAY A FINE IN THE AMOUNT OF $2000.00 PLUS
AN EIGHTEEN PERCENT (18%) SURCHARGE FOR THE 'VICTIM COMPENSATION'
FUND' AND A FIFTEEN PERCENT (15%) SURCHARGE FOR THE 'SUBSTANCE ABUSE
REHABILITATION, TREATMENT, EDUCATION AND PREVENTION FUND.' FINES ARE
HEREBY SUSPENDED.

EFFECTIVE September 14,2001, THE DEFENDANT IS PLACED IN THE
CUSTODY OF THE DEPARTMENT OF CORRECTION AT SUPERVISION LEVEL 5   FOR
A PERIOD OF 15 YEARS.

THIS SENTENCE IS SUSPENDED AFTER SERVING 4 YEARS AT SUPERVISION
LEVEL 5 AND UPON SUCCESSFUL COMPLETION OF THE KEY TREATMENT PROGRAM
FOR 11 YEARS AT SUPERVISION LEVEL 4- CREST.  UPON SUCCESSFUL
COMPLETION OF THE CREST TREATMENT PROGRAM, THE SENTENCE IS SUSPENDED
FOR 10 YEARS AT SUPERVISION LEVEL 3.   AFTER SERVING 3 YEARS AT
SUPERVISION LEVEL 3, THE SENTENCE IS SUSPENDED FOR 7 YEARS AT
SUPERVISION LEVEL 2.

THE DEFENDANT IS TO BE HELD AT SUPERVISION LEVEL 5 UNTIL SPACE
IS AVAILABLE AT SUPERVISION LEVEL 4.

B-37

STATE OF DELAWARE V. DWAYNE A WALKER
0109010116

AS TO THE CHARGE OF PN01091675, POSS,USE,CONS.N,
                                 HEROIN

IT IS THE ORDER OF THE COURT THAT:

THE DEFENDANT IS ADJUDGED GUILTY OF THE OFFENSE.
CHARGED.

THE DEFENDANT IS TO PAY THE COST OF PROSECUTION.

THE DEFENDANT IS TO PAY A FINE IN THE AMOUNT OF $1000.00 PLUS
AN EIGHTEEN PERCENT (18%) SURCHARGE FOR THE 'VICTIM COMPENSATION'
FUND' AND A FIFTEEN PERCENT (15%) SURCHARGE FOR THE 'SUBSTANCE ABUSE
REHABILITATION, TREATMENT, EDUCATION AND PREVENTION FUND.' FINES ARE
HEREBY SUSPENDED.

THE DEFENDANT IS PLACED IN THE CUSTODY OF THE DEPARTMENT OF
CORRECTION AT SUPERVISION LEVEL 5 FOR A PERIOD OF 2 YEARS.

THIS SENTENCE IS SUSPENDED FOR 2 YEARS AT SUPERVISION LEVEL 3.


THE NON-INCARCERATIVE PORTION OF THIS SENTENCE SHALL BE SERVED
CONCURRENTLY WITH THE NON-INCARCERATIVE PORTION OF THE SENTENCE
IMPOSED IN CR.A. NO. 01-07-0758..

B-38

STATE OF DELAWARE V. DWAYNE A WALKER
0109010116

AS TO THE CHARGE OF IN01091677, CONSP 2ND,
IT IS THE ORDER OF THE COURT THAT:

THE DEFENDANT IS ADJUDGED GUILTY OF THE OFFENSE
CHARGED.

THE DEFENDANT IS PLACED IN THE CUSTODY OF THE DEPARTMENT OF
CORRECTION AT SUPERVISION LEVEL 5 FOR A PERIOD OF 2 YEARS.

THIS SENTENCE IS SUSPENDED FOR 2 YEARS AT SUPERVISION LEVEL 3.

THE NON-INCARCERATIVE PORTION OF THIS SENTENCE SHALL BE SERVED
CONCURRENTLY WITH THE NON-INCARCERATIVE PORTION OF THE SENTENCE
IMPOSED IN CR.A. NO. 01-07-1675..

B-39

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE      ) CASE NO. 0102003251
                    )
     V.           ) CR.A. NO. VN0102095501
                 ) CHARGE:   VIOL O/PROBATN
DWAYNE A WALKER    ) ORIG. CHARGE: PWITD NSI CS
DOB: 12/10/1982      )
SBI: 00354596       )

VIOLATION OF PROBATION

NOW THIS 10TH DAY OF OCTOBER, 2001, IT IS THE ORDER OF THE COURT THAT:

THE DEFENDANT IS ADJUDGED GUILTY OF VIOLATION OF THE PROBATION SENTENCE ORDERED IN THE ABOVE STATED ACTION AND SUCH PROBATION IS HEREWITH:

DISCHARGED AS UNIMPROVED.

FINANCIALS TO BE COLLECTED UNDER NEW SENTENCE.

B-40

STATE OF DELAWARE V. DWAYNE A WALKER,
0106020017 0109010116 0102003251

THE FOLLOWING CONDITIONS SHALL APPLY TO THIS SENTENCE, THE
DEFENDANT SHALL:

PAY FINANCIAL OBLIGATIONS DURING THE PROBATIONARY PERIOD.

PAY TO THE DEPARTMENT OF CORRECTION, A MONTHLY FEE   TOWARD THE
COST OF SUPERVISION IN ACCORDANCE WITH A SCHEDULE SET BY THE
DEPARTMENT OF CORRECTION.

NOT DRIVE FOR 2 YEARS.

BE ASSIGNED TO THE RESIDENTIAL DRUG/ALCOHOL PROGRAM UNTIL SUCH
PROGRAM IS COMPLETED.

BE ASSIGNED TO THE OUTPATIENT DRUG/ALCOHOL PROGRAM UNTIL SUCH
PROGRAM IS COMPLETED.

BE EVALUATED FOR SUBSTANCE ABUSE AND FOLLOW ANY DIRECTIONS FOR
COUNSELING, TESTING, OR TREATMENT BY THE DEPARTMENT OF CORRECTIONS.

JUDGE RICHARD S. GEBELEIN

B-41



**WILCOX & FETZER LTD.**

In the Matter Of:

# Walker

## v.

## City of Wilmington, et al.

### C.A. # 06-288

---

Transcript of:

Karen Walker

**February 21, 2007**

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

B-42

# Walker v. City of Wilmington, et al.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DeWAYNE WALKER, SR., KAREN )
WALKER, his wife, D.W., JR., )
minor, and T.W., minor child, )
                           )
         Plaintiffs,    )
                           )   Civil Action
v.                       )   No. 06-288
                           )
THE CITY OF WILMINGTON, a )
political subdivision of the )
State of Delaware, DETECTIVE )
MICHAEL R. LAWSON, JR., )
individually and in his )
official capacity, and )
UNKNOWN ENTITIES,            )
                           )
         Defendants.    )

     Deposition of KAREN WALKER taken pursuant to
notice at the City of Wilmington Law Department,
800 N. French Street, 9th Floor, Wilmington,
Delaware, beginning at 10:00 a.m. on Wednesday,
February 21, 2007, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        PHILIP B. BARTOSHESKY, ESQ.
       Biggs and Battaglia
         921 Orange Street
         Wilmington, Delaware 19801
         for the Plaintiffs,

        ALEX J. MILI, JR., ESQ.
       City of Wilmington Law Department
         800 N. French Street, 9th Floor
         Wilmington, Delaware 19801
         for the Defendants.

- - - - - - - - - - - - - - - - - - - - - - - --

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
(302) 655-0477
www.wilfet.com

B-43

# Walker v. City of Wilmington, et al.

| Page 2 | Page 4 |
|---|---|

**Page 2**

1    (K. Walker Deposition Exhibit Nos. 1, 2
2  and 3 were marked for identification.)
3         -- -- -- --
4      KAREN WALKER,
5  the witness herein, having first been
6  duly sworn on oath, was examined and
7  testified as follows:
8  BY MR. MILI:
9    Q.  Let's start with some background information
10  about you.  What do you do for a living?
11    A.  Currently, I'm a manager of a low income
12  housing development.
13    Q.  Which low income housing development?
14    A.  Crosby Square.
15    Q.  Where is that?
16    A.  That's in Chester, PA.
17    Q.  How long have you been doing that?
18    A.  Three months.
19    Q.  What did you do before that?
20    A.  I was actually a counselor at Connections here
21  in Wilmington, Delaware.
22    Q.  What's your education and formal training,
23  starting with high school and work your way up?
24    A.  Okay.  After high school, I attended Cheyney

**Page 3**

1  University for two years and later pursued a year at
2  Wilmington College.  So I am a little short on my
3  bachelor's, but I plan to take an accelerated course
4  here at Springfield and actually get my master's.
5    Q.  What other professional training do you have?
6    A.  At Connections, I actually receive drug and
7  alcohol counseling, administer medication.  What else?
8  Let's see.  I'll think of it in a minute.
9    Q.  That's fine.  I am just trying to get some
10  background.  How long have you lived at Dutton Court?
11    A.  Dutton Drive, about ten years.
12    Q.  Where did you live before that?
13    A.  Toby Farms.  That's in Upland, Pennsylvania.
14  Excuse me.  Brookhaven, Pennsylvania.
15    Q.  Let's get into some of the allegations that
16  have been made.  As you know, we're here today because
17  a lawsuit was filed on your behalf about a SWAT raid
18  that happened at your house September of '05.  I have
19  marked as K. Walker 1 a document that's the document
20  your attorney prepared on your behalf, obviously,
21  setting forth the allegations of your version and your
22  family's version of what supposedly happened on this
23  date.
24        I want to ask you some questions about some

**Page 4**

1  specifics in there.  The paragraphs are numbered.  I
2  would like to start with the number 8.  Take a second
3  to read it because I want to ask you about it.
4    A.  Okay.
5    Q.  Where were you in the house when the police
6  came through the front door?
7    A.  I was actually in the laundry room/coat closet,
8  and I was about to put on my ^ daughter's coat when
9  they came in.  And looking at this, I see it says
10  approximately 6:05, but it had to be before
11  6:00 o'clock because I leave out at 6:00.  And my
12  son's alarm clock goes off at 6:00 for him to wake up.
13    Q.  So the statement in there is wrong?
14    A.  By probably about ten minutes, the time.
15    Q.  Okay.  When did you realize that that statement
16  was wrong?
17    A.  When I read it.
18    Q.  Where did the statement come from?
19    A.  It came from my husband.
20    Q.  Okay.  He was wrong?
21    A.  He wasn't as accurate.  I wouldn't say,
22  "Wrong."  He just wasn't to the minute.
23    Q.  Explain to me the relationship, the spatial
24  relationship of the laundry room to the front door.

**Page 5**

1    A.  Sure.  There is a little entryway when you
2  first come into my house, and directly in front of you
3  you would see the laundry room and coat closet.  So I
4  was standing there when they came in.
5    Q.  Was the front door in your line of sight from
6  where you were standing?
7    A.  Yes.
8    Q.  Did you have to turn your head?
9    A.  Yes, I had to turn around because I had my back
10  turned.
11    Q.  Was the door locked or unlocked?
12    A.  It was locked.
13    Q.  How did they get in?
14    A.  When I -- I turned around because I heard this
15  boom come through the door, and all I could see was
16  red lights everywhere.  I was like, you know, "Oh, my
17  God!  You know, what's going on, what's going on?"
18  They kept saying, "Get down, get down, get down."  And
19  one or two of them came into the laundry room with a
20  gun pointed at my daughter's and my head and said,
21  "Stay down."
22    Q.  Did they identify themselves, say who or what
23  they are?
24    A.  You know, I am not sure if they said "SWAT" or

2 (Pages 2 to 5)

# Walker v. City of Wilmington, et al.
## Karen Walker

|  | Page 6 |
|---|---|

1  I just knew it was SWAT because they had their faces
2  covered.
3     Q.  Okay.  Did they have anything on their clothing
4  that would say either "POLICE" or "SWAT" or anything
5  at all?
6     A.  It was still dark outside, and I had, you know,
7  really didn't -- the foyer was still dark and I just
8  had the light on in the closet in the, you know, coat
9  closet/laundry room where I was, so I really couldn't
10 see them.  All I could see was the red lights.  So I
11 didn't make out anything on their clothing, no.
12    Q.  Did they order you to do anything when they
13 came in?
14    A.  To stay down.
15    Q.  Did you?
16    A.  Yes.
17    Q.  Then what did they do?
18    A.  It was a lot of them, and then they just
19 started to go throughout the house.  And, you know,
20 I'm staying down because a gun is pointed at my head
21 while they go throughout the house.
22    Q.  Did they ask you if there was anybody else in
23 the house?
24    A.  Again, I am not sure whether they asked me or I

|  | Page 8 |
|---|---|

1  document.  Go ahead and read it, and I'm going to ask
2  you some questions about it.
3     A.  You said 11, correct?
4     Q.  Yeah.
5     A.  Okay.
6     Q.  You looked kind of puzzled when you read it.
7     A.  Oh.
8     Q.  Did something stick out at you?
9     A.  Well, my husband was in the basement, and I was
10 upstairs, so I wasn't there when he was talking to my
11 husband.  That's what the paragraph is, basically,
12 about.
13    Q.  Okay.  You said Detective Lawson.  How did you
14 know the detective's last name was Lawson?
15    A.  From reading this information.
16    Q.  Okay.  So on that morning, you didn't know his
17 name?
18    A.  Oh, of course, not.  Never seen him before.
19 Didn't know anything.
20    Q.  He didn't give you a business card?
21    A.  When he left.
22    Q.  Did it have his name on it?
23    A.  Yes.
24    Q.  Did he explain to you why he was there?

|  | Page 7 |
|---|---|

1  just instinctively as a mother said, "You know, my son
2  is upstairs; you know, what's going on?  Why are you
3  here, you know?"  So I -- while I was down, I
4  automatically went down to the basement where my
5  husband was.  So I didn't have to say he was there;
6  they saw him down there.
7     Q.  Did they eventually bring him upstairs?
8     A.  Yes.
9     Q.  You said earlier your son was upstairs?
10    A.  Yes.
11    Q.  Did they eventually bring him downstairs?
12    A.  Yes.  They, of course, the SWAT team wouldn't
13 answer anything.  They just, you know, cleared out,
14 and then, I don't know, I guess it might have been
15 about ten minutes later Officer Lawson, you know, came
16 in and asked me to have a seat in the family room.
17 And I said, "What's going on?"  He didn't want to
18 answer any questions, you know, he said, here, answer
19 them once everyone is there.
20    Q.  All I asked you --
21    A.  Oh.
22    Q.  -- is did they bring your son downstairs?
23    A.  Oh.  I'm sorry.
24    Q.  Okay.  Let's go on to paragraph 11, the same

|  | Page 9 |
|---|---|

1     A.  Yes.  He actually said that there had been a
2  crime committed in Wilmington and that I had the
3  same -- that my middle name is Alisha and that the
4  person who committed the crime mother's name was
5  Alisha Walker, and that the person's who committed the
6  crime name was Dwayne Walker, and that's why they were
7  there.
8     Q.  What's your husband's DeWayne?
9     A.  DeWayne.
10    Q.  What's his last name?
11    A.  Walker.
12    Q.  Isn't that the same name of the suspect you
13 just told me about?
14    A.  There is a lot of people with the same name in
15 the world, but that doesn't mean that their home
16 should be invaded.
17    Q.  Actually my question was isn't the suspect's
18 name the same, first and last name, as your husband's
19 first and last name?
20    A.  Well, I don't remember receiving anything in
21 here or in the mail in reference to the person who
22 committed the crime, to tell you the truth.
23    Q.  You don't know his last name?
24    A.  Yeah, it is Walker, but I am not sure of his B-45

3  (Pages 6 to 9)

Walker v. City of Wilmington, et al.
Karen Walker

| Page 10 | Page 12 |
|---|---|
| first name. | A. It's near the Wilton, but it's not in the |

**Page 10**

1  first name.
2   Q. You are still not sure of his first name, even
3  today.
4   A. Well, I believe the spelling is different than
5  the way my husband and son spell their name.
6   Q. What do you believe is different about it?
7   A. I don't -- I don't think it's spelled the same,
8  like -- I don't know how his is spelled, but I
9  don't -- I believe that -- I don't think it's spelled
10  D-e-W-A-Y-N-E.
11   Q. How do you believe it's spelled? What do you
12  think is different?
13   A. I think it's just D-W-A-Y-N-E. I'm not sure
14  where I seen it, but I don't believe it's the exact
15  spelling.
16   Q. Is it off by one letter or more than one
17  letter?
18   A. At least one letter.
19   Q. Possibly more?
20   A. Possibly more.
21   Q. Now, when we left off, we were talking about
22  you were gathering in the family room. Let me back
23  up. Was is it the family room or the laundry room
24  where they brought your husband up?

**Page 11**

1   A. The family room. First, they had told me I
2  could get up off my knees and sit in the family room.
3   Q. Okay. Then they brought your husband up from
4  the basement, you said. Where did they bring him?
5   A. In the family room.
6   Q. Your son is upstairs. You said they eventually
7  brought him down. Where did they bring him?
8   A. To the family room.
9   Q. At what point did Detective Lawson talk to your
10  whole family gathered in the family room?
11   A. Once they brought my son downstairs, because
12  they brought my husband up and then they brought my
13  son down.
14   Q. What did Detective Lawson say to you?
15   A. I believe I answered that, but I'll answer it
16  again. He said that they were there because a crime
17  was committed in Wilmington and that my name is
18  Alisha -- Karen Alisha Walker and that the suspect's
19  mother's name is Alisha Walker -- and we found that
20  later to be false because her name isn't Alisha
21  Walker -- and that they had reason to believe that the
22  suspect was in the Wilton. And our home is not in the
23  Wilton.
24   Q. Is it near Wilton?

**Page 12**

1   A. It's near the Wilton, but it's not in the
2  development called Wilton.
3   Q. Is it behind the Wilton?
4   A. No, it's not behind the Wilton. It's after you
5  pass the Wilton.
6   Q. Can you give me -- I won't hold you to an exact
7  number, but -- can you give me an approximation of how
8  many miles away it is from Wilton?
9   A. Half a mile.
10   Q. We'll come back to that document in a minute.
11  Let me go to the one that's marked No. 2. It will
12  say, "K. Walker-2" in the bottom.
13   A. Oh.
14   Q. I already asked your husband about the photos,
15  so we won't get into that again. Go on to page 2,
16  paragraph 2, subparagraph A, a written statement that
17  the Walkers prepared within days of the incident. I
18  had actually asked your attorney to provide me with
19  that statement during your husband's depo and haven't
20  received it yet. Is there any reason why you don't
21  want me to see that statement?
22   A. No. Excuse me. Could you clarify the question
23  once again?
24   Q. Okay. This is a document that your attorney

**Page 13**

1  prepared on your behalf answering the question in bold
2  No. 2 that asks for: "Description of documents in
3  custody, control of plaintiffs" -- that's you, your
4  family -- "that may be used to support their claim."
5  The answer your attorney gave us is, in A: "Written
6  statement the Walkers prepared within days of the
7  incident." Does such a statement exist?
8   A. So the question is: Did our attorneys ask us
9  to write a statement within days after the incident
10  and did we write it?
11   Q. No, no. The question is your attorneys
12  prepared a response on your behalf saying there is a
13  written statement of the Walkers prepared within days
14  of the incident. My question to you is: Is there
15  such a written statement?
16   A. If our attorneys asked us to do it, we did
17  everything that they asked us. This was awhile ago,
18  so I, you know, don't remember back then because we
19  would have gave it to him.
20   Q. Do you have any objection to me seeing this
21  written statement?
22   A. No.
23       MR. MILI: Okay. For the record, I want to
24  make my second request for this written statement in

4 (Pages 10 to 13)

Walker v. City of Wilmington, et al.
Karen Walker

| Page 14 | Page 16 |
|---|---|

**Page 14**

1 case my first request wasn't clear enough.
2 BY MR. MILI:
3   Q.  Do you have any idea what written statement
4 might be referred to on this document?
5   A.  Are you saying a written statement about the
6 accounts of the day in question?
7   Q.  Yeah, did you write something?  Did you sit
8 down at a computer and write something --
9   A.  Yes, yes.
10   Q.  -- or sit down and write --
11   A.  Yes, yes, yes, yes.
12   Q.  How many statements?
13   A.  I believe my husband and I did it together.
14   Q.  Did anyone else besides you and your husband
15 help you with it?
16   A.  No.  I mean, we probably put my son's input in
17 it as well since, you know, he was involved.  But, no,
18 nobody else helped us with it, no.
19   Q.  Did you do it on a computer or did you
20 handwrite it?
21   A.  Computer.
22   Q.  Did you print it out?
23   A.  Yes.
24   Q.  Save it somewhere?

**Page 16**

1 Dr. Lazar do for you?
2   A.  Actually, I just went to her because I was
3 getting flu symptoms more, you know, just really
4 tired.  But Dr. Travani is the one we have been seeing
5 on an ongoing basis because it just helps to see
6 someone to talk to after you've experienced something
7 traumatic.
8   Q.  What does she do for you?
9   A.  Actually, Dr. Kosma is her associate, and we
10 see him more.  And he puts us in a relaxation state.
11 He asks us, you know, how are we feeling since the
12 incident.  And it's very helpful when you can explain
13 to someone that, in my particular case, I used to be a
14 sound sleeper.  I used to sleep all night, but now I
15 wake up in the middle of the night and I feel like my
16 home is not a home anymore; it's just four walls and
17 not a sanctuary because it was invaded.  And so
18 consequently, I don't rest properly.  And when I go
19 there, he puts on a relaxation tape and it just, it
20 just helps.  It just helps.
21   Q.  You had your eyes closed when you answered that
22 for me.
23   A.  I'm sorry.
24   Q.  Is there a reason why you do that?  I'm just

**Page 15**

1   A.  I know we printed it out.  Now, whether it's
2 still saved, my husband deals with the computer more
3 than I do.
4   Q.  We'll come back to that.  Let's go on to No. 3.
5 No, not No. 3 of this document.  Let's go on to
6 document No. 3.  It will say, "K. Walker" -- in the
7 bottom right-hand corner, it will say,"K. Walker-3,"
8 or you can look at the court reporter's copy.
9   A.  Thank you.
10   Q.  In that document, there is a series of
11 questions with answers that were prepared on your
12 behalf.  I want to get clear on question No. 1, which
13 asks about the doctors.  I want to know which doctor
14 belongs to which family member.  So let's go through
15 them.  Whose doctor is Dr. Morris?
16   A.  I see Dr. Morris.
17   Q.  When did you begin seeing Dr. Morris?
18   A.  He's been my family physician for about 12, 14
19 years.
20   Q.  After this incident, the SWAT incident on
21 September '05, have you treated with Dr. Morris?
22   A.  No.  Since that incident, Dr. Lazar and
23 Dr. Travani.
24   Q.  Let's go through one by one.  What does

**Page 17**

1 curious.
2   A.  Oh.  You know what, I don't know.  Because when
3 I said Dr. Kosma, I just thought about when I'm in his
4 office and I guess I'm closing my eyes.  I didn't do
5 it purposely.  I'm sorry.
6   Q.  No.  No, I was just wandering, you didn't want
7 to look me in the eye or anything.
8   A.  Oh, no, no, no.
9   Q.  Okay.  So it's Dr. Cosmo gives you more
10 treatment than Dr. Tavani, is that the bottom line?
11   A.  Right.
12   Q.  Or does she anything in addition to what
13 Dr. Cosmo does?
14   A.  No, they do about the same.
15   Q.  Is this a family group session or is it just
16 you?
17   A.  It's just myself.  My husband and I have been
18 there together.  And for the record, sometimes I do
19 close my eyes when I talk, when I'm really thinking in
20 thought.
21   Q.  Okay.  Have you, I guess, since the
22 September '05 incident -- I don't want to have to
23 embarrass you by asking you this question, but it is
24 kind of relevant -- have you had any difficulty with

5 (Pages 14 to 17)

Walker v. City of Wilmington, et al.
Karen Walker

| Page 18 | Page 20 |
|---|---|
| 1 marital intimacy with your spouse? | 1 tried to pay two mortgages and, consequently, trying |
| 2  A.  Yes. | 2 to pay two mortgages got us back in our credit card, |
| 3  Q.  What kind of difficulty? | 3 debt which they added on late fees and over the limit |
| 4  A.  Well, we're both pretty stressed out, so it's | 4 fees, and so we sought the advice of an attorney and |
| 5 just, it's just, it's just, it's just -- let me see | 5 that was their advice. |
| 6 what words I can put this in. | 6  Q.  Let's go back to the document No. 3.  I think |
| 7  Q.  Take your time. | 7 you still have it in front of you.  I want to go on to |
| 8  A.  Well, my husband is stressed, so he doesn't | 8 question No. 5, which is a few pages in.  I'll let you |
| 9 perform as he used to, and I am stressed, so I am | 9 read it and read the answers.  Then I'll ask you some |
| 10 really not in the mood as I used to be because I am | 10 questions about it. |
| 11 not getting proper rest.  And there is a lot of -- I | 11  A.  Okay. |
| 12 think as a man he feels as though he should have been | 12  Q.  All right.  The second sentence in the answer, |
| 13 able to protect us in some way, and so he has a lot of | 13 it says, "Relationships with close neighbors have |
| 14 frustration and anxiety.  And I just don't feel at | 14 deteriorated."  Which neighbors are you talking about? |
| 15 peace in my own home any longer. | 15  A.  Really, all of them.  All of our immediate |
| 16  Q.  Did you have these kind of problems with the | 16 neighbors.  Whereas we used to sometimes engage in |
| 17 intimacy back when he filed for bankruptcy in the late | 17 conversation, basically, now, it's just a wave.  But |
| 18 '90s? | 18 specifically, I would like to say, there was a young |
| 19  A.  That was exactly seven years ago, and no. | 19 man, Derrick, whom my son was a close acquaintance |
| 20  Q.  What was that all about, the bankruptcy? | 20 with, and after the event, my son said to me, 'Mom, |
| 21  A.  I actually was in between jobs at the time, | 21 you know, Derrick won't talk to me.  Derrick isn't |
| 22 and, of course, most families need two incomes to | 22 allowed to talk to me.  And he told everyone on the |
| 23 survive, and so we saw an attorney and laid out our | 23 bus that we were selling drugs and the SWAT team came |
| 24 debts, and they suggested that we file. | 24 and invaded, you know, our house.  And so he's not |

| Page 19 | Page 21 |
|---|---|
| 1  Q.  Did you have a lot of debts at that time? | 1 allowed to talk to me." |
| 2  A.  Mainly credit card debt.  We, of course, have | 2  Q.  Do you recall if there was an article in the |
| 3 our home, which we always made the payment on, and -- | 3 News Journal about this whole raid at your house? |
| 4 oh, I know.  Okay.  And also we had a rental property | 4  A.  Yes.  Not that there -- I mean, someone at work |
| 5 where the tenant didn't pay her rent, so we were | 5 told me that it was on a Saturday it was in the paper, |
| 6 having to pay two mortgages. | 6 that they saw where we were -- there was a court case |
| 7  Q.  Did you have to use your credit cards to pay | 7 involving us and the City of Wilmington for a home |
| 8 the second mortgage? | 8 invasion. |
| 9  A.  No, but after we paid the second mortgage, we | 9  Q.  And did you read this article? |
| 10 didn't have money to pay our credit card bills. | 10  A.  Yes. |
| 11  Q.  So did you have to -- | 11  Q.  Do you remember what the article said about |
| 12  A.  Because the person -- | 12 whether the raid at your house was a mistake or not? |
| 13  Q.  -- use the credit card for the incidentals -- | 13  A.  No, I don't remember the article in detail. |
| 14 sorry.  Finish your answer. | 14  Q.  Following along with that same answer that we |
| 15  A.  I'm pretty much finished with what happened | 15 were looking at, that I was asking you about.  It goes |
| 16 seven years ago. | 16 on to say that "Neighbors have suddenly relocated." |
| 17  Q.  All right.  I guess you said earlier about the | 17  A.  Right.  Derrick and his family have moved. |
| 18 credit card debt -- | 18  Q.  Do you think they moved because of this raid? |
| 19  A.  Mm-hmm. | 19  A.  I think that it would be a contributing factor |
| 20  Q.  -- which is part of what prompted the | 20 that they probably felt as though they lived in a |
| 21 bankruptcy. | 21 neighborhood that might be unsafe to their children if |
| 22  A.  Well, actually what prompted the bankruptcy is | 22 they have people doing drug trafficking in the area. |
| 23 our tenant not paying her rent.  And so since we had | 23  Q.  What's Derrick's last name? |
| 24 already invested thousands of dollars in the house, we | 24  A.  I'm sorry.  I can't think of it.    B-48 |

6 (Pages 18 to 21)

Walker v. City of Wilmington, et al.
Karen Walker

Page 22

1   Q. Okay.
2   A. But I can find it out.
3   Q. Could you, please?
4   A. Certainly.
5   Q. All right. Do you know what house number
6   Derrick lived in?
7   A. It was the corner of Fowler, directly across
8   the street from me.
9   Q. Could you spell Fowler?
10  A. Yes, F, like frank, O-W-L-E-R.
11  Q. Derrick was the son?
12  A. Yes.
13  Q. Your son's age?
14  A. Yes.
15  Q. Do you know what Derrick's parents' names were?
16  A. Oh, my goodness. I'm not good with names.
17  Q. Were these the close neighbors that you were
18  talking about earlier in the answer? You said
19  relationship --
20  A. Sir, I am not good with names. My son was
21  close with them. I'm a working mother. I don't have
22  very much time to socialize, but my son did. That was
23  his good friend.
24  Q. Okay. So I guess that gives me --

Page 23

1   A. But--
2   Q. Oh, go ahead.
3   A. But the neighbors on the left are Otis,
4   O-T-I-S, and the neighbors to the right of me are
5   Mr. and Mrs. Kohler. I believe it's K-O-H-L-E-R. And
6   then the neighbor on the other side is Ms. Becky
7   Betts. And she actually asked me what was going on
8   because the neighbors are calling her, since she --
9   since they know her and I are close, because the SWAT
10  team was actually in their backyard that morning as
11  well. They surrounded the whole house, and they were
12  in the people's next door backyard as well.
13  Q. So I guess -- you just told me earlier, you're
14  a working mother, you don't have time to socialize.
15  So help me out, then. Who are the close neighbors --
16  A. Okay. No, I didn't say --
17  Q. Can I --
18  A. I don't have time to socialize with everyone,
19  you know, with everyone, but Becky and I are very
20  close. She used to babysit. She's a daycare provider. She used to babysit
21  my son. And she lives two doors down in my block.
22  Q. Is that the only close neighbor you were
23  referring to in that answer?
24  A. No. And the Kohlers and Mr. and Mrs. Otis as

Page 24

1   well.
2   Q. Okay. They no longer socialize with you, is
3   that what you said?
4   A. That is correct. Now, Ms. Becky felt --
5   Miss Becky does. And I am sure she would be willing
6   to state how the neighbors were telling, you know,
7   her, you know: "What kind of people are they, you
8   know, living next door to us? They had SWAT, you
9   know, there. What's going on?" She tried to reassure
10  them we are people of good character and it must be
11  some type of mistake. She said, you know, she was
12  receiving calls.
13  Q. Was she aware that it was some type of mistake?
14  A. Not at the time it happened. She didn't know
15  what was going on. She just started receiving phone
16  calls.
17  Q. Eventually did she learn that this was a
18  mistake?
19  A. Not from any type of written apology we never
20  received. She just took my word because of the type
21  of person that I am and she knew me a little better
22  than the other neighbors. But we're not sure of what
23  opinions the other neighbors have formed.
24  Q. Have you asked?

Page 25

1   A. It's been a defamation of character. They
2   don't speak to me in order for me to ask them. We
3   don't have conversation.
4   Q. We're going to switch topics. Before we do
5   that, do you need a bathroom break or water break or
6   anything like that?
7   A. No, thank you, I'm fine.
8   Q. Keep forging ahead. We're going to talk about
9   some medical expenses. The same document in front of
10  you, No. 6 asks you about medical expenses. Tell you
11  what, go ahead and read the answer, and I'll ask you
12  some questions.
13  A. Okay.
14  Q. I guess the question is, the expenses or bills
15  from Dr. Tavani, are they the only expenses that
16  you've had arising out of this incident?
17  A. Dr. Tavani and Dr. Kosma and also I would like
18  to add that there is another doctor that I see at a
19  health facility on Foulk Road. I can't think of
20  anybody's name right now. But I believe that since I
21  believe so stressed out, my immune system isn't what
22  it used to be. And I have seen Dr. Morris and that
23  doctor on Foulk Road for constant flu symptoms.
24  Q. Are they send ing you bills?

B-49

7 (Pages 22 to 25)

# Walker v. City of Wilmington, et al.
## Karen Walker

Page 26

1  A. I have insurance, but I am paying my
2  co-payment. Now, Dr. Tavani and Dr. Kosma is not
3  covered by our insurance, so we are paying them.
4  Q. Have you made payments to them?
5  A. Yes.
6  Q. About how much?
7  A. Well, my husband handles the bills, but it's a
8  couple thousand dollars.
9  Q. He's paid out-of-pocket a couple thousand
10 dollars?
11  A. Yes.
12  Q. We're going to go back, the same document, back
13 to No. 4. I want to ask you some questions. Well,
14 the same thing, read the question and answer, and
15 then I'll ask you about it. Just No. 4.
16  A. Oh, okay. Okay.
17  Q. Is this the first time you've seen the answer?
18  A. No. I was just making sure -- you told me to
19 read No. 4 and it references others, so I was trying
20 to reference back and forth. But go ahead.
21  Q. Basically, the answer talks about allegations
22 of negative stereotyping, bias, judgment, et cetera.
23 Before we get to that, let me ask you this. At the
24 time you gave this answer, did you know the last name

Page 27

1  of the suspect the police were looking for on that
2  morning that they came to your house?
3  A. I didn't know anything on the morning that they
4  came to my house.
5  Q. No, no.
6  A. Oh.
7  Q. At the time you filled out this answer, this
8  answer No. 4, on the date that you gave this answer,
9  did you know the name of the suspect that the police
10 were looking for?
11  A. My No. 4 says: "Identify and describe each act
12 to which you are referring to in paragraph 22."
13 Correct?
14  Q. Yes.
15  A. Is this paragraph 22?
16  Q. No.
17  A. Well --
18  Q. Here's my question.
19  A. Okay.
20  Q. At some point, you filled out an answer, this
21 answer No. 4.
22  A. Mm-hmm.
23  Q. On the date that you filled it out -- I guess,
24 actually we have a date on it -- September 12th of

Page 28

1  2006.
2  A. Mm-hmm.
3  Q. On that date, did you know the name of the
4  suspect that the police had been looking for that
5  morning that they came to your house?
6  A. And the date isn't listed here. So you said
7  the date was 2006?
8  Q. It's at the end of the document.
9  September 12th, 2006 is the date that your attorneys
10 filed this answer, your answer No. 4. What I am
11 asking you is: On that date, September 12th, 2006,
12 did you know that the suspect that the police were
13 looking for, for almost a year earlier when they came to
14 your house, did you know what his name was?
15  A. Yes.
16  Q. What was his name?
17  A. His name was the same or similar to my husband
18 and my son's name.
19  Q. Okay then let's go back to No. 4 and see
20 the very last sentence says, "The only commonality
21 with the suspect was race." That was the answer that
22 you gave to this question. Right?
23  A. Race. Well, it was two commonalities, race and
24 name. There is plenty of people in America with the

Page 29

1  same name, but that doesn't give you the right to
2  assume that the person -- everybody with the same name
3  is guilty. You're innocent until proven guilty.
4  Q. But this statement made under oath says the
5  only commonality with the suspect is race. Do you
6  still stand by that statement?
7  A. Race and name.
8  Q. So race wasn't the only commonality?
9   MR. BARTOSHESKY: Asked and answered. Go
10 ahead. You can answer him again.
11  Q. If you want to. If you don't want to touch it,
12 that's fine.
13  A. Race and name.
14  Q. Okay. Now, do you believe that this was not an
15 honest mistake by the police?
16  A. I believe that with modern technology and
17 computers, you have access to the ages. My son is a
18 minor, you know, with no record. My son is a Honor
19 Roll student. My son is vice-president of YPD at
20 church. My son is an apprentice at DuPont in a
21 robotics program. My son makes the Honor Roll
22 program. My son doesn't have a criminal record. I
23 believe that, no, no, they don't have a lot in common
24 but race and name, and that doesn't give you the right

8 (Pages 26 to 29)

# Walker v. City of Wilmington, et al.
## Karen Walker

1  to invade his privacy and put gun to his head when
2  he's done nothing wrong. My son is not in the system
3  for criminal, no.
4  Q. So do you believe that the police came to your
5  address knowing that it was the wrong address?
6  A. This person -- we live in New Castle. This
7  person lived in Wilmington. They have -- they're two
8  different ages. This is America. We're innocent
9  until proven guilty. That doesn't give you the right
10  to invade our home even if they do have the same name.
11  And, you know, if we didn't have an ethnic name, you
12  know, like Walker, I don't believe it would have
13  happened, no. I've done research and this happens
14  more with black people than with white people.
15        MR. MILI: I ask the court reporter, could
16  you, please, read back the question that I just asked
17  her?
18        (The reporter read as requested.)
19  BY MR. MILI:
20  Q. Please answer --
21  A. Yes, I do.
22  Q. They purposely came to your house even though
23  they know the suspect wouldn't be found there?
24  A. Yes, I do.

1  Q. You believe they did this because you're black?
2  A. Yes.
3  Q. Let's go on to item No. Question No. 12. Do
4  you know what, strike that, your husband covered all
5  of those. I think we're done with the documents.
6        I just have a few final questions. Did you
7  miss any time from work after this incident happened
8  in September of '05?
9  A. Yes.
10  Q. How much time?
11  A. I missed about a week and a half.
12  Q. What was the week and a half? Give me the
13  beginning and end dates.
14  A. It was after it happened, so I believe it had
15  to be around the 7th through the 10th or 11th. Around
16  that period of time as well. I'm not exactly sure,
17  but it was after it happened.
18  Q. Did you have to cash in sick time?
19  A. Yes.
20  Q. Vacation time?
21  A. Yes. A week vacation and I took a few sick
22  days, yes.
23  Q. Were there any problems in your job performance
24  after this?

1  A. Yes.
2  Q. Like what?
3  A. I wasn't focused. I am -- I wasn't focused.
4  Mood swings, irritability, just not myself --
5  Q. Did you get written up?
6  A. -- poor job performance. No, because I did
7  explain to some degree what was going on. But I do
8  believe that a transfer to another department was a
9  contributing factor to this.
10  Q. Let me ask you: Were you transferred to
11  another department?
12  A. To another location, yes.
13  Q. Location. What location?
14  A. I was transferred to Harbor House.
15  Q. To Harbor House from where?
16  A. From 9th & Washington Street.
17  Q. Do you know who made that transfer decision?
18  A. No. One day my supervisor just came to me and
19  said, "We're moving you."
20  Q. What's your supervisor's name?
21  A. Cheryl Fields.
22  Q. With a C or an S?
23  A. With a C.
24  Q. Did she give you an explanation as to why?

1  A. Yes.
2  Q. Do you believe it was because of performance?
3  A. Yes.
4  Q. What's different about the work at Harbor House
5  from the work at 9th & Washington?
6  A. Well, I was in direct -- I dealt directly with
7  the clients and I was actually in charge of keeping
8  the files in order for the psychiatrist that I worked
9  for. And I started to misfile things, not have things
10  in order as I used to. So the job where I was
11  transferred to, I didn't have the paperwork load. I
12  mean, they knew that I connected really well with the
13  clients in the past, so I guess they didn't want to
14  let me go, but they could see that when it came to the
15  paperwork, I was just not focused as I used to be.
16  Q. Is there less paperwork at the Harbor House?
17  A. Yes.
18  Q. Is there less client contact at Harbor House?
19  A. Just the same, but not the paperwork.
20  Q. Do you do less work at Harbor House than you
21  did at 9th & Washington?
22  A. I do less paperwork and less work, yes.
23  Q. Was your pay reduced when you were transferred
24  to Harbor House?

B-51

9 (Pages 30 to 33)

## Walker v. City of Wilmington, et al.
## Karen Walker

Page 34

1  A.  It stayed the same.
2  Q.  They reduced your workload, but gave you the
3  same pay?
4  A.  I was a good employee before this happened, so
5  I believe they were understanding, but felt as though
6  I could not perform that particular job the way I used
7  to.
8  Q.  But they paid you the same?
9  A.  But the pay stayed the same, sir, yes.
10  Q.  Are you taking any medications?
11  A.  Zoloft.
12  Q.  Anything else?
13  A.  No.
14  Q.  Have you taken any medications in the past
15  year?
16  A.  Other than Zoloft, no.  One moment.  Let me
17  think for a second.  Zoloft and antibiotics I've had
18  over this year.
19  Q.  How often do you take the Zoloft?
20  A.  Once or twice a day.
21  Q.  When did you start doing it?
22  A.  When it was prescribed back in September of the
23  year of this incident.
24  Q.  Once or twice a day.  Is it every day seven

Page 35

1  days a week?
2  A.  Every day seven days a week.
3  Q.  What does it do for you?
4  A.  Puts -- sometimes it helps, sometimes it
5  doesn't.
6  Q.  When it helps, how does it help?
7  A.  Well, I am easily startled around the house
8  now.  Like, you know, if I hear a noise, you know, I
9  jump.  So it makes me a little less anxious.
10  Q.  Just a few more, then we'll wrap up.  Did you
11  ever, after this incident happened in September of
12  '05, did you ever file a complaint with the police
13  department itself; for example, internal affairs or
14  something like that to ask someone higher up in the
15  chain of command to look into the matter?
16  A.  I left that up to my husband to do.  I am not
17  exactly sure if he did.
18  Q.  Do you think it would be appropriate for
19  someone higher up, like the chief or someone in the
20  police department to investigate what was done?
21  A.  I certainly do, yes.
22  Q.  You don't know if your husband asked for an
23  investigation of any sort like that?
24  A.  I actually left it up to my husband and him to

Page 36

1  consult with the attorneys on that.  I am not exactly
2  sure about that.
3       But, yes, I do believe that someone should
4  have to answer for invading someone's home before
5  6:00 o'clock in the morning and invading their
6  privacy.  I believe that we experienced defamation of
7  character.  I believe that we worked hard, saved money
8  in our 401(k) plan all our lives to buy a nice home in
9  a nice neighborhood.  And now, what happened to us, it
10  just should not have happened to us.  It just should
11  not have happened in our neighborhood.  We work every
12  day.  We're taxpayers.  We don't have criminal
13  records.  It was just no reason for you to invade our
14  home, like I said, in the wee hours of the morning
15  when we didn't commit any crimes.
16  Q.  Is it racism?
17  A.  That is part of it, yes.
18  Q.  You said earlier that, I think you said
19  earlier, that Detective Lawson gave you a business
20  card.
21  A.  Not myself.  I believe he may have given my
22  husband one.
23  Q.  What did your husband do with the business
24  card?

Page 37

1  A.  I am not exactly sure.
2  Q.  Is there a phone number on it?
3  A.  Most business cards have a phone number, I
4  believe, yes.
5  Q.  Did you recall if Detective Lawson explained to
6  either you or your husband as to why he was handing
7  over his business card?
8  A.  No, I don't.
9  Q.  I think we're done, but give me a second.
10       I'm not sure if I asked you this.  Forgive
11  me if this is a repeat.  When you were -- when the
12  family -- when your family was gathered in the family
13  room, did Detective Lawson or any of the SWAT officers
14  show you a wanted poster of someone?
15  A.  No.  But I am glad you asked because there is
16  no way that a 15-year-old could look like somebody
17  20-something.
18       MR. MILI:  Okay.  I don't have anything
19  further.
20       MR. BARTOSHESKY:  No questions.
21       (Deposition concluded at 10:49 a.m.)
22       -- -- -- --
23
24

B.52

# Walker v. City of Wilmington, et al.

**Page 38**

```
1
2
3                    I N D E X
4  WITNESS: KAREN WALKER              PAGE
5  EXAMINATION BY MR. MILI              2
6           DEPOSITION EXHIBITS
7  NO.                    MARKED
8  1  Complaint              2
9  2  Plaintiff's Initial Disclosure    2
      Pursuant to Federal Rule of
10    Civil Procedure 26(a)(1)
11 3  Plaintiff's Answers to Defendant's 2
      Interrogatories
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 40**

```
1   State of Delaware  )
2                      )
2   New Castle County  )
3
4         CERTIFICATE OF REPORTER
5
      I, Lucinda M. Reeder, Registered Diplomate
6   Reporter, Certified Real-time Reporter and Notary
    Public, do hereby certify that there came before me on
7   February 21, 2007, the witness herein, KAREN WALKER,
    who was first duly sworn by me and thereafter examined
8   by counsel for the respective parties; that the
    questions asked of said witness and the answers given
9   were taken down by me in Stenotype notes and
    thereafter transcribed by use of computer-aided
10  transcription and computer printer under my direction.
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17                              Lucinda M. Reeder
18              Lucinda M. Reeder, RDR, CRR
                Certification No. 132-RPR
19              (Expires January 31, 2008)
20
21
    DATED:    3-16-07
22
23
24
```

**Page 39**

```
1
2
         REPLACE THIS PAGE
3
         WITH THE ERRATA SHEET
4
         AFTER IT HAS BEEN
5
         COMPLETED AND SIGNED
6
         BY THE DEPONENT.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

B-53

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

5d95955a-6005-4481-9223-20bf304d6980

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
DeWAYNE WALKER, SR.;        )
KAREN WALKER, his wife;     )
D.W., JR., minor child;     )
and  T.W., minor child,     )
                            )
     Plaintiffs,            )
                            )
        v.                  ) C.A. No. 06-288
                            )
THE CITY OF WILMINGTON, a   )
political subdivision of    )
the State of Delaware;      )
DETECTIVE MICHAEL R.        )
LAWSON, JR., individually   )
and in his official         )
capacity; and UNKNOWN       )
ENTITIES,                   )
                            )
     Defendants.            )
```

Deposition of DeWAYNE WALKER, SR., taken pursuant to notice at the offices of the City Solicitor, Louis L. Redding City/County Building, 800 French Street, Wilmington, Delaware, beginning at 1:00 p.m., on Thursday, January 25, 2007, before Kimberly A. Hurley, Registered Merit Reporter and Notary Public.

APPEARANCES:

      PHILIP B. BARTOSHESKY, ESQUIRE
      BIGGS & BATTAGLIA
        921 Orange Street
        Wilmington, Delaware 19801
        for the Plaintiffs

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

B-54

e1487c2b-777a-4939-93c3-648c0fece77d

## Page 2

1 APPEARANCES (cont'd):
2
3     ALEX J. MILI, JR., ASSISTANT CITY SOLICITOR
      CITY OF WILMINGTON
4     Louis L. Redding City/County Building
      800 French Street
5     Wilmington, Delaware 19801
      for the Defendants
6
7          - - - - -
8          (D. Walker Deposition Exhibit Nos. 1
9 through 19 were marked for identification.)
10     DeWAYNE WALKER, SR.,
11     the witness herein, having first been
12     duly sworn on oath, was examined and
13     testified as follows:
14 BY MR. MILI:
15     Q.   Good afternoon, Mr. Walker.  My name is
16 Alex Mili.  I represent the police department and
17 Detective Lawson in this lawsuit that you filed arising
18 out of the raid from September of 2005.  We have met
19 before, obviously, at Detective Lawson's deposition.  Now
20 today's my turn to ask you questions about the
21 allegations in the lawsuit.  I'm going to start off with
22 just asking you some background about yourself first.
23          What's your highest level of education?
24     A.   I have some college.

## Page 3

1     Q.   How much college?
2     A.   It's equivalent to an Associate's degree.
3     Q.   Where did you get this college training from?
4     A.   The United States Navy.
5     Q.   What's your military background?
6     A.   I was an engineer in the United States Navy for
7 four years.
8     Q.   Which four years?
9     A.   From 1985 through 1989.
10    Q.   What year did you graduate from high school?
11    A.   1984.
12    Q.   Did you go to the Navy right after high school?
13    A.   Not right after.
14    Q.   What did you do in the meantime?
15    A.   I worked, was self-employed.  We had a
16 production company going on.  We were DJ'g and things of
17 that nature.
18    Q.   What was your rank in the Navy?
19    A.   I was an E-4, an engineman.
20    Q.   Were you honorably discharged?
21    A.   Yes, I was.
22    Q.   In what year?
23    A.   1989.
24    Q.   What did you do after that?

## Page 4

1     A.   I joined a company called Fiber Metals in
2 Pennsylvania.  After that I joined Arco Chemicals.
3     Q.   The first company you said, for how long did
4 you work there?
5     A.   It was only for a short period of time, say six
6 months.
7     Q.   That takes us still to 1989.  Then you went to
8 Arco still in 1989?
9     A.   The latter part of '89, beginning part of '90.
10    Q.   How long did you stay at Arco?
11    A.   I stayed there approximately -- I believe that
12 was '94, '95 it was downsized.
13    Q.   Then what did you do after that?
14    A.   I left Arco and I joined -- I was unemployed
15 for a while.  I went to a company called Johnson Mathey
16 for a short period of time.
17    Q.   For how long?
18    A.   About less than a year.
19    Q.   That was in '95?
20    A.   '94, '95, yes.
21    Q.   After that what did you do?
22    A.   '95 and '96 rejoined -- I went to Ganes
23 Chemical.  It was '98 or '99 I joined Ganes.
24    Q.   How long did you stay there?

## Page 5

1     A.   I was at Ganes for approximately a year or two.
2     Q.   That's 2000 or say 2001?
3     A.   Yes.
4     Q.   What did you do after that?
5     A.   From 2001 I went to W.L. Gore.
6     Q.   How long did you stay there?
7     A.   I stayed at Gore for about a year or so.
8     Q.   That's 2002.  What did you do after that?
9     A.   I joined Johnson & Johnson.  I was contracted
10 to Kelly Services to Johnson & Johnson.
11    Q.   Kelly Services is a temp. agency?
12    A.   Yes.
13    Q.   That was a temp. assignment, Johnson & Johnson?
14    A.   Yes.
15    Q.   How long did you do that?
16    A.   I got hired on full-time, and I'm currently
17 working for Johnson & Johnson.
18    Q.   Is that the same as Noramco, Incorporated?
19    A.   Yes.
20    Q.   I'm going to call it Noramco just for
21 simplicity.
22          What do you do there?
23    A.   I'm a pharmaceutical operator.  B-55
24    Q.   Did it require any training to do that job?

## DeWayne Walker, Sr.

**Page 6**

1  A.  Over the years my experience, Navy, Arco
2  Chemicals.
3  Q.  Any formal certification required?
4  A.  No.
5  Q.  Are you married?
6  A.  Yes.
7  Q.  What's your wife's name?
8  A.  Karen Alicia Walker.
9  Q.  When did you marry Karen?
10  A.  July 31st, 1993.
11  Q.  Is that your first marriage?
12  A.  Yes.
13  Q.  You have two children from that marriage?
14  A.  Yes.
15  Q.  What are their names?
16  A.  I have Tatiana Talea Walker, she's
17  approximately three now.  And DeWayne Walker, Jr., he's
18  16.
19  Q.  How long have you lived at the house in Wilton?
20  A.  It's in Eagle Glen.
21  Q.  Okay.
22  A.  Dutton Drive, Eagle Glen, 118.  I have been
23  there since '96.
24  Q.  Where is Wilton in relation to Eagle Glen?

**Page 7**

1  A.  Wilton is a separate development.  I guess
2  that's off of Appleby Road and Wilton.
3  Q.  273, Route 273?
4  A.  Yes.  I live in a development called Eagle
5  Glen, which is Wedgefield.
6  Q.  Is Wilton further down -- there's a portion
7  where 273 and 40 intersect, correct?
8  A.  Yes.  Well, Appleby from Wilton Boulevard, if
9  you're familiar with Victory Church and Wal-Mart, Wilton
10  Boulevard, and it intersects Appleby and that's the
11  Wilton area.
12  Q.  We're going to get into some documents.  We're
13  going to get into the first document which I have
14  numbered D. Walker No. 1.  That's the complaint.  That's
15  the first document that your attorney has filed on your
16  behalf initiating this lawsuit.  That contains all the
17  factual allegations about what you say happened in this
18  raid and legal allegations of what you believe the police
19  department did incorrectly or did wrong.
20  I'm going to ask you to take a look at that
21  document, because I'm going to ask you some specific
22  questions now about some of the allegations that were
23  made in this document.
24  I want to start with paragraph No. 8.  It's

**Page 8**

1  on page 2.  It starts at the bottom of page 2 and carries
2  over onto page 3.  I want to give you an opportunity to
3  just read paragraph 8.  As soon as you're done reading
4  it, I'm going to ask you some questions about it.  Read
5  it, and take your time.  Look up at me when you're done.
6  A.  (Complied.)
7  Q.  Tell me each and every person who was in the
8  house, in your house, on the morning of the raid.
9  A.  Karen Alicia Walker, Tatiana Talea Walker,
10  DeWayne Walker, Jr., and DeWayne Walker, Sr.
11  Q.  Let's go one at a time.  Tell me where each
12  person was at the time that the police came in.
13  A.  DeWayne Walker, Jr., was upstairs in his
14  bedroom.  Karen was in the foyer area directly facing the
15  front door preparing Tatiana to depart for work.  I was
16  in the basement.
17  Q.  So Karen's location, how close is that to the
18  front door?
19  A.  It's approximately, I'd say, 5 to 7 feet.
20  Q.  Is it within eyesight of the front door?
21  A.  Oh, absolutely, yes.
22  Q.  So from the position that she was in, if
23  someone walks through that front door, can she see that
24  person come through the front door without moving from

**Page 9**

1  whatever position she was in?
2  A.  Yes.
3  Q.  How many bedrooms are in the house?
4  A.  Four.
5  Q.  Give me a breakdown of who has what bedroom.
6  A.  Yes.  My wife and I have one bedroom.  We have
7  a guest bedroom.  Tatiana has her own bedroom, and
8  DeWayne Walker, Jr., has a bedroom.
9  Q.  Let's go on to paragraph 9.  Again, I'm going
10  to ask you to read it and then I'm going to ask you some
11  questions about it.
12  A.  (Complied.)
13  Q.  It alleges that the police officers broke down
14  the front door.  You said earlier you were in the
15  basement.
16  A.  Yes.
17  MR. BARTOSHESKY:  Let me object.  Doesn't
18  say "broke down the front door."
19  MR. MILI:  What does it say?  It doesn't
20  say "broke."  This second line.
21  MR. BARTOSHESKY:  It says "broke through
22  the front door."
23  MR. MILI:  Okay.  It says "broke through."
24

DeWayne Walker, Sr.

Page 10

BY MR. MILI:
1  BY MR. MILI:
2      Q.   To the extent that there's a difference, broke,
3  did you see the officers break through the front door?
4      A.   I heard them break through the front door.
5      Q.   What did you hear?
6      A.   I heard a loud bang.  There was two bangs.
7  There was one when the front door initially opened and a
8  second from the force of the door hitting a table in that
9  foyer area.  Aside from the bangs, did you hear anything
10  else?
11      A.   Yes.  There was profusely screaming and it was
12  my wife screaming and my one-year-old daughter.
13      Q.   The people that came through the door, did
14  you hear them say anything?
15      A.   I heard -- it was so fast, it was the bang and
16  it was a lot of voices and there was the screaming.
17  Almost simultaneously.
18      Q.   Screaming by --
19      A.   My wife and my daughter.
20      Q.   You didn't hear any words uttered by the people
21  entering the house?
22      A.   I didn't hear any words.
23      Q.   Do you know if the door was locked or unlocked

Page 11

1  that morning?
2      A.   The door was locked.
3      Q.   The screen door or the front door, or both?
4      A.   They both were locked.  The screen door, the
5  hinges on the screen door were broken and the actuator,
6  it was broken off from the frame.  The front door, the
7  knob, handle, lock where the deadbolt enters into the
8  frame of the wall was broken.
9      Q.   Did you eventually learn that the people that
10  came to the house were police officers?
11      A.   After hearing my wife screaming and my
12  daughter, then they proceeded -- they ran through -- so
13  many officers, they ran through every room of the house
14  and they came to the basement.
15      Q.   You don't want to answer my question?  Did you
16  eventually find out if they were police officers or not?
17      A.   Eventually we did find out they were officers,
18  sure.
19      Q.   How did you find out that they were police
20  officers?
21      A.   When the officer came down to the basement with
22  his weapon drawn, with a laser beam pointed at me, and I
23  seen something said "SWAT," something to that effect,
24  "SWAT" on their uniform.

Page 12

1      Q.   Did they eventually explain to you why they
2  were there?
3      A.   They handcuffed me, forced me to my knees, and
4  they began to show me a picture.
5      Q.   You don't want tell me if they ever --
6          MR. BARTOSHESKY:  Object to the form of the
7  question.  You can ask him the question.
8  BY MR. MILI:
9      Q.   The question is:  Did the police officers ever
10  explain to you why they were there?
11      A.   Eventually they did.
12      Q.   What did they say was the reason for being
13  there?
14      A.   They showed me a picture of a suspect.  They
15  asked me did I know this gentleman.
16      Q.   Did they tell you the suspect's name?
17      A.   It was on the picture that they had.  His name
18  was on the picture.
19      Q.   Do you know what his name was?
20      A.   Yes.  His name was Dwayne spelled D-w-a-y-n-e.
21  I remember that.
22      Q.   What was his last name?
23      A.   I don't recall.
24      Q.   You don't recall his last name?

Page 13

1      A.   I don't recall his last name.  I remember the
2  first name because I looked at the officers and I said,
3  "His name is not spelled like our name."  His first name.
4      Q.   Did you look at the last name?
5      A.   I may have, but I don't recall.
6      Q.   Even to this day you don't know what that
7  suspect's last name was?
8      A.   I can't recall.
9      Q.   If I told you his last name was Walker, would
10  you have any reason to dispute that or disbelieve that?
11      A.   No, because in the newspaper it came out
12  afterwards, the article that said his last name was
13  Walker.
14      Q.   What's your last name?
15      A.   Walker.
16      Q.   Was your son still in the bedroom when you had
17  that conversation with the detective?
18      A.   Yes.  He was upstairs in the bedroom.  Alone.
19      Q.   How did he eventually come down to the
20  downstairs?
21      A.   There was weapons.  Officers was behind him
22  with weapons and escorted him downstairs.
23      Q.   Did you see the officers escort him upstairs?
24      A.   At the same time I was being escorted upstairs.

DeWayne Walker, Sr.

**Page 14**

1  So we kind of met in like the vestibule area we have, the
2  little foyer.
3      Q.  Where was your son upstairs?
4      A.  In the bed.
5      Q.  Did someone eventually go into the bedroom and
6  get him?
7      A.  Yes.  The officers stormed into his room,
8  surrounded his bed, had weapons drawn, and he was naked.
9  So the officer went into his drawer and threw him a pair
10 of pants and told him to get dressed.
11     Q.  Did you see all this happen?
12     A.  No, I didn't see it.
13     Q.  Did your son eventually tell you this happened?
14     A.  He explained that to my wife and I.
15     Q.  At some point they took him out of the bedroom.
16 Where did they take him?
17     A.  Brought him downstairs to the family room.  We
18 all met in the family room.
19     Q.  When you say "we all," who's that?
20     A.  It was Officer Lawson, another officer, my
21 wife, my daughter, and my son and myself.
22     Q.  Once they had everybody in the family room, did
23 someone explain to you that they had the wrong house?
24     A.  We said that from the initial impact when they

**Page 15**

1  broke through the door.  "You have the wrong house."  We
2  kept saying that over and over again.  Then they admitted
3  that they had the wrong house and that these things
4  happen.
5      Q.  Do you believe that these officers took the
6  time to come all the way to your house just because
7  you're black?
8      A.  I think race had an important aspect of the
9  invasion.
10     Q.  The suspect that they told you they were
11 looking for, do you know what his race was?
12     A.  Yes.
13     Q.  What was his race?
14     A.  He was African-American.
15     Q.  What's your race?
16     A.  African-American.
17     Q.  Let's go on to paragraph No. 15 in that same
18 document.  Again, take a second to read it and then I'm
19 going to ask you some questions about it.
20     A.  (Complied.)
21         MR. BARTOSHESKY:  Did you say 15?
22         MR. MILI:  Paragraph 15.  I'm sorry.  Not
23 15.  14.
24         THE WITNESS:  Yes.

**Page 16**

1  BY MR. MILI:
2      Q.  Have you read it?  Are you ready?
3      A.  Yes.
4      Q.  Which house does Mr. Peoples live in?
5      A.  He lives on Fowler.  It's the street adjacent
6  to Dutton Drive.  It's the first right off of Dutton
7  Drive.
8      Q.  Do you know which house number?
9      A.  No.
10     Q.  How far is it from your house in terms of house
11 lengths?  I guess that would make it easier.
12     A.  He's four houses -- he's five houses away from
13 ours.
14     Q.  Can you see his house from any of the windows
15 in your house?
16     A.  The garage window, yes.
17     Q.  Paragraph 14 makes a statement about
18 Mr. Peoples hearing the officer tell him, "You won't be
19 seeing Walker going to work for a while."
20     A.  Exactly.
21     Q.  How did you find out about this statement being
22 made?
23     A.  After the whole ordeal, I went to work.
24 Peoples was there.  He was concerned about the welfare of

**Page 17**

1  my family and he asked me what had happened.  And he said
2  that "Those officers were rude."  And he stated to me
3  that he asked the officer what did the people in the
4  residence do, and they told him, "Don't worry about it
5  because you won't be seeing him for a long time."
6      Q.  When was this conversation?
7      A.  On the way to work.
8      Q.  The same day?
9      A.  That morning.
10     Q.  Let's switch gears and go to the other document
11 that you have right behind that one.  That's No. 2.  It's
12 called "Rule 26 Disclosures."  No.  We're done with that
13 document.  We're going to the one behind it.
14         This document was prepared by counsel on your
15 behalf.  It basically asks you to list
16 people that have information about this lawsuit.  Some
17 people are listed there, as you can see in No. 1.  I want
18 to go through these people one by one and find out from
19 you what kind of information you think they might have
20 with regard to this lawsuit.
21         Let's start with Dr. Tavani.  Who is she?
22     A.  She's the psychiatrist I'm currently under and
23 I'm currently seeing.
24     Q.  How did you come into contact with her?

B-58

# DeWayne Walker, Sr.

**Page 18**

1  A.  I came into contact with her through a friend
2  and through my primary physician, Maria --
3  Dr. Maria Lazar.
4  Q.  Did anybody else also recommend that you see
5  Dr. Tavani?
6  A.  Dr. Tavani also knew my attorney.
7  Q.  Are you still seeing her?
8  A.  Yes.  Her and a doctor by the name of
9  Dr. Kozma.
10  Q.  We're going to get to him shortly, but let's
11  focus on Dr. Tavani for the moment.
12      What does she do for you?
13  A.  She's the therapist.  We visited with her
14  initially.  She recommended that we go see Dr. Kozma.
15  Q.  You said you're still seeing her now presently?
16  A.  Yes.  Occasionally -- well, it's a practice,
17  it's an office.  Dr. Kozma isn't there and I see
18  Dr. Tavani and vice versa.
19  Q.  What does she do when you see her?  What does
20  she do for you or --
21  A.  We go over -- we talk about the scenario, what
22  happened, how am I doing psychologically, how are we
23  coping with things.  She really eases all of the
24  frustration and anger and emotional anxiety that I'm

**Page 19**

1  suffering.
2  Q.  Let's go on to the person right underneath
3  Dr. Tavani, Richard Brousell.  Who's he?
4  A.  That's a specialist for my son.  He saw him on
5  a number of occasions.  I believe it was four.  He's a
6  therapist that deals with youth.
7  Q.  Let's go back a second to Dr. Tavani.  I think
8  I heard you say "we see Dr. Tavani."
9  A.  My wife and I.
10  Q.  Does your son also see Dr. Tavani?
11  A.  No.
12  Q.  That's just Dr. Brousell treats your son?
13  A.  Yes.
14  Q.  I won't ask you too much about what he does
15  with your son because I'll have an opportunity to ask him
16  later.
17      Let's go on to Dr. Kozma.  It's right
18  underneath it on the next page.  Tell me who he is.
19  A.  He's a psychologist, and he helps us -- we do
20  relaxation, different types of breathing exercises.  And
21  he's a therapist that really eases and comforts us.
22  Q.  Are you still going to see him?
23  A.  Yes.
24  Q.  How often?

**Page 20**

1  A.  It's every -- it's a new year now.  It's every
2  four to six weeks now.
3  Q.  For how long?
4  A.  It's no set time.  We haven't determined my
5  condition.  Still under medication and still under his
6  care.
7  Q.  I understand no set time, but give me on
8  average, is it five minutes, is it an hour?
9  A.  Oh, for the duration of the appointment?
10  Q.  The sessions, yes.
11  A.  It's an hour.
12  Q.  Right after the doctor it mentions some
13  personnel from Noramco.  What are the names of the people
14  you had in mind in that response?  See letter g?
15  A.  Yes.
16  Q.  Personnel at plant, DeWayne Walker's employment
17  at Noramco.  What personnel?  Give me their names.
18  A.  As far as -- could you be more specific with
19  your question?
20  Q.  I'll read the question that was asked of you.
21  "Name of individuals likely to have discoverable
22  information."
23  A.  Okay.
24  Q.  And your answer was, some personnel at Noramco.

**Page 21**

1  Give me their names.
2  A.  Noramco has an Occupational Health Center, and
3  I don't know the names of the doctors.  There is an array
4  of doctors.  It's a practice.  And they have knowledge of
5  the scenario.
6  Q.  Anybody else at Noramco besides that
7  Occupational Health Center?
8  A.  Oh, sure.  Employees.  It was in the newspaper,
9  so there was an array of employees that asked me how my
10  family's doing, what happened, was that you.
11  Q.  What are their names?
12  A.  Tony Simpson, Brian Drayton, Rich Nichols.
13  Those are all the ones I can think of.  But it was in the
14  newspaper.  It's public information.
15  Q.  After we ask you about the people in that No. 2
16  I just asked you about, I also asked you about documents,
17  descriptions of documents.  Do you see there, No. 2?
18  A.  Yes.
19  Q.  Now I want to ask you about one of your
20  responses is that there's a written statement.
21  Unfortunately that wasn't provided to me, so I make a
22  standing request on the record for a copy of that
23  statement.  But I'll work it out with your attorney
24  later.

6  (Pages 18 to 21)

DeWayne Walker, Sr.

Page 22

1   Tell me for now, when did you write this
2   written statement that you're talking about in that
3   response?
4   A.   Prior to seeking counsel, I wrote exactly
5   verbatim everything that transpired on September the
6   15th, 2005.
7   Q.   Doesn't have to be exact.  Can you give me as
8   best you can an approximate date when you wrote that
9   statement?
10  A.   That evening I wrote the statement.
11  Q.   Was it when you got home from work, later that
12  evening?
13  A.   It was later that evening.  It was after --
14  around 7:00 p.m., 8 o'clockish.
15  Q.   Did you write it on a computer or handwrite it?
16  A.   Both.  I handwrote it first and then I typed it
17  on the computer.
18      MR. MILI:  My standing request will be for
19  any drafts of it, as well as the computer printout of it
20  I didn't receive.
21  BY MR. MILI:
22  Q.   Did you write it by yourself or did anybody
23  help you with it?
24  A.   I wrote it myself.

Page 23

1   Q.   Did your wife have any input on it?
2   A.   Yes.  She made comments.
3   Q.   Did your son have any input on it?
4   A.   He made comments.
5   Q.   Let's go one at a time.  What comments did your
6   wife make on it?
7   A.   My wife made the comments that the laser -- we
8   all agreed that she said there was lasers pointed at her
9   from the weapons, and I agreed with her because it was
10  the same when I was in the basement.  My son said the
11  same thing, that there were lasers on the guns when they
12  were in his bedroom.
13      The damage to the door, how the lock
14  doesn't work, how are we going to lock the door, we
15  agreed on that.
16      My wife was saying how it was an array of
17  officers, how she just remembered it was a mess, the
18  amount of officers invaded our home.
19  Q.   I won't belabor this statement because I'm
20  obviously going to get a chance to read it myself.  So
21  I'll take the time to do that.
22      Let's go on right below it about the
23  15 photographs.  As you remember, your attorney brought
24  them with you.  We have them here today.  Our court

Page 24

1   reporter was kind enough to number them, so when I ask
2   you what each photograph is and I want you to keep them
3   in order because I don't want to get the numbers out of
4   order for this transcript.  Starting with No. 5, the
5   reason we're starting with 5 is because the documents in
6   front of you have been marked 1 through 4.
7   A.   Yes.
8   Q.   First No. 5, photograph No. 5, tell me what
9   that is.
10  A.   This is a picture of the carpet.  Appears to be
11  the steps where there's footprints, all types of stains
12  from the officers storming through our home.
13  Q.   Did you eventually clean those stains?
14  A.   Yes.  We attempted to clean them.
15  Q.   You say "attempted."  Were they not able to be
16  cleaned?
17  A.   Some were removed and some weren't.
18  Q.   Are they still there today?
19  A.   Some are, yes.
20  Q.   Put them facedown so we keep them in order.  On
21  to No. 6.  What is No. 6?
22  A.   No. 6 looks like there are more stains, and
23  this appears to be the hall area.  There's footprints and
24  stains.

Page 25

1   Q.   Upstairs or downstairs hall area?
2   A.   This appears to be the upstairs hall area.
3   Q.   Did you eventually clean all those stains?
4   A.   Some were removed and some weren't able to come
5   out.
6   Q.   Do you still have the same carpet that you had
7   back then?
8   A.   Yes, we do.
9   Q.   Put that one down.  On to No. 7.  What's that?
10  A.   This is the hall area from the entrance to the
11  door to the kitchen, and this is showing the same stains
12  and footprints in which some were removed and some are
13  still present.
14  Q.   For the three we just went over, you said some
15  were removed, some are still there.  How did you remove
16  them?
17  A.   I used to have a cleaning business.  I'm a
18  professional carpet cleaner.  I have a janitorial
19  service.  And I used some of the commercial cleaning
20  equipment that I had.
21  Q.   Did you call Stanley Steamer or any of those
22  people?
23  A.   No.
24  Q.   Do you plan to call any of those professionals?

B-60

DeWayne Walker, Sr.

Page 26

1    A.   No. I'm a professional.
2    Q.   On to the next photograph, which I guess we're
3    at No. 8. Tell me what that is.
4    A.   This is the entrance area from the front door
5    on the laminated floor, and it's showing stains and
6    markings.
7    Q.   Are those stains and markings still there?
8    A.   Some are.
9    Q.   And some are not?
10   A.   Some are not.
11   Q.   The ones that are not there, how did they get
12   removed?
13   A.   My wife and I, we were able to remove some of
14   the stains.
15   Q.   Done with that one. On to No. 9. What is
16   that?
17   A.   This is the rear of the front door. This is
18   where I was showing how the front door -- it's a table
19   and there's indentations, markings on the rear of the
20   front door from where it hit the table from officers
21   continuing to enter our home.
22   Q.   I'm done with that. No. 10, what is No. 10?
23   A.   These are the stairs leading upstairs. These
24   are stains, and a lot of these stains are still existing.

Page 27

1    Q.   I'm done with that one. On to No. 11.
2    A.   This is the attic where the door was forcefully
3    opened and even to this day, this door still doesn't
4    close properly. And then there is stress marks from the
5    door being opened and closed, because the officer went up
6    there at one time and then they -- for some reason they
7    opened the door again and another officer proceeded to go
8    upstairs in the attic and by them slamming the door, it
9    caused stress fractures across the frame of the attic
10   door.
11   Q.   Did you see them slam the door of the attic?
12   A.   You could hear it.
13   Q.   Did you see them slam the door?
14   A.   I heard it.
15   Q.   My question is: Did you see it?
16   A.   I didn't see it.
17   Q.   Thank you. Next picture, No. 12?
18   A.   Stains, more stains on the stairs, footprints.
19   Q.   No. 13?
20   A.   This is showing footprints and stains in the
21   dining room area.
22   Q.   No. 14?
23   A.   This is the light fixture adjacent to the attic
24   door. From the attic door being opened and closed, it

Page 28

1    fell off.
2    Q.   On to No. 15.
3    A.   This is the laminated floor from when they
4    entered, they pulled the laminate back from the seal.
5    Q.   No. 16.
6    A.   This is the door showing the molding, the
7    strike plate, showing that the handle -- this is showing
8    where the actual deadbolt doesn't engage into the door
9    frame.
10   Q.   Was that ever fixed?
11   A.   Yes, that was repaired.
12   Q.   Who fixed it?
13   A.   I did that myself.
14   Q.   Next photograph?
15   A.   This is the screen door, showing the damages
16   from when the screen door was pulled off the hinges,
17   showing where actually it was broken.
18   Q.   Was that ever fixed?
19   A.   Yes.
20   Q.   Who fixed it?
21   A.   That was Home Depot.
22   Q.   Did they charge you money to fix it?
23   A.   Sure. I had to buy a new door and redo the
24   framework. Yes.

Page 29

1    Q.   On to the next one.
2    A.   This is another shot of the same door, showing
3    that the actuator -- how the door was forcefully opened,
4    removed from the frame, broken from the frame.
5    Q.   What's different from that photograph and the
6    one we just looked at?
7    A.   It's just a further-back shot showing the door.
8    The actuator itself.
9    Q.   Last one we're on is No. 19.
10   A.   Yes. This is showing all the damages and
11   nicks. And prior to September 15, 2005, none of this
12   damage was existing.
13   Q.   We're done with the photographs.
14        At some point when the officers were in
15   your house, did they ever give you a business card?
16   A.   Yes.
17   Q.   Who?
18   A.   I believe his name is Detective Lawson.
19   Q.   Did his business card have a phone number on
20   it?
21   A.   Yes.
22   Q.   Did he tell you why he was giving you his
23   business card?
24   A.   Yes. He seen the damages to the door and I

B-61

# DeWayne Walker, Sr.

Page 30

1 asked him: "What about the damages to my front door?"
2          He scribbled out a number and he wrote
3 another number on the card and said, "Call this number to
4 get your front door repaired."
5     Q.   Did you call it?
6     A.   No.
7     Q.   You went to Home Depot instead?
8     A.   Exactly.
9     Q.   You didn't want him to pay for it?
10    A.   I didn't want him back -- I didn't want any
11 dealings with the officers at all.
12    Q.   Did you send him the Home Depot bill and tell
13 him to pay you?
14    A.   No.
15    Q.   Do you want him to pay you back?
16    A.   Sure.
17    Q.   We're going to go on now to the third document.
18 We have it marked as No. 3 at the bottom. These are more
19 specific questions and answers that, again, were posed to
20 you, but obviously your counsel prepared the final
21 document. These are your answers to questions that I had
22 asked about the case.
23          No. 1 contains a couple of doctors that we
24 didn't go through in that last document, so I want to ask

Page 31

1 you about these doctors. I think you did mention
2 Dr. Lazar. The question asks you to tell me which doctor
3 with regard to each plaintiff -- and it actually
4 underlines the word "each plaintiff," but your answer
5 doesn't quite tell me which is which. Which is for you
6 and which is for your wife. I felt the question was
7 clear enough, but maybe it wasn't.
8          Tell me now, whose doctor is Dr. Morris?
9     A.   That's my wife. We have Open Choice health
10 insurance. So my wife and I both see both of these
11 doctors. But my wife prefers Dr. Morris.
12    Q.   I think you said earlier when I was asking you
13 about Dr. Tavani, you said Dr. Lazar referred you to
14 Dr. Tavani.
15    A.   Yes.
16    Q.   Is that you and your wife?
17    A.   I suggested that my wife should see her, also.
18    Q.   Has your son been treated by any doctor?
19    A.   Dr. Brousell.
20    Q.   Let's get off of No. 1 for now. Let's go down
21 to No. 5 of that same document. Take a second to read
22 it, then I'll ask you some questions. Go ahead and read
23 the question and the answer, and then I'll ask you about
24 your answer.

Page 32

1     A.   (Complied.)
2     Q.   Did you read all that?
3     A.   Yes.
4     Q.   The second sentence in that No. 5, in your
5 answer, it says, "Our relationships with close neighbors
6 have deteriorated."
7     A.   Yes.
8     Q.   Give me the names of the close neighbors that
9 you're talking about.
10    A.   My neighbor next door to me, Jeff. I can't
11 think of his last name.
12    Q.   What house number?
13    A.   That would be, I believe, 120.
14    Q.   120?
15    A.   Yes.
16    Q.   Your relationship has deteriorated with him?
17    A.   Yes.
18    Q.   How so?
19    A.   We used to speak, talk about current events,
20 sports, things of that nature, and it dissipated. It's
21 no longer in existence.
22    Q.   Have you tried to speak to him?
23    A.   Sure.
24    Q.   What does he do?

Page 33

1     A.   Just ignores me.
2     Q.   Anybody else?
3     A.   There were neighbors that actually -- that were
4 across the street, they moved, that we were friendly
5 with.
6     Q.   What was their name?
7     A.   His name was -- I forget their last name.
8 Jeff, Jim, and they had a son.
9     Q.   Jeff and Jim had a son?
10    A.   No. Jeff and Jim and I, we were all pretty
11 close. But Jim moved.
12    Q.   Jim's across the street. Jeff's next door at
13 120.
14    A.   Yes. And Brandon. Brandon is across the
15 street as well.
16    Q.   Brandon is separate from Jim?
17    A.   Yes.
18    Q.   You don't know their last names?
19    A.   No.
20    Q.   The answer says the relationship with close
21 neighbors. They weren't close enough for you to know
22 their last names?
23    A.   No, I didn't know their last -- I know Jeff's
24 last name. It begins with a K. But I don't recall their

DeWayne Walker, Sr.

Page 34

1  last name.
2     Q.   But they're close neighbors.  Is that accurate,
3  their close neighbors?
4     A.   We were fairly close.
5     Q.   In that same answer it says, "Neighbors have
6  suddenly relocated."
7     A.   The neighbors across the street, they just put
8  their house up for sale and soon after this entire
9  ordeal.
10    Q.   Do you have reason to believe that they
11 relocated because of this ordeal?
12    A.   I do.
13    Q.   Why?
14    A.   Well, because the way we were treated
15 afterwards.  We were always speaking.  My wife had a real
16 close relationship with the lady that lived there.  They
17 spoke periodically.  After this incident it all just
18 vanished.
19    Q.   In that same answer it goes on to say, "The
20 respect once held in our community seems to have
21 decreased."
22         What community are you talking about?
23    A.   Our development is called Eagle Glen, and
24 people speak and very friendly, very close community, and

Page 35

1  it just seems to have decreased since this incident.
2     Q.   Jeff stopped talking to you and Jim stopped
3  talking to you?
4     A.   They moved.  Jim moved.  And Jeff, we don't
5  speak.
6     Q.   Did anybody else stop talking to you?
7     A.   Not in the community.
8     Q.   Anywhere else, period.
9     A.   At work, you get -- it's just a different type
10 of treatment from your coworkers.  Some coworkers are
11 embracive, they embrace us.  And some coworkers are just
12 cold.
13    Q.   Of the coworkers, aside from Mr. Peoples, do
14 other coworkers live in that neighborhood?
15    A.   No.  Not in that development.
16    Q.   So how did they find out what happened?
17    A.   Newspaper.
18    Q.   Did the newspaper say anything about this being
19 the wrong house?
20    A.   Yes.  The article states that, yes.
21    Q.   So the people that read the newspaper article
22 that said the police came to your house, which was the
23 wrong house; is that accurate?
24    A.   That is stated in the article, but it's a lot

Page 36

1  stated in the article.  It states -- there's a lot of
2  information stated in the article.
3     Q.   Such as?
4     A.   The type of lawsuit.  It's racial.  As a matter
5  of fact, there was a security guard that worked there
6  who's recently retired who was -- he retired -- he's a
7  retired Wilmington officer, and he was sort of cold
8  towards me.
9     Q.   What's his name?
10    A.   Michael --
11    Q.   He's a retired Wilmington police officer who
12 works as a security guard for Noramco?
13    A.   Yes.  He retired from Noramco as well.
14    Q.   You say he was cold to you.  Can you tell me
15 more specifically?
16    A.   Yes.  He made a comment that "With your
17 lawsuit, I hope you don't affect my pension."  Comments
18 like that.
19    Q.   That's a cold comment?
20    A.   Yes.  It's abrasive.
21    Q.   Let go on to the next question right after.  I
22 ask you about medical expenses in No. 6.
23    A.   Yes.
24    Q.   The only thing you have down there is about

Page 37

1  records of Dr. Tavani.
2     A.   Yes.
3     Q.   Next sentence says, "The expenses are
4  continuing."  Is Dr. Tavani the only person sending you
5  medical bills?
6     A.   That's not covered under the health insurance
7  that we have, yes.
8     Q.   Okay.  Let's actually back up to No. 4 in that
9  same document.  Go ahead and read it and I'll ask you
10 some questions about it.
11    A.   (Complied.)
12    Q.   Let's look at 4(c).  It says, "Our race allowed
13 defendants to override policies, procedures and
14 protocols."
15         Now, do you believe that this was not
16 simply a mistake by the police but that this was a
17 calculated effort to drive all the way out to Eagle Glen
18 to pick on you because you're black?
19    A.   I think that the only commonality that the
20 suspect and my family has is race.
21    Q.   Don't you have the same last name as the
22 suspect?
23    A.   It's the same last name, yes.     B-63
24    Q.   So then that race isn't the only commonality,

e1487c2b-777a-4939-93c3-648c0fece77d

# DeWayne Walker, Sr.

**Page 38**

1  is it?
2   A.   I think based on by the officers doing what
3  they did as far as invading our home, I think race, yes.
4   Q.   Race is the only commonality?
5   A.   I'm saying as far as by them making a decision
6  to come into our home based on the evidence and it's only
7  race. You can have a same name as a person, but if the
8  race is different, they wouldn't have invaded the
9  person's home.
10  Q.   This is a racist conspiracy?
11        MR. BARTOSHESKY: Object to the form. You
12  can answer.
13  A.   Do I believe that the race is a conspiracy?
14  Q.   Do you believe that this whole incident is a
15  racist conspiracy against you?
16  A.   No. I believe it was a major error, but
17  because of our race, it happened.
18  Q.   Let's go down to No. 11. I'll let you read it.
19  Basically it asks you how long they had been there, how
20  long they were at the house that morning. I'm not going
21  to hold you to the pinpoint second, but I want to know
22  minutes, seconds, whatever. You didn't seem to want to
23  answer No. 11. I want to ask you today: How long were
24  they there?

**Page 39**

1   A.   To give the exact amount of time, I can't say.
2  I know it was approximately 6:00 a.m. and I departed for
3  work -- we're going back almost 14 months --
4   Q.   Now --
5        MR. BARTOSHESKY: He's still answering.
6   A.   I would say approximately a half-hour or so.
7   Q.   What time did you have to be to work?
8   A.   I have to be to work at 6:30.
9   Q.   What time did you get to work?
10  A.   I didn't get to work until 7 o'clock.
11  Q.   How long does it take you to drive to work?
12  A.   Takes about half an hour.
13  Q.   Do you punch a time clock at work?
14  A.   We have a card reader that you key in.
15  Q.   Let's go down to No. 12. There's a list of
16  items. We're asking you what was damaged in the house.
17        Actually, this is going to be a long series
18  of questions. Let me ask you first: Do you want to take
19  a break or do you want to forge ahead?
20  A.   Let's forge ahead.
21  Q.   I think we went over some of these when we went
22  over the pictures. As far as the items listed in your
23  answer for No. 12 that aren't covered, let me ask you
24  about -- it says that furniture was damaged.

**Page 40**

1   A.   Yes.
2   Q.   What furniture was damaged?
3   A.   There's a table that sits in the hall. From
4  when the door swung open, it hit the table. That table
5  is not structurally sound.
6   Q.   What did you do with it?
7   A.   Tried to repair it because my wife really likes
8  it. It's still there.
9   Q.   What's the second-floor railing? Did we see
10  pictures of the railing?
11  A.   No.
12  Q.   What happened to the railing?
13  A.   The railing -- the brackets to the railing were
14  jogged loose.
15  Q.   Did you fix it?
16  A.   Yes.
17  Q.   How did you fix them?
18  A.   I adjusted the bolts on the bottom portion of
19  the railing and tightened them down; put new support
20  brackets on.
21  Q.   You finish off that answer with saying
22  something about miscellaneous and sacred items are
23  destroyed in the attic.
24  A.   Yes.

**Page 41**

1   Q.   Tell me what items.
2   A.   My wife has pictures, whatnots, collectibles
3  from like traveling, there's luggage, there's Christmas
4  ornaments, there were lights, a lot of personal items up
5  there that were just destroyed.
6   Q.   What did you do with them?
7   A.   She threw them out.
8   Q.   You went to work that morning you said?
9   A.   Yes.
10  Q.   Did you miss any time from work?
11  A.   Yes.
12  Q.   How much time?
13  A.   I missed two weeks from work.
14  Q.   Were you paid for the two weeks?
15  A.   Yes.
16  Q.   How?
17  A.   Short-term disability.
18  Q.   Did you have to fill out any application to get
19  short-term disability?
20  A.   Yes. Forms filled out. I actually visited the
21  medical center that I was explaining to you earlier.
22  Q.   How detailed were the forms? How long in terms
23  of the number of pages? I won't hold you to the exact
24  number.

## DeWayne Walker, Sr.

Page 42

1  A.  A lot of it was done electronically, over the
2  phone, because the headquarters is up in New Brunswick,
3  New Jersey.
4  Q.  When did the short-term disability start?
5  A.  That was the 16th of September, 2005.
6  Q.  You said two weeks.  Does that take us to,
7  what, September 30th?
8  A.  Yes.  A Friday.
9  Q.  What kind of information did you have to give
10 when you were applying for the disability?  I know you
11 said over the phone, but what kind of information did you
12 have to provide?
13 A.  I had to briefly explain why we were filing for
14 short-term disability, what transpired.
15 Q.  That's all?
16 A.  Yeah.  You don't have to -- I told them it was
17 personal, so I gave a brief description of what had
18 transpired, and the doctors from the medical facility
19 also reiterated some of the things that we mentioned.
20 Q.  When you went back to work on September 30th,
21 did you have to go see a doctor and have someone
22 sign off and say it was okay for you to go back to work?
23 A.  Yes.
24 Q.  Did someone?

Page 43

1  A.  Yes.
2  Q.  Who?
3  A.  It was at the Omega Center.
4  Q.  Newark?
5  A.  Yes.  Hygeia Drive, I believe.
6  Q.  After this short-term disability, did you start
7  taking any medication?
8  A.  I was taking medication after we went and had
9  an appointment with Dr. Tavani initially.
10 Q.  What medication?
11 A.  Zoloft.
12 Q.  Anything else?
13 A.  No.  That's it.  Zoloft.
14 Q.  Between that time, September of '05, and now,
15 any other medication?
16 A.  No.
17 Q.  Obviously I'm going to have a chance to depose
18 your wife as well to ask her about her medication, but
19 can you tell me what, if anything, you know about the
20 medication she's taking?
21 A.  Zoloft.
22 Q.  Do you know if she's taking anything else?
23 A.  No.
24 Q.  How about your son?

Page 44

1  A.  No, he's not taking anything.
2  Q.  He's not taking anything else or anything at
3  all?
4  A.  Anything at all.
5  Q.  You mentioned therapy with Dr. Tavani.  Any
6  other therapy sessions with any other doctors?
7  A.  Kozma.
8  Q.  Anybody else?
9  A.  My son with Dr. Brousell.
10 Q.  Is there like a family group therapy type of
11 thing that any of you do?
12 A.  No.  We go individually.
13 Q.  No. 4 is the document that we pulled from your
14 personnel file at Noramco.  I'm going to ask you some
15 questions about it in a minute.
16     First and foremost, you filed this lawsuit
17 because you want to be paid money for what happened in
18 this raid, correct?
19 A.  Yes.
20 Q.  You had some money problems in the past,
21 haven't you?
22 A.  Yes, but it was business-related.
23 Q.  When you say, "Yes, but it was
24 business-related," what were the money problems?

Page 45

1  A.  Well, we had a business -- I had a janitorial
2  service that I invested a lot of time and money into.
3  Q.  Did you get past due to any creditors?
4  A.  During?
5  Q.  At any time in your life.
6  A.  Sure.  Yes.
7  Q.  How far past due?
8  A.  I'll say 60 days.  Sixty or ninety days past
9  due.
10 Q.  Any 180 days past due?
11 A.  Not to my recollection.  One hundred eighty
12 days past due.
13 Q.  Take a look at the credit report that your
14 employer pulled on you.  It's after the employment
15 history.  It lists your creditors.  See where it says
16 "Credit Profile"?  I'm starting on page 2.
17 A.  Yes.  Yes.
18 Q.  Capital One, you were past due.
19 A.  Yes.  This was in 2001.
20 Q.  Do you see where it says delinquent 180 at the
21 very last line?
22 A.  Yes.
23 Q.  Is that accurate?
24 A.  Currently?  No, it's not currently accurate.

B-65

# DeWayne Walker, Sr.

## Page 46

1    Q.   What's accurate, then?
2    A.   These are all 2001 and 2002.
3    Q.   It says 180 days past due.  You said that's not
4  accurate.  What is accurate?
5    A.   No, I'm saying that the date -- the date is not
6  delinquent.  I'm saying it's not delinquent currently.
7    Q.   You eventually paid it?
8    A.   This was when we filed bankruptcy.
9    Q.   So you did file bankruptcy?
10   A.   Yes.
11   Q.   Did you eventually pay off your creditors what
12 you owed them?
13   A.   No.  We filed Chapter 7 and it was charged off.
14 In 2001.
15   Q.   Did you pay any of your bills?
16   A.   Yes.  Currently I pay my bills.
17   Q.   Currently you pay your bills.
18        What was going on in your life that you got
19 to the point that you had to file for bankruptcy?
20   A.   The business.  I had a business that I invested
21 a lot of time and money into, and it wasn't going well.
22 In 2001, I think that's when my wife was unemployed at
23 the time, I believe.  Around that time.
24   Q.   I'll just go over a few more things and that

## Page 47

1  might be it.
2        MR. MILI:  That's it for me.  Your attorney
3  has the right to supplement the record if he wants to.
4  If not, we're done.
5        MR. BARTOSHESKY:  I have no questions.  We
6  will read.
7        (Deposition concluded at 1:55 p.m.)
8        - - - - -

## Page 48

TESTIMONY

DEPONENT: DeWAYNE WALKER, SR.        PAGE

BY MR. MILL.................................. 2

EXHIBITS

D. WALKER DEPOSITION EXHIBIT NO.        MARKED

1 - First Amended..............................2
2 - Plaintiffs' Initial Disclosures
Pursuant to Federal Rule of Civil
Procedure 26(a)(1)............................2
3 - Plaintiffs' Answers to Defendants'
Interrogatories................................2

4 - Document entitled, "Report For:  J&J
Worldwide Security Group".......................2
5 through 19* - Photographs.....................2

* Retained by Mr. Mili

## Page 49

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

B-66

Page 50

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

     I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 25th day of
January, 2007, the deponent herein, DeWAYNE WALKER, SR.,
who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.
     I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
     I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


     Kimberly A. Hurley
     Certification No. 126-RPR
     (Expires January 31, 2008)


DATED:

B-67

e1487c2b-777a-4939-93c3-648c0fece77d



## DELJIS Menu | Web Searches | Support/Help

# Detail Display: WALKER, DWAYNE

INCORRECT DA

If there is a mist
record, please c
Support

Additional Identification data for SBI Number: <u>00354596</u> - Sequence: 01

To continue with processing of the rap sheet, click on the SBI number.

Last Name: **WALKER**    First Name: **DWAYNE**    MI: **A**    Suffix:    Name Title:

Status data on file: **PAROLE**
                    **WARRANT** effective 08/31/2005

Sex: **MALE**    Race: **Black**    Height: **6'00**    Weight: **175lbs**    Marital Status: **Single**
Eye Color: **Brown**    Hair Color: **Black**    Skin Tone: **Fair**    Ethnic Origin: **Non-Hispanic**

Address: **703 W 5TH ST**    Development:
City: **WILMINGTON**    State: **Delaware**    Zip Code: **19802**    County: **Unknown**

Driver's License: **1344226**    State: **Delaware**    Expiration Year:

Employer: **UNEMPLOYED**    Occupation: **DETAIL CARS**
    County: **Unknown**

Telephones: Residence: **302-655-1751**    Work:

The current commitment status is **PAROLEE** in agency **P & P WILMINGTON**

Caution Information: -**KNOWN TO ABUSE DRUGS**

Religion: **NO PREFERENCE - NONE**    Place of Birth: **Delaware**    Hair Description:    Hand:
**R**
Possible Alien: **NO**    Foreign Born: **NO**    DNA Sample Available: **NO**
FBI Number: **200253KB8**    Fingerprint Class: **15131305COPO12TTPOCI**    On File: **YES**

Other Names Used:                Dates of Birth:            SSA Numbers:
**02-WALKER , DWAYNE**        **12/10/1982**            **221668366**

Nicknames:    Other SBI Number:    Family Court File:    Other ID Numbers:
              **T0979028**                              **WPD-69449**
              **T1251005**

SCARS, MARKS AND TATTOOS:

Scar--Left Eyebrow

B-68

| OTHER ADDRESSES ON FILE: |
| --- |

From:  to 07/31/2000 Status:  Type:
Address: **1324 W. 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19808**  County: **New Castle**

From:  to 07/31/2000 Status:  Type:
Address: **1324 W. 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19808**  County:

From:  to 07/31/2000 Status:  Type:
Address: **1324 W. 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19808**  County:

From:  to 07/31/2000 Status:  Type:
Address: **NCC DETENTION CENTER**  Development:
Address: **963 CENTRE ROAD**
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County:

From:  to 07/31/2000 Status:  Type:
Address: **1324 W. 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19808**  County:

From:  to 08/02/2000 Status:  Type:
Address: **1315 WEST 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19809**  County: **New Castle**

From:  to 08/02/2000 Status:  Type:
Address: **1315 WEST 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19809**  County:

From:  to 08/16/2000 Status:  Type:
Address: **1315 W. 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County: **New Castle**

From:  to 10/03/2000 Status:  Type:
Address: **1315 W 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County:

From:  to 02/05/2001 Status:  Type:
Address: **1106 WEST 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County:

From:  to 02/06/2001 Status:  Type:
Address: **1106 WEST 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County:

From:  to 02/20/2001 Status:  Type:
Address: **GANDER HILL**  Development:
Address: **PO BOX 9561**
City: **WILMINGTON**  State: **Delaware**  Zip Code: **1909**  County:

From:  to 05/03/2001 Status:  Type:
Address: **1106 W 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County: **New Castle**

B-69

From:  to 06/27/2001 Status:  Type:
Address: **1106 W 3RD ST**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County:

From:  to 06/27/2001 Status:  Type:
Address: **GANDER HILL PRISON**  Development:
Address: **PO BOX 9561**
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19809**  County:

From:  to 09/17/2001 Status:  Type:
Address: **1315 W 3RD ST**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19801**  County: **New Castle**

From:  to 09/17/2001 Status:  Type:
Address: **GANDER HILL PRISON**  Development:
Address: **POST OFFICE BOX 9561**
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19809**  County:

From:  to 09/18/2001 Status:  Type:
Address: **GANDER HILL PRISON**  Development:
Address: **POST OFFICE BOX 9561**
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19809**  County:

From:  to 09/26/2001 Status:  Type:
Address: **1315 W 3RD ST**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County: **New Castle**

From:  to 09/26/2001 Status:  Type:
Address: **1315 WEST 3RD STREET**  Development:
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19805**  County:

From:  to **CURRENT** Status:  Type:
Address:  Development:
City:  State:  Zip Code:  County:

---

**ASSOCIATED NAMES:**

ID Number:  Last: **HENRY**  First: **ANNETTE**  MI:  Suffix:
Address:
City:  State:  Zip Code:
Telephones: Residence:  Work:

ID Number:  Last: **MANESS**  First: **ROCHELLE**  MI:  Suffix:

Address: **1315 W 3RD STREET**           *1119 Lancaster Ave.*
City: **WILMINGTON**  State: **Delaware**  Zip Code: **19801**
Telephones: Residence: **302-658-2882** Work:

Copyright DELJIS (2005)

B-70

## CERTIFICATE OF SERVICE

I, Philip B. Bartoshesky, undersigned counsel of record, hereby certify that on July 12, 2007, I caused one copy of the attached Plaintiffs' Answering Brief in Opposition to Defendants' Opening Brief in Support of Their Motion for Summary Judgment and Plaintiffs' Appendix to Their Brief in Opposition to Defendants' Opening Brief in Support of Their Motion for Summary Judgment to be served on the following by hand delivery:

> Alex J. Mili, Jr., Esquire
> Senior Assistant City Solicitor
> City of Wilmington Law Department
> Louis L. Redding City/County Building
> 800 N. French Street, 9th Floor
> Wilmington, DE 19801
> Attorney for Defendants City of
> Wilmington and Detective Michael R. Lawson, Jr.

> /s/ Philip B. Bartoshesky (#2056)
> /s/ Victor F. Battaglia (#156)
> Philip B. Bartoshesky, Esquire
> Victor F. Battaglia
> 921 North Orange Street
> Post Office Box 1489
> Wilmington, Delaware 19899
> Attorney for Plaintiffs

Dated:  July 12, 2007