# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DeWAYNE WALKER, SR., KAREN WALKER, his wife, D.W., Jr., minor child, and T.W., minor child, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civ. No. 06-288-SLR |
| THE CITY OF WILMINGTON, a political subdivision of the State of Delaware, DETECTIVE MICHAEL R. LAWSON, JR., individually and in his official capacity, and UNKNOWN ENTITIES, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Victor F. Battaglia, Sr., Esquire, and Philip B. Bartoshesky, Esquire, of Biggs & Battaglia, Wilmington, Delaware. Counsel for Plaintiffs.

Andrea J. F. Rhen, Esquire, City of Wilmington Law Department, Wilmington, Delaware. Counsel for Defendant.

## MEMORANDUM OPINION

Dated: September 29, 2008
Wilmington, Delaware

*Jue + Robner*
**ROBINSON, District Judge**
## I. INTRODUCTION

Plaintiffs DeWayne Walker, Sr., and Karen Walker, along with their minor

children D.W. and T.W. ("plaintiffs"), filed this lawsuit against the City of Wilmington

("the City"), Detective Michael R. Lawson, Jr. ("Lawson"), and "unknown entities"

(collectively, "defendants") on May 2, 2006,[1] seeking relief under 42 U.S.C. § 1983 and

Delaware state law. (D.I. 4) Plaintiffs allege that defendants violated plaintiffs' Fourth

and Fourteenth Amendment rights, as well as committed false imprisonment and

battery, in connection with defendants procuring and executing a search warrant at

plaintiffs' residence. (*Id.*)

Pending before the court is defendants' motion for summary judgment on all

claims. The court has jurisdiction over the 42 U.S.C. § 1983 claims pursuant to 28

U.S.C. § 1331. Because the court, as explained hereafter, grants defendants' motion

for summary judgment on the § 1983 claims, the court declines to exercise

supplemental jurisdiction over plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3).

## II. BACKGROUND

Plaintiffs, all African-American, reside at 118 Dutton Drive,[2] New Castle,

Delaware, 19720. (D.I. 4) The City is a political subdivision of the State of Delaware

---

[1]Plaintiffs' initial complaint on May 2, 2006, set forth the full names of the Walkers' two minor children in violation of the court's administrative procedures governing filing and service by electronic means. On May 3, 2006, plaintiffs filed an amended complaint substituting the minor children's initials for their full names.

[2]In their amended complaint, plaintiffs aver that they reside at 118 Dutton Place. (D.I. 4, at ¶¶ 1-4) However, in an affidavit, plaintiff DeWayne Walker, Sr., avers that he has lived with his family at 118 Dutton Drive since 1996. (D.I. 51, at 31, ¶ 2) Defendants executed a search warrant at 118 Dutton Drive and found it to be plaintiffs' residence. (E.g., D.I. 47, 113-14) In short, the record contains ample independent evidence suggesting that 118 Dutton Drive, not 118 Dutton Place, is plaintiffs' address.

and maintains a police department. (Id.) The City employs Lawson as a detective in its police department. (Id.)

## A. Investigation of the Freeman Homicide

On September 13, 2005, at approximately 2:08 p.m., DeWayne Freeman was stabbed to death at Third and North Franklin Streets in Wilmington. (D.I. 46 at 1-2; 25) The City's police interviewed several witnesses. (Id. at 26-30) One witness told police that she heard a black female, Tranika, say, "My brother just stabbed Freeman, that's him lying on the ground." (Id. at 28) This witness knew Tranika to be the sister of Dwayne Walker ("suspect Walker") and positively identified suspect Walker in a photographic lineup. (Id.) Another witness, who had seen the homicide, also positively identified Walker in a photographic lineup and told police that suspect Walker, wearing a black shirt, blue jean shorts, tan boots, and a black and green Boston Celtics baseball cap, stabbed Freeman in the chest with a pocket knife. (Id. at 27) Based on this information, Lawson, the chief investigator on the case (D.I. 47 at 122), that same day obtained an arrest warrant for suspect Walker for murder in the first degree and possession of a deadly weapon during the commission of a felony. (D.I. 46 at 33)

## B. The Search for Suspect Walker

Later on September 13, 2005, Lawson retrieved suspect Walker's criminal record from the Delaware criminal justice information system ("DELJIS").[3] (D.I. 47 at 146) The criminal record identified suspect Walker as "Dwayne A. Walker," a black male, six feet tall, weighing 175 pounds, born on December 10, 1982, with an address

---

[3]DELJIS is the criminal justice information database created pursuant to 11 Del. C. §§ 8601-8610.

2

of 703 West Fifth Street in Wilmington.[4] (D.I. 46 at 52) A police officer went to the 703 West Fifth Street address but found that suspect Walker did not reside there. (D.I. 47 at 126)

On September 14, 2005, a confidential informant ("CI") contacted Lawson's colleague, Detective Jeffrey Silvers ("Silvers"), with information regarding the Freeman homicide. (*Id.* at 132-33, 186; D.I. 46 at 50, ¶ 8) Silvers had received information from this particular CI before and found him to be reliable.[5] (D.I. 47 at 180-84) The CI told Silvers that suspect Walker was staying with the CI's sister-in-law. (*Id.* at 208) The CI took Silvers to the sister-in-law's residence, (*id.*), but the police did not find suspect Walker there.

Later that same day, the CI again contacted Silvers and told him that, if suspect Walker was not at the CI's sister-in-law's residence, he was most likely at his mother's house in Wilton. (*Id.* at 209-10) The CI said that suspect Walker had a habit of going to his mother when he was "in trouble" and would likely go to her in this situation to get money to flee. (*Id.* at 216, 224) Silvers asked the CI for the mother's address, but the

---

[4]The record also showed previous addresses and associated names, including the names Annette Henry and Rochelle Maness. (D.I. 51 at 68-70) Annette Henry is suspect Walker's mother. (D.I. 47 at 148) However, his criminal record did not provide that information (D.I. 51 at 70), and the police did not learn of her relationship to suspect Walker or her contact information until after his arrest on September 15, 2005. (D.I. 47 at 131-32, 148) Lawson attempted several times to contact Annette Henry but never succeeded. (*Id.* at 131) Rochelle Maness is suspect Walker's ex-girlfriend and the mother of his five-year old child. (D.I. 46 at 29) Lawson interviewed her on September 15, 2005. (*Id.*)

[5]At the time of the Freeman homicide investigation, Silvers had known the CI for nearly five years and worked with him at least "twenty to twenty-five" times. (D.I. 47 at 181, 183) In each of these instances, Silvers found the CI's information to be accurate. (*Id.* at 184)

3

CI could not provide it. (*Id.* at 220)  The CI could say only that suspect Walker's mother lived in the Wilton area.[6]  (*Id.* at 220-21)

Silvers searched DELJIS for a "Dwayne Walker" with a Wilton area address. (*Id.* at 186-87)  The search yielded a report concerning a 2003 theft of a bicycle from Wilton Park in New Castle. (D.I. 46 at 45)  The report identifies "Walker Karen Alicia" as the victim and "Walker Dwayne NMN, J" as a witness. (*Id.*)  The report lists these persons' address as 118 Dutton Court, New Castle, Delaware 19720. (*Id.*)  Silvers plotted the address on a map and determined it to be in the Wilton area.[7]  (*Id.* at 46; D.I. 47 at 188)  Silvers relayed this information to Lawson. (D.I. 47 at 185-90)

Noting from the 2003 report that "Walker Dwayne NMN, J" had the same first and last name as suspect Walker, and noting that "Walker Karen Alicia" and "Walker Dwayne NMN, J" shared the same surname and address, Lawson searched DELJIS for "Karen Walker," thinking that she may have been suspect Walker's mother. (*Id.* at 139-

---

[6]The CI testified that he also told Silvers that suspect Walker's mother drove a maroon Nissan Maxima. (D.I. 47 at 213)  The CI continued, however, that suspect Walker's family "had a couple dollars, so they could have been driving just about anything. . . . So, it's possible that they could have not only been driving a Lexus; they could have been driving a Jaguar." (*Id.* at 222)  The CI testified further: "Yes, I did [tell Silvers that I have seen Walker's mother drive a Nissan Maxima], but then he asked me were there any other vehicles.  I told him it could have been anything because, like I said, they had a little bit of money at the time." (*Id.* at 223)  Silvers vaguely recalls the CI telling him that suspect Walker's family had "a Lexus, black or dark blue, and a van." (*Id.* at 186)  Lawson, for his part, recalls Silver telling him that, per the CI, suspect Walker's mother had a "dark Lexus." (*Id.* at 150, 186)  In any event, defendants did not rely on the presence of a dark-colored Lexus at 118 Dutton Drive in obtaining the search warrant. (D.I. 46 at 50-51)

[7]Plaintiff Karen Walker testified that 118 Dutton Drive is "near the Wilton, but it's not in the development called Wilton." (D.I. 51 at 46)  She estimated that 118 Dutton Drive is "half a mile" from Wilton. (*Id.*)

4

40, 149) That search yielded a report for Karen A. Walker residing at 118 Dutton Drive, Eagle Glen, New Castle, Delaware 19720.[8] (D.I. 46 at 47) A subsequent DELJIS search yielded a report showing a "DeWayne Walker, Sr." at the same 118 Dutton Drive address. (*Id.* at 49) Lawson also called Conectiv, the power company ("Conectiv"), and received confirmation over the phone that "Dwayne Walker" resided at 118 Dutton Drive. (D.I. 47 at 144)

Lawson had the vice squad surveil 118 Dutton Drive. (*Id.* at 149-154) Over "roughly maybe two or three hours" (*id.* at 150), the vice squad observed a black female and a black teenaged male exit the residence and drive toward Chester, Pennsylvania in a dark-colored Lexus. (*Id.* at 151, 157) The vice squad also observed possible evidence of a small female child. (*Id.* at 152) The vice squad did not observe suspect Walker at 118 Dutton Drive. (*Id.* at 153)

## C. The Search Warrant for 118 Dutton Drive

Lawson applied for a warrant to search 118 Dutton Drive for evidence related to the Freeman homicide.[9] (*Id.* at 37) In a probable cause affidavit attached to the application, Lawson stated that he had received information from "a past proven reliable informant" that suspect Walker was "currently hiding at his mother's house in New Castle and [was] making plans to flee Delaware." (*Id.* at 50, ¶ 8) Lawson further stated

---

[8]118 Dutton Drive is in the City of New Castle, Delaware, and is normally under the jurisdiction of the New Castle County Police. (D.I. 47 at 119)

[9]The application sought permission to search the address for "any weapons to include a pocket type folding knife" and "clothing consisting of a black shirt, blue jean shorts, black Boston Celtics baseball hat and any clothing with blood transfer." (D.I. 46 at 37)

5

that, "according to DELJIS Drecords [sic], a Dwayne Walker DOB 12-10-82 with a

previous reported incident at 118 Dutton Drive in New Castle." (*Id.* at 51, ¶ 9) Finally,

he stated that "current records with Conectiv Power Company of Delaware show 118

Dutton Drive, New Castle registered to Dwayne Walker. A check on DELJIS currently

shows Dwayne Walker Sr. with a current address of 118 Dutton Drive in New Castle."

(*Id.* at 51, ¶ 10) The magistrate authorized a daytime search warrant[10] for 118 Dutton

Drive. (*Id.* at 36)

## D. Execution of the Search Warrant at 118 Dutton Drive

On September 15, 2005, at approximately 6:05 a.m., the City's police executed

the search warrant at 118 Dutton Drive. (D.I. 4 at ¶ 8) The police deployed twenty

members of the SWAT team to 118 Dutton Drive, including three K-9 officers. (D.I. 46

at 70-71) Armed and wearing clothing identifying themselves as the City's police SWAT

team, fifteen members of the SWAT team entered the residence through the front door

without knocking or announcing their identity or purpose.[11] (D.I. 4 at ¶ 9; D.I. 47 at 167-

68; D.I. 51 at 44, 57, 70-71) Once inside, the SWAT team, with weapons drawn,

ordered plaintiff Karen Walker to kneel on the floor with plaintiff T.W., ordered plaintiff

D.W. to get out of bed and get dressed, and handcuffed plaintiff DeWayne Walker, Sr.,

and forced him to his knees. (D.I. 51 at 44, 56-58)

---

[10]"Daytime" search warrants may be executed only between 6:00 a.m. and 10:00
p.m. *See* 11 Del. C. § 2308.

[11]As discussed infra at section IV.a.2.iii., plaintiffs testified that they never heard
the SWAT team knock on the front door or announce their identity or purpose. (D.I. 51
at 44, 57). Neither the SWAT team's reports nor Lawson's testimony indicate
otherwise. (D.I. 46 at 71; D.I. 47 at 159)

Once the SWAT team had secured the premises, Lawson entered and found plaintiff DeWayne Walker, Sr., detained in the basement. (*Id.* at 57) Lawson immediately observed that plaintiff DeWayne Walker, Sr., was not the suspect Walker. (D.I. 47 at 113, 155-56) Lawson showed suspect Walker's picture to plaintiff DeWayne Walker, Sr., and asked whether he knew suspect Walker or was related to him or whether he had stayed at the residence. (D.I. 51 at 57; D.I. 47 at 113-14) Plaintiff DeWayne Walker, Sr., answered those questions in the negative. (*Id.*) After confirming that there were no outstanding warrants for plaintiff DeWayne Walker, Sr., the police removed the handcuffs from plaintiff DeWayne Walker, Sr. (D.I. 47 at 114)

The police then gathered plaintiffs in the family room, and Lawson explained to plaintiffs that the search was a matter of mistaken identity. (D.I. 47 at 114, 155-56; D.I. 51 at 45-46) Lawson apologized to plaintiffs and gave them his business card. (D.I. 47 at 114) He asked the plaintiffs to contact him if they discovered any damage to the residence from the SWAT team executing the search warrant.[12] (*Id.* at 114-15) The police then left. The police were at the residence no more than thirty minutes. (D.I. 51 at 64)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

[12]Plaintiffs state that their residence sustained damage from the SWAT team executing the search warrant. (D.I. 51 at 60-61) Plaintiffs did not, however, contact Lawson or anyone else at the police department about repairs or reimbursement for repairs. (*Id.* at 61-62)

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

To survive summary judgment on their § 1983 claims, plaintiffs must show a genuine issue of material fact that defendants violated plaintiffs' federal rights. *See*

8

*Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996); *Groman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995). Plaintiffs argue that defendants' procurement and execution of a search warrant at 118 Dutton Drive violated plaintiffs' rights under the Fourth and Fourteenth Amendments. The court addresses those arguments. The court confines its discussion to the § 1983 claims because resolving those claims in defendants' favor, which the court does here, disposes of all claims over which the court has original jurisdiction. The court, therefore, declines to exercise supplemental jurisdiction over plaintiffs' state law claims, *see* 28 U.S.C. § 1367(c)(3), and need not discuss them.

## A. Section 1983 Fourth Amendment Claims

Plaintiffs argue that the search warrant was procured and executed in violation of the Fourth Amendment. The Fourth Amendment normally requires the police to obtain a search warrant, supported by probable cause, before they may search a person's property. *United States v. Burton*, 288 F.3d 91, 102 (3d Cir. 2002). Plaintiffs do not dispute that defendants entered 118 Dutton Drive pursuant to a search warrant, but they do dispute the validity of that search warrant. Plaintiffs argue that the search warrant was invalid because it was based on a false affidavit of probable cause from Lawson. Were it to be rewritten to remove the false statements and add omitted material facts, plaintiffs argue, the affidavit would not support a finding of probable cause.

Plaintiffs also argue that the manner in which the search warrant was served violated the Fourth Amendment. Specifically, they argue that defendants used

9

excessive force in executing the search warrant and seizing plaintiffs during the search;

that defendants had no jurisdiction to execute the search warrant outside of

Wilmington; that defendants violated the "knock and announce" rule; and that

defendants executed the search warrant, which was a daytime search warrant, earlier

than 6:00 a.m.

## 1. Validity of the search warrant

To successfully challenge the search warrant's validity on false affidavit grounds,

plaintiffs "must satisfy the two-part test developed by the Supreme Court in *Franks v.*

*Delaware*, 438 U.S. 154, 155-56 (1978)." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d

Cir. 1997). To wit,

> plaintiff[s] must prove, by a preponderance of the evidence, (1) that the
> affiant knowingly and deliberately, or with a reckless disregard for the
> truth, made false statements or omissions that create a falsehood in
> applying for a warrant; and (2) that such statements or omissions are
> material, or necessary, to the finding of probable cause.

*Id.* (citing *Franks*, 438 U.S. at 171-72).

The Fourth Amendment does not require that all statements in the probable

cause affidavit be correct, "for probable cause may be founded upon hearsay and upon

information from informants, as well as upon information within the affiant's own

knowledge that sometimes must be gathered hastily." *Franks*, 438 U.S. at 165. Rather,

the Fourth Amendment requires that the affiant "believe[ ] or appropriately accept [the

information in the affidavit] as true." *Id.* Thus, an officer only recklessly disregards the

truth in applying for a warrant where he or she "ha[s] obvious reasons to doubt the truth

of what he or she is asserting" or "omits facts that any reasonable person would want to

10

know[.]" *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).

If a court finds that an affiant's statement is a falsehood, the court "must excise the false statement from the affidavit." *Sherwood*, 113 F.3d at 400. Similarly, if a court finds that an affiant's omission creates a falsehood, the court must supply "the omitted information to the original affidavit." *Id.* The court then analyzes whether the excised or added "information materially affect[s] the existence of probable cause." *Id.* at 402. If the modified affidavit shows that, "based on a totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place[,]'" the affidavit supports a finding of probable cause and the warrant is valid. *Id.* at 401 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Plaintiffs recite several inaccuracies and omissions in Lawson's probable cause affidavit. They will be addressed *seriatum*.

Plaintiffs first contend that the second sentence of paragraph 8 is inaccurate because the CI did not state that suspect Walker was "currently hiding at his mother's house" or "making plans to flee Delaware." The record demonstrates, however, that Lawson did not know to be false, or have obvious reason to doubt, that the CI had told Silvers that suspect Walker was at his mother's house in New Castle making plans to flee Delaware.[13] Silvers was trustworthy as a fellow police officer, and the CI had worked with Silvers at least 20 times over a five-year period and proven reliable in each instance. (D.I. 47 at 159, 181-84)

Plaintiffs next contend that paragraph 9 contains numerous inaccuracies in terms

---

[13]Contrary to plaintiffs' assertion, the second sentence of paragraph 8 is an accurate paraphrase of what Silvers told Lawson the CI had said. (D.I. 47 at 134, 224)

11

of identifying 118 Dutton Drive as suspect Walker's location. In making his DELJIS

search, Lawson obtained several leads on suspect Walker. One lead was to a "Walker

Dwayne NMN J," identified as a witness to a 2003 larceny occurring at Appleby Road in

Wilton Park, New Castle; he was reported as living with a second witness, "Walker

Karen A," at 118 Dutton Court in New Castle. Upon further investigation, "Walker

Karen A" was identified in DELJIS as living at 118 Dutton Drive in New Castle. Yet

another DELJIS report identified a "DeWayne Walker, Sr.," as living at 118 Dutton

Drive, New Castle. Also in the mix of information available to Lawson was that from

suspect Walker's criminal record retrieved from DELJIS, which identified his full name

as "Dwayne A. Walker" with a birth date of December 10, 1982.

Ultimately, Lawson identified "Dwayne Walker DOB 12-10-82 with a previous

reported incident at 118 Dutton Drive." This sentence is poorly written and susceptible

of at least two interpretations. It can be read to mean, as plaintiffs argue, that Lawson

meant to imply that the 2003 larceny occurred at 118 Dutton Drive. Alternatively, the

language can be read to mean simply that the DELJIS records had identified, through

the report of a previous incident, a "Dwayne Walker" "at 118 Dutton Drive in New

Castle." The court, therefore, does not find this language to be so clear as to be a

falsehood.[14] Lawson also reported that the "Walker Dwayne NMN J" living at 118

Dutton Drive had a birth date of December 10, 1982; the court agrees that no DELJIS

record links that birth date to this name and, therefore, Lawson had reason to doubt the

---

[14]Plaintiffs contend that suspect Walker was incarcerated at the time of the 2003
larceny, making it impossible for him to have been witness to said incident. The record
contains insufficient information for the court to review this contention with any level of
confidence and, therefore, the court does not include it in its analysis.

accuracy of this statement. Finally, the fact that suspect Walker's name was "Dwayne A. Walker," while the Dwayne Walker living at 118 Dutton Drive had no middle name, gave Lawson reason to doubt the accuracy of this statement. Notwithstanding the above, the DELJIS records, when viewed together and given the degree of similarity between the names,[15] gave Lawson no obvious reason to doubt that a "Dwayne Walker" lived at 118 Dutton Drive in New Castle.

With respect to paragraph 10, plaintiffs contend that Conectiv and DELJIS records show that "DeWayne Walker, Sr.," not "Dwayne A. Walker," resides at 118 Dutton Drive. Given the immediacy of the investigation, Lawson confirmed the Conectiv records over the telephone and, therefore, did not have the opportunity to visually check the correct spelling of the customer's name. Once again, given the similarities between the names "DeWayne" and "Dwayne," and the fact that a "Dwayne" Walker was reported as living at 118 Dutton Drive, the court concludes that Lawson had no obvious reason to doubt that the Conectiv records confirmed that suspect Walker could be located at 118 Dutton Drive, New Castle.

Plaintiffs cite to various omissions concerning suspect Walker's mother. More specifically, Lawson did not include in his affidavit the fact that Silvers was not sure whether suspect Walker's mother shared his last name[16] or mentioned the

---

[15]The court takes judicial notice of the fact that records, both official and business-related, are full of honest mistakes, particularly when it comes to the correct spelling of a person's name. DELJIS is not exempt from this reality.

[16]The CI testified that he knew her last name was "Walker," while Silvers testified that he did not know her last name, a fact he passed along to Lawson. (D.I. 47 at 148, 191, 221)

13

discrepancies between the CI's description of the car driven by suspect Walker's mother[17] and the car observed through police surveillance at 118 Dutton Drive.[18] In the first instance, having found that the DELJIS records provided a sufficient basis for Lawson to believe that suspect Walker could be located at 118 Dutton Drive, the fact that a "Karen Walker" also was associated with that address lends more credence, not less credence, to the reasonableness of Lawson's affidavit vis a vis suspect Walker's mother. Therefore, an unsubstantiated statement from Silvers regarding the last name of suspect Walker's mother is not a "**fact** that any reasonable person would want to know" in determining probable cause. With respect to the omission from the affidavit of the CI's information regarding the car, the only information Lawson had regarding the car was from Silvers, who informed Lawson that the suspect's mother drove a dark-colored Lexus and a van. Lawson, therefore, did not intentionally omit from the affidavit the CI's contrary representation or the fact that the surveillance team did not observe a Nissan Maxima. Because Lawson did not have the CI's information in the first instance, he did not intentionally omit such information and, thereby, create a "falsehood."

The court agrees with plaintiffs that the fact that the surveillance team did not observe Walker (or signs of him) at 118 Dutton Drive is a "fact that any reasonable person would want to know" in determining whether it is probable that a search of 118 Dutton Drive would uncover evidence of suspect Walker's crime. Therefore, that omission is material.

---

[17]A Nissan Maxima.

[18]A dark-colored Lexus.

14

When the affidavit is modified to reflect the inaccuracies and omissions, it reads

as follows:

> 9. Your affiant can truly state that according to DELJIS records, a Dwayne Walker, Jr., resides at 118 Dutton Drive in New Castle.
>
> 10. Your affiant can truly state current records with Conectiv Power Company of Delaware show 118 Dutton Drive, New Castle registered to Dwayne Walker. A check on DELJIS currently shows DeWayne Walker, Sr., with a current address of 118 Dutton Drive. Three hours of surveillance at 118 Dutton Drive on 9/14/05 did not reveal suspect Dwayne Walker's presence.

The material information in paragraph 9 is that DELJIS records identified a person with

the same first and last name as suspect Walker residing at 118 Dutton Drive in New

Castle. Likewise, the material information in paragraph 10 is that utility and DELJIS

records confirmed a "Dwayne Walker" or "DeWayne Walker, Sr.," residing at 118

Dutton Drive in New Castle. Because suspect Walker's name is very similar to the

names of the record residents of 118 Dutton Drive in New Castle, it was fairly probable

that 118 Dutton Drive in New Castle was the address of suspect Walker's mother's

house in New Castle, which was where the past proven reliable informant said suspect

Walker was hiding.

The police did not observe evidence of suspect Walker at 118 Dutton Drive,

which mitigates somewhat against a finding of probable cause. However, the

surveillance lasted only a few hours. Also, the police conducted the surveillance fewer

than 48 hours after the homicide, at a time when suspect Walker would likely be

scrupulously avoiding detection.

Based on the information in the affidavit and considering the totality of the

circumstances, the court finds there was a fair probability that evidence of suspect

15

Walker's crime would be found at 118 Dutton Drive. Accordingly, the court holds that the search warrant was supported by probable cause and not procured in violation of plaintiffs' Fourth Amendment rights.

### 2. Execution of the search warrant

#### i. Excessive force

Plaintiffs argue that defendants' use of an armed 20-member SWAT team, including three K9 officers, and a battering ram in executing the search warrant and seizing plaintiffs was unreasonable in violation of the Fourth Amendment. Courts examine reasonableness "at the moment," or "from the perspective of a reasonable officer **on the scene**, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (emphasis added). "The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises." *Id.* (internal citations omitted). "[T]he question is whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them[.]" *Id.* at 397 (internal quotations omitted). "Factors to consider include the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999) (quoting *Graham*, 490 U.S. at 396).

Based on the record, the court holds that defendants' use of force was objectively reasonable under the circumstances. The employment of a 20-member

16

SWAT team was objectively reasonable because, as the police had learned from surveillance, 118 Dutton Drive had multiple floors to cover and multiple occupants to detain. (D.I. 51 at 56) Using K9 officers was objectively reasonable because police believed suspect Walker to be preparing to flee. (D.I. 46 at 169) Using weapons was objectively reasonable because suspect Walker was wanted for murder, had a criminal history, and was believed to be armed with at least a knife; police did not know whether the other occupants had weapons.[19]

The manner in which the police seized plaintiffs was objectively reasonable. The record shows that plaintiffs Karen Walker, T.W., and D.W. were ordered to remain in place, but none was handcuffed or otherwise physically restrained. Plaintiff DeWayne Walker, Sr., was handcuffed and forced to his knees but, as soon as Lawson confirmed that plaintiff DeWayne Walker, Sr., was not suspect Walker, had no information about suspect Walker, and was not himself wanted, the handcuffs were removed and he was allowed to stand. Plaintiffs were then gathered to the family room for Lawson to explain the situation. The seizure lasted no more than thirty minutes.

No reasonable jury could find from this record that, in light of the facts and circumstances, the police's use of force here was excessive. Accordingly, the court holds that defendants' use of force was not unreasonable in violation of the Fourth Amendment.

### ii. Jurisdiction to execute the search warrant

Plaintiffs argue that defendants' executing the search warrant outside the City's

---

[19]The use of a battering ram to effect a "no-knock" entry will be addressed infra.

jurisdiction renders their search unreasonable in violation of the Fourth Amendment. However, "[t]he Fourth Amendment is satisfied where . . . officers obtain a warrant, grounded in probable cause and phrased with sufficient particularity, from a magistrate of the relevant jurisdiction authorizing them to search a particular location, **even if those officers are acting outside their jurisdiction as defined by state law**." *United States v. Green*, 178 F.3d 1099, 1106 (10th Cir. 1999) (emphasis added).

Here, the search warrant was supported by probable cause and, as the record reflects, particular in identifying the location and the scope of the search. Furthermore, the search warrant issued "from a magistrate of the relevant jurisdiction," because Delaware's justice of the peace courts may issue warrants statewide. *Stroik v. State*, 671 A.2d 1335, 1338 (Del. 1996) (explaining that 11 Del. C. § 2304 provides that justices of the peace may issue warrants within their territorial jurisdictions and that 11 Del. C. § 2701 provides that justice of the peace jurisdiction is statewide for purposes of issuing warrants). Accordingly, even if defendants were acting outside their jurisdiction in executing the search warrant, which the court does not here decide, it would not render the search unreasonable in violation of the Fourth Amendment.

### iii. The "knock and announce" rule

Plaintiffs allege that the SWAT team failed to knock on the front door and announce their identity and purpose before entering the residence. Drawing all inferences in plaintiffs' favor, the court accepts plaintiffs' allegation as true. Plaintiffs DeWayne Walker, Sr., and Karen Walker testified that they did not hear the SWAT team knock or announce, and neither Lawson nor the SWAT team contradicts plaintiffs'

testimony. Plaintiffs argue that this failure violates the "knock and announce" rule and renders the search unreasonable in violation of the Fourth Amendment.

"[T]he method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search and seizure." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). Pursuant to the "knock and announce" rule generally, "police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997). However, not "every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *Arkansas*, 514 U.S. at 934.

Thus, it may be reasonable under the Fourth Amendment for police officers to "dispens[e] with the knock-and-announce requirement." *Kornegay v. Cottingham*, 120 F.3d 392, 397 (3d Cir. 1997). Courts have upheld "no-knock" entries in at least four situations: "(1) the individual inside was aware of the officers' identity and thus announcement would have been a useless gesture; (2) announcement might lead to the sought individual's escape; (3) announcement might place the officers in physical peril; and (4) announcement might lead to the destruction of evidence." *Id.* If police officers have reasonable suspicion that any of these situations exists, a "no-knock" entry is reasonable. *See Richards*, 520 U.S. at 394.

The court finds that the SWAT team had reason to suspect that knocking and announcing at 118 Dutton Drive might lead to suspect Walker's escape. The police had

19

information from the CI that suspect Walker intended to flee Delaware. Also, although

the police had conducted surveillance of the house, and had officers and dogs

positioned outside (D.I. 51 at 29-30), the record does not show that the police knew and

had covered all avenues of escape from 118 Dutton Drive. Thus, it was reasonable for

the officers to suspect that knocking and announcing might lead to suspect Walker's

escape.

Consistent with this finding, the court holds that the SWAT team's "no-knock"

entry was reasonable under the Fourth Amendment.[20]

### iv. Time of search warrant execution

The time at which the police executed the search warrant is a material fact.

Unless the police had "reason for apprehension that the evidence within the house

_____

[20]Even if the court were to find that a reasonable jury could conclude from this record that the "no-knock" entry was unreasonable in violation of the Fourth Amendment, summary judgment of the § 1983 Fourth Amendment claim in favor of the named defendants would still be appropriate. As the record reflects, the City's SWAT team, not Lawson, effected the "no-knock" entry. (D.I. 47 at 118-20) Neither did Lawson order the SWAT team to do so. (*Id.*) He, then, would be neither directly nor vicariously liable for any violation of the Fourth Amendment stemming from the SWAT team's "no-knock" entry.

Nor would the City be liable. Municipal liability under § 1983 may not be based on a *respondeat superior* theory. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). Thus, the SWAT team's "no-knock" entry may not be imputed to the City. The SWAT team's "no-knock" entry could support municipal liability for the City if plaintiffs could show that the unreasonable "no-knock" entry was the result of the City's policy or failure to train. *See* infra Section IV.C. The record here, however, does not contain evidence of constitutionally-suspect "no-knock" policies or training.

Plaintiffs, then, would be left with a question for a jury regarding the reasonableness of the "no-knock" entry but no named defendant from which they could obtain relief if they prevailed at trial; as discussed infra, the case could not proceed solely against unnamed defendants. Thus, even if the court were to find differently with respect to the "no-knock" entry, the case's outcome would be the same.

would be removed, hidden or destroyed before morning[,]" executing the daytime search warrant earlier than 6:00 a.m. would render the search "constitutionally invalid." *United States ex rel. Boyance v. Myers*, 398 F.2d 896, 899 (3d Cir. 1968). Conversely, executing the daytime search warrant at 6:00 a.m. or later would not.

Plaintiffs aver in their amended complaint that the SWAT team entered the residence at approximately 6:05 a.m. However, plaintiffs Karen Walker and D.W. later testified that the SWAT team entered the residence earlier than 6:00 a.m. (D.I. 47 at 231; D.I. 51 at 44) Lawson testified that the SWAT team entered the residence "[a]round 6[:00 a.m.]" (D.I. 47 at 159)

Plaintiffs' contradictory sworn statements as to the entry time implicate, by analogy, the sham affidavit doctrine. Under the sham affidavit doctrine, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)). "When a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 254 (3d Cir. 2007) (citing *Hackman*, 932 F.2d at 241).

Applying the foregoing principles here, the court disregards plaintiffs' later-proffered deposition testimony that the entry occurred earlier than 6:00 a.m. The court so holds because plaintiffs have not satisfactorily explained the contradiction between

those sworn statements and their earlier sworn statement in the amended complaint that the entry occurred at approximately 6:05 a.m. *See Hackman*, 932 F.2d at 241. Plaintiffs had the opportunity to explain the contradiction during their depositions but failed to do so. Plaintiff Karen Walker testified that the statement in the amended complaint came from her husband and was not "accurate," (D.I. 51 at 44), but the court finds no "*independent* evidence in the record" to support that assertion. *See Baer*, 392 F.3d at 625-26 (emphasis added). Where plaintiffs "advance[ ] only the argument that [they] made a mistake[,]" it is appropriate for the court to disregard the later contradictory statement. *See id.* at 625.

Accordingly, the court holds that plaintiffs' deposition testimony as to the entry time does not create a genuine issue of material fact and so is not an impediment to a grant of summary judgment. Finding that the SWAT team entered the residence later than 6:00 a.m., the court holds that the time at which the SWAT team executed the search warrant did not violate plaintiffs' Fourth Amendment rights.

## B. Section 1983 Fourteenth Amendment Claims

Plaintiffs argue that defendants' actions in connection with the search violated the equal protection clause of the Fourteenth Amendment. "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by other individuals similarly situated." *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992) (quoting *Andrews v. Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (internal quotation and punctuation marks omitted)); *see also Harrison v. Christopher*, 489 F. Supp. 2d. 375, 380 (D. Del. 2007).

22

Plaintiffs claim that defendants searched their residence primarily because they are African-American, but the record does not support this conclusion. The record shows that police had multiple reasons to believe that suspect Walker and evidence of his crime could be found at 118 Dutton Drive, of which plaintiffs' race was only one. According to DELJIS records, suspect Walker had the same last name as all known residents of 118 Dutton Drive and had the same first name, or a very similar one, as plaintiffs DeWayne Walker, Sr., and D.W. Further, Silvers had mapped 118 Dutton Drive as being in the Wilton area in New Castle, which is where the past proven reliable CI had said suspect Walker could likely be found. Lawson considered plaintiffs' race only insofar as it made it more probable that there was a familial relation between suspect Walker and plaintiffs (D.I. 47 at 164) which, in turn, would have made it more probable that suspect Walker's mother's house was in fact 118 Dutton Drive.

No reasonable jury could conclude on this record that defendants purposefully discriminated against plaintiffs on the basis of race. Nor have plaintiffs pointed in the record to similarly situated persons who were treated differently. Accordingly, the court holds that defendants did not violate plaintiffs' Fourteenth Amendment rights.

## C. The City's Section 1983 Liability

As plaintiffs note, a municipality may be liable under § 1983 where implementation or execution of the municipality's policies or customs or a failure to train employees results in a violation of constitutional rights. *See Monell*, 436 U.S. at 690; *City of Canton v. Harris*, 489 U.S. 378, 380 (1989). Here, however, the court holds that there has been no violation of constitutional rights. Thus, there is nothing for which the City might be liable. Summary judgment of the § 1983 claims in the City's favor, then,

is appropriate.

## D. Claims Against "Unknown Entities"

Plaintiffs' complaint named "unknown entities" as defendants. Plaintiffs failed to amend their complaint to specify these defendants, even after discovery had afforded them an opportunity to learn these unnamed defendants' identities. Neither does the record show that plaintiffs served any additional entities with process. Thus, it is appropriate at this stage to dismiss "unknown entities" from the suit. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007) (dismissing § 1983 claim against unnamed defendant at summary judgment stage where plaintiff had failed, even after discovery, to amend his complaint to identify the unnamed defendant).

Morever, "[a]n action cannot proceed solely against unnamed parties." *Hindes v. F.D.I.C.*, 137 F.3d 148, 159 (3d Cir. 1998). The court has here determined to grant summary judgment of the § 1983 claims in favor of the City and Lawson; plaintiffs' claims against unknown persons are dismissed without prejudice. *See Scheetz v. Morning Call, Inc.*, 747 F. Supp. 1515, 1535 n.32 (E.D. Pa. 1990) (claims may be later raised if unnamed party is later identified).

## V. CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment (D.I. 48) is granted with respect to the § 1983 claims. All other claims are dismissed. An appropriate order shall issue.

24